# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**Cornell F. Daye,**
**Petitioner Below, Petitioner**

**FILED**

April 4, 2014
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)  No. 13-0913** (Raleigh County 04-C-531)

**Marvin Plumley, Warden, Huttonsville**
**Correctional Center, Respondent Below,**
**Respondent**

## MEMORANDUM DECISION

Petitioner Cornell F. Daye, appearing *pro se*, appeals the order of the Circuit Court of Raleigh County, entered August 23, 2013, that denied his petition for a writ of habeas corpus following an omnibus hearing. Respondent warden, by counsel Julie A. Warren, filed a response. Petitioner filed a reply.[1]

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner was twice convicted of possession of crack cocaine with intent to deliver in this State and convicted for possession of a controlled substance with intent to deliver in the State of Florida. In *State ex rel. Daye v. McBride*, 222 W.Va. 17, 658 S.E.2d 547 (2007), petitioner challenged the imposition of a life sentence pursuant to the recidivist statute, West Virginia Code §§ 61-11-18 and -19. This Court held in *Daye* that the imposition of a life sentence was mandatory and remanded the case for development of outstanding habeas corpus issues. 222 W.Va. at 24, 658 S.E.2d at 554.

Pursuant to this Court's remand order, petitioner was appointed counsel. After experiencing disagreements with his attorneys, petitioner moved to proceed *pro se*, which motion was granted. Petitioner was also provided with discovery; however, respondent warden subsequently moved to terminate discovery. *See* Rule 7(a), W.V.R. Governing Post-Conviction Habeas Corpus Proceedings (a petitioner may engage in discovery "if, and to

---

[1] Petitioner also moved to strike respondent warden's brief alleging that it had been untimely filed. This Court finds that respondent warden timely filed his brief and, therefore, denies the motion to strike.

1

the extent that, the court in the exercise of its discretion, and for good cause shown, grants leave to do so."). The circuit court granted the motion to terminate discovery and also later resolved petitioner's outstanding discovery and subpoena requests in its final order.

Petitioner was given an omnibus hearing on May 9, 2012, and April 11, 2013. On August 23, 2013, the circuit court denied the petition in an exhaustive 116-page order that addressed petitioner's numerous grounds for relief.

Petitioner appeals the circuit court's August 23, 2013, order that denied habeas relief. We review a circuit court's denial of a habeas petition under an abuse of discretion standard. *See* Syl. Pt. 1, in part, *Mathena v. Haines,* 219 W.Va. 417, 633 S.E.2d 771 (2006).

On appeal, petitioner raises eight claims that were rejected by the circuit court in its order: (1) that the circuit court erred in refusing petitioner's subpoena requests and in not ruling on discovery issues prior to the omnibus hearing; (2) that *Brady v. Maryland,* 373 U.S. 83 (1963), was violated; (3) that the imposition of a life sentence pursuant to the recidivist statute was unconstitutional; (4) that the State was impermissibly allowed to present the name and nature of petitioner's prior offenses despite his offer to stipulate to the previous offenses; (5) that a jury instruction on intent was unconstitutional; (6) that the State violated a plea agreement when sentences were not run concurrently; (7) that petitioner did not waive his right to be indicted; and (8) that an adequate factual basis did not exist for petitioner's plea. Respondent warden argues that petitioner has failed to show that the circuit court erred in denying his petition.

After careful consideration of the parties' arguments, this Court concludes that the circuit court did not abuse its discretion in denying the petition. Having reviewed the circuit court's "Order Denying Petition for Omnibus Writ of Habeas Corpus and Resolving Other Matters Raised in Case Nos. 97-F-16-H, 99-IF-69-K, 00-F-36-K, & 01-IF-158," entered August 23, 2013, we hereby adopt and incorporate the circuit court's well-reasoned findings and conclusions as to the assignments of error raised in this appeal. The Clerk is directed to attach a copy of the circuit court's order to this memorandum decision.

For the foregoing reasons, we find no error in the decision of the Circuit Court of Raleigh County and affirm its August 23, 2013, order that denied the petition.

Affirmed.

**ISSUED:** April 4, 2014

**CONCURRED IN BY:**

Chief Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Allen H. Loughry II

# IN THE CIRCUIT COURT OF RALEIGH COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA, EX REL.
CORNELL F. DAYE,

Petitioner,

v.                                                          Civil Action No. 04-C-531

THOMAS McBRIDE, Warden,
Mount Olive Correctional Complex,

Respondent.

---

## ORDER DENYING PETITION FOR OMNIBUS WRIT OF HABEAS CORPUS AND RESOLVING OTHER MATTERS RAISED IN CASE NOS. 97-F-16-H, 99-IF-69-K, 00-F-36-K & 01-IF-158

---

On the 9th day of May, 2012, this matter came before the circuit court of Raleigh County for an Omnibus hearing on Petitioner's Amended Petition for Post-Conviction Habeas Corpus relief brought pursuant to the provisions of West Virginia Code §53-4A-1, *et seq.*, as amended. Present at the hearing were the Petitioner, *pro se*, and Chief Deputy Prosecuting Attorney Thomas Truman, counsel for the State.

Petitioner seeks habeas corpus relief from a sentence of life imprisonment imposed by the court after his conviction for recidivism. He contests the constitutionality of his incarceration on eight primary grounds: (1) newly discovered exculpatory evidence should have been disclosed by the State; (2) the life sentence under the habitual offender statute was constitutionally disproportionate, as all three underlying convictions were for nonviolent offenses to wit: possession of a controlled substance with intent to deliver; (3) Rule 35(a) only allows a court to correct a sentence; (4a) once a defendant begins serving a sentence, trial courts have no authority

1

or jurisdiction to increase the sentence, under double jeopardy principles; (4b) only the specific sentence enhancement under W.Va. Code § 60A-4-408 can be applied where the defendant has multiple convictions under the Uniform Controlled Substances Act; and (4c) West Virginia Rule of Criminal Procedure 35(a) only permits a trial court to correct an illegal sentence, not impose a harsher sentence; (5) his convictions in case numbers 97-F-16-H and 99-IF-69-K, should be invalidated; (6) the State insisted upon presenting other criminal convictions evidence, where Petitioner's prior conviction was a status element of the crime, when Petitioner repeatedly requested to stipulate to the prior convictions; (7) he was denied effective assistance of counsel when his lawyer presented a jury instruction advising the jury that the element of intent could be assumed; (8) and the Interstate Agreement on Detainers was violated. All other Losh grounds Petitioner listed as grounds for relief are set forth and addressed in Section V of this Opinion

After due and careful consideration and for the reasons set forth below, the Court finds and concludes that the Amended Petition for Writ of Habeas Corpus should be denied.[1]

## I.  PROCEDURAL HISTORY and FINDINGS OF FACT

1. This present matter includes contentions of error arising from Cornell Daye's convictions in 1997, 1999, and 2001.

2. In January of 1997, the Raleigh County Grand Jury returned an indictment charging the Cornell Daye[2] with one count of obtaining property by false pretenses and one count of possession of "crack" cocaine with the intent to deliver.

---

[1] On February 5, 2013, the West Virginia Supreme Court of Appeals assigned the Honorable William J. Sadler of the 9th Circuit to preside in this matter. Although the proceedings in this case had been completed prior to the assignment, Judge Sadler has exhaustively reviewed all related matters, files, evidence, and documents in order to prepare the instant Order.

[2] Throughout this Habeas Order the Court refers to Cornell Daye by his name, as "Petitioner" and as "Defendant."

3. The count of possession with intent to deliver arose from an incident on or about August 22, 1996, wherein a Beckley City Police officer arrested the Petitioner pursuant to an outstanding warrant. In conducting a search of the Petitioner's person, the officer uncovered a sock tucked into the Petitioner's waistband which contained a plastic baggie containing crack cocaine and two $50.00 bills.

4. The Petitioner and his appointed counsel both signed a Waiver of Preliminary Hearing on September 3, 1996, and the case was assigned to Raleigh County Circuit Court Judge John A. Hutchison in Case No. 97-F-16-H.

5. On March 28, 1997, the Petitioner entered pleas of guilty to petit larceny and possession of "crack" cocaine with intent to deliver. The pleas were accepted by this Court.

6. On July 3, 1997, this Court sentenced the Petitioner upon his guilty pleas to a term of one (1) year in the Southern Regional Jail on the petit larceny conviction, and a term of not less than one (1) nor more than fifteen (15) years in the penitentiary on the conviction of possession with intent to deliver. The Court ordered that the sentences run consecutive to each other. The Court thereafter suspended the sentence and ordered that the Petitioner be sentenced to not less than six (6) months nor more than two (2) years at the Anthony Center for youthful offenders. The Petitioner was given credit for 316 days served.

7. On or about April 16, 1998, the Petitioner was returned from the Anthony Center as a satisfactory inmate. This Court placed the Petitioner on probation for a period of three (3) years.

8. On or about October 6, 1998, the Petitioner, while still on probation in Case No. 97-F-16-H, was arrested and charged with possession of "crack" cocaine with intent to deliver. The arrest occurred after Beckley City Police officers responded to a complaint at the Honey in

3

the Rock Motel in Beckley. The officers were eventually directed to Room 39, in which the Petitioner was staying. Upon inspection of the room, the officers noticed a green tube on a nightstand containing a substance which was later revealed to be crack cocaine.

9. The Petitioner and his appointed counsel both signed a Waiver of Preliminary Hearing on October 16, 1998, and the case was assigned to Raleigh County Circuit Court Judge H.L. Kirkpatrick, III, as Case No. 99-IF-69-K.

10. The court file for 99-IF-69-K contains an unsigned Waiver of Indictment form. However, the final order in that case makes a specific finding that the Petitioner had knowingly waived his right to have the matter reviewed by a grand jury, as was his right pursuant to Rule 7 of the *West Virginia Rules of Criminal Procedure*.

11. On March 22, 1999, the Petitioner entered a plea of guilty before the Honorable H.L. Kirkpatrick, III, to possession of a controlled substance with intent to deliver, to-wit: "crack" cocaine. The Court accepted the guilty plea. The Petitioner waived his right to a pre-sentence investigation, and the Court sentenced the Petitioner to a term of not less than one (1) nor more than fifteen (15) years in the penitentiary. The Petitioner was given credit for 168 days served. Upon motion, the Court suspended the sentence and placed the Petitioner on probation for a term of two (2) years upon the completion of serving four (4) months of actual confinement in Southern Regional Jail pursuant to W.Va. Code § 62-12-9. The jail sentence was ordered to run consecutively to any sentence previously imposed upon the Petitioner in Raleigh County Magistrate Court.

12. On November 24, 1999, Raleigh County Adult Probation Officer Walter H. Harper filed a Motion seeking to revoke the Petitioner's probation in Case No. 99-IF-69-K. By Order

4

entered the same day, this Court, by Judge Kirkpatrick, ordered the Circuit Clerk to issue a capias for the Petitioner's arrest.

13. At the time the capias was issued, the Petitioner was incarcerated in Orange County, Florida, where he pled *nolo contendere* to possession of a controlled substance, and was sentenced to six months in jail. On December 28, 1999, the Petitioner executed a Waiver of Extradition, and upon completion of his sentence, on May 19, 2000, the petitioner was transported back to West Virginia and was arraigned on the indictment in 00-F-36 On November 6, 2000

14. In January of 2000, the Raleigh County Grand Jury returned an indictment charging the Petitioner with one count of possession of "crack" cocaine with intent to deliver, 2nd offense. The charge arose from an incident that occurred on or about August 25, 1999. While on probation for the prior felony drug charge, the Petitioner was arrested following a traffic stop of a vehicle in which he was a passenger. The Petitioner was found to be in possession of crack cocaine.

15. A warrant for the Petitioner's arrest was ordered in Case No. 00-F-36-K on January 25, 2000.

16. On or about December 5, 2000, the Petitioner filed a *pro se*, handwritten Motion: Dismissal (sic), arguing that violations in Case Nos. 00-F-36-K and 99-IF-69-K violated the Interstate Agreement on Detainers Act (IADA), W.Va. Code § 62-14-1, and should therefore be dismissed.

17. On January 19, 2001, Judge Kirkpatrick entered an Order Denying Defendant's Motion to Dismiss in 99-IF-69-K and 00-F-36-K. In the Order, the Court pointed out that the Petitioner was taken into custody by the State of West Virginia due to a probation violation, rather than an "untried indictment, information, or complaint"; therefore, the IADA was not violated.

18. On February 15, 2001, Judge Kirkpatrick entered an Order Denying Motions to Dismiss; Finding Defendant Violated Terms of Probation and Ordering Reinstatement of Original Sentence in Case No. 99-IF-69-K. Pursuant to the Order, the Petitioner's probation was revoked, and he was remanded to the Southern Regional Jail to complete the sentence imposed on March 22, 1999, on the Raleigh County felony drug conviction.

19. On February 23, 2001, the Petitioner, by counsel Dewitt Daniell, filed a Notice of Intent to Appeal the Court's decision in Case No. 99-IF-69-K. The Petitioner also filed a *pro se* Notice of Appeal on March 6, 2001. The appeal was refused by the West Virginia Supreme Court of Appeals on or about November 8, 2001, in Case No. 011849.

20. On June 22, 2001, the Petitioner, by counsel John Parkulo, filed a Renewed Motion to Dismiss, or in the Alternative, Writ of Habeas Corpus in Case No. 00-F-36-K. By Order entered July 5, 2001, Judge Kirkpatrick denied the Motion, again finding that the State had complied with all applicable provisions of the IADA.

21. On or about August 13, 2001, the Petitioner filed a *pro se* Motion to Dismiss and Petition for Writ of Prohibition in Case No. 00-F-36-K.

22. The petitioner's trial in Case No. 00-F-36-K began on August 20, 2001, and concluded on August 21, 2001, with a jury verdict of guilty of possession of "crack" cocaine with the intent to deliver, second offense.

23. On August 22, 2001, pursuant to W.Va. Code § 61-11-19(1943), the Prosecuting Attorney filed an Information in Case No. 01-IF-158-H, stating that the petitioner had been convicted on: (1) August 23, 2001, of possession of crack cocaine with intent to deliver, (2) March 22, 1999, of possession of a controlled substance with intent to deliver; and (3) April 28, 1998,

of possession of crack cocaine with intent to deliver. All convictions were for felony offenses.

24. On September 6, 2001, a hearing was held to consider the State's August 22, 2001, information. This hearing was presided over by a different judge (Judge Hutchison) than the judge who had presided over all of the prior proceedings. The explained to the defendant that if he admitted he was the person convicted of the crimes identified in the State's information, "you *could be* sentenced to a period of life in the penitentiary, with possibility of parole." (Emphasis added). The appellant admitted that he was the person convicted in the previous cases. The judge accepted the appellant's admission and entered a finding that the appellant "knowingly, voluntarily and understandingly appreciates the ramifications of an admission." The Court also revoked the Petitioner's bond in Case No. 00-F-36-K, upon the Petitioner's admission in open court that he was the same person to have been convicted in Case Nos. 97-F-16-H, 99-IF-69-K, and 00-F-36-K, and as alleged in Information 01-IF-158-H.

25. Petitioner's counsel, John Parkulo, had filed a renewed Motion to Withdraw as Counsel in Case No. 00-F-36-K, and by Order entered September 6, 2001, Judge Kirkpatrick (the original judge) denied the motion.

26. On September 10, 2001, the Petitioner, by counsel, filed Assignments of Error and Motions for a New Trial in Case No. 00-F-36-K.

27. On September 14, 2001, the Petitioner, *pro se*, filed a Motion to Resubmit Writ of Prohibition and Motion to Dismiss in Case No. 00-F-36-K.

28. On September 26, 2001, the original judge (Judge Kirkpatrick) in the case reviewed the pre-sentence report and the record relating to the petitioner's admission to the prior convictions. On September 26, 2001, the judge ordered the defendant sentenced in Case No. 00-F-36-K

7

to not less than two nor more than thirty years in the state correctional facility pursuant to the enhancement provisions of W.Va. Code § 60A-4-408 (1971). The judge specifically declined to enhance the sentence for a habitual offender under the provisions of W.Va. Code § 61-11-18(2000). The sentence was ordered to run consecutive to the sentence imposed by the Court in Case No. 99-IF-69-K.

29. On October 2, 2001, the State filed a motion, pursuant to Rule 35(a) of the *West Virginia Rules of Criminal Procedure*, to correct the sentencing order, contending that a life sentence was mandatory under W.Va. Code §61-11-18 (2000).

30. On October 11, 2001, Judge Kirkpatrick entered an Order which "corrected" the sentence and ordered that the appellant be confined in a correctional facility for life.

31. On October 11, 2001, the Court also entered an Order Denying Defendant's Motion to Set Aside Verdict; Denying Motion for New Trial; Granting Motion of the State to Correct Sentence and Granting Motion to Withdraw as Counsel in Case Nos. 00-F-36-K and 01-IF-158-H.

32. On July 10, 2002, the Court entered an Order Denying Petition for Writ of Habeas Corpus in Case Nos. 99-IF-69-K and 00-F-36-K.

33. The defendant filed a direct appeal to the West Virginia Supreme Court challenging the life sentence. On March 11, 2003, the West Virginia Supreme Court denied the appeal in Case No. 00-F-36-K.

34. On May 25, 2004, the Petitioner filed a *pro se* Petition for Writ of Habeas Corpus in the present action, Case No. 04-C-531-H. The Petition raised ten (10) grounds for relief. An amendment to the Petition was filed on June 15, 2004.

8

35. On June 9, 2005, the trial court summarily denied all habeas corpus relief pursuant to W.Va. Code § 53-4A-3 (1971), finding that the Petitioner had failed to raise any constitutional issues. Following the denial of his *pro se* habeas corpus petition, the petitioner requested that the court appoint him counsel to appeal his case. The judge denied the request for appointment of counsel on June 28, 2005.

36. On July 20, 2005, the Petitioner, *pro se*, filed an Assignment of Error, in which he argued that this Court should not have summarily dismissed the Petition for Writ of Habeas Corpus. The Petitioner subsequently filed a *pro se* Petition for Appeal in the West Virginia Supreme Court of Appeals

37. On or about May 26, 2006, the Supreme Court issued an Order granting the appeal, and appointing Lonnie C. Simmons as counsel for Petitioner in Case No. 33100.

38. On June 27, 2007, the Supreme Court issued its opinion in *State ex rel. Cornell Daye v. McBride*, Nos. 33100 and 33101. The Supreme Court, Starcher, J., affirmed the decision of this Court on the issue of the Rule 35(a) correction of an illegal sentence by Judge Kirkpatrick, and remanded the case for appointment of counsel and further proceedings on all issues not decided in the opinion.

39. Pursuant to the Supreme Court's order, this Court on October 19, 2007, entered an Order Granting Leave to Proceed *In Forma Pauperis*; Appointing Counsel to File Amended Petition; Directing Respondent to File Answer in Case No. 04-C-531-H.

40. On August 29, 2008, the Petitioner, by counsel, Matthew A. Victor, filed a Second Amended Petition for a Writ of Habeas Corpus. Mr. Victor subsequently moved to withdraw as counsel for Petitioner, which motion was granted by this Court.

41. On March 18, 2009, this Court entered an Order Appointing Counsel, Ordering to Copy Transcript and Record and Order Requiring Amended Petition. In the Order, the Court appointed Lonnie C. Simmons as counsel for the Petitioner in Case No. 04-C-531-H, and ordered counsel to file an amended petition and an executed "*Losh* list."

42. Pursuant to the Order, the Petitioner, by counsel, filed an Amended Petition for Writ of Habeas Corpus (hereinafter "Amended Petition") on May 20, 2010, raising eight (8) grounds for relief. Included with the Amended Petition was Petitioner's Objection to the Court's Order Requiring Him to Fill Out a *Losh* List. The Petitioner, despite the objection, did file with the Court a verified *Losh* list.

43. On November 23, 2010, this Court entered an Order Requiring Prosecuting Attorney to Respond to Amended Petition for Writ of Habeas Corpus. The State filed its response on January 14, 2011.

44. On May 12, 2011, the Petitioner, *pro se*, filed a Motion for Severance and Appointment of New Counsel in Case No. 04-C-531-H. Thereafter, the Petitioner filed in the Supreme Court a *pro se* Motion to Recuse Judge John Hutchison of the Raleigh County Circuit Court.

45. The Motion to Recuse was denied by an Administrative Order of the Supreme Court issued on or about June 24, 2011. The Petitioner filed a Sur-Reply in the Supreme Court regarding his Motion on June 30, 2011. The following day, the Petitioner filed a Motion for Hearing on Recusal Issue and Substitution of Counsel in this Court.

46. On December 12, 2011, Petitioner's counsel, Lonnie C. Simmons, filed a Motion to Withdraw as Counsel in Case No. 04-C-531-H. Thereafter, the Petitioner, *pro se*, filed a Motion in Support of Attorney Lonnie C. Simmons' Motion to Withdraw, and Motion of Petitioner to Represent Himself in Writ of Habeas Corpus.

10

47. This Court, by Order entered March 7, 2012, granted counsel's Motion to Withdraw and Petitioner's Motion to Represent Himself.

48. On April 24, 2012, the Petitioner filed a Motion to Strike Impertinent or Otherwise Scandalous Matter from the Record of the Proceedings. At the omnibus hearing, the petitioner clarified that the motion sought to strike Ground 5 of the Amended Petition and replace it with paragraph 5 in "Petitioner's Pro Se Supplemental Application for Writ of Habeas Corpus."[3] The Court granted that motion.

49. On May 9, 2012, an omnibus evidentiary hearing on the Amended Petition for Writ of Habeas Corpus was held in this Court. At the conclusion of the hearing, the Court ordered both parties to provide proposed findings of fact and conclusions of law. The Court has received and carefully reviewed both parties' proposals.

50. On January 28, 2013, John A. Hutchison, who was the Judge originally presiding in this habeas corpus proceeding, entered an Order recusing himself from the case and requesting that the Chief Justice of the West Virginia Supreme Court of Appeals assign a judge to take over the above-styled case. The Supreme Court appointed the undersigned judge, Judge William J. Sadler, to preside.

51. On April 11, 2013, Judge Sadler held a status hearing. Tom Truman, Prosecuting Attorney for Raleigh County, West Virginia, appeared in person. Cornell Daye appeared by video and pro se.

52. As a result of the matters addressed in the hearing, the Court granted Daye's request for James Ewell's criminal files from magistrate court. The Court itself obtained the relevant court files directly from the Magistrate Clerk of Raleigh County, West Virginia, and

---

[3] Hrg. Transcr. pp. ᴄ ɔ (May 9, 2012).

provided the entirety of each file, TO-WIT, Case Numbers 99M-2481 and 99M-4519, to the petitioner along with the Order granting the discovery request.

53. By Order 2013, the Court denied Daye's request for discovery regarding the reasons for the Raleigh County judges' recusals.

54. By Order dated May 23, 2013, the Court denied Daye's motion for post-conviction bail.

55. By Order dated May 28, 2013, the Court denied Daye's motion to correct or amend sentence.

56. By Order dated June 25, 2013, the Court granted the State's motion to terminate discovery, denied Daye's motion for discovery regarding crime lab employees Janet Hudson and Timothy White, and denied Daye's request for additional subpoenas *duces tecum*.

57. The Court has been diligently working on the instant Order, which has involved extensive record and transcript review and careful study of pertinent legal authorities. The completion of the order has been slowed by the time needed to consider and rule on all motions Daye has filed as well as the time required to manage the Court's active docket.

## II.    STANDARD OF REVIEW

A habeas corpus proceeding is not a substitute for a writ of error, in that ordinary trial error not involving constitutional violations will not be reviewed. Syl. pt. 4, *State ex rel. McMannis v. Mohn*, 163 W.Va. 129, 254 S.E.2d 805 (1979). Furthermore, claims that have been "previously and finally adjudicated," either on direct appeal or in a previous post-conviction habeas proceeding, may not be the basis for habeas relief. W.Va. Code § 53-4A-1(b); *Bowman v. Leverette*, 169 W.Va. 589, 289 S.E.2d 435 (1982). If the claims were merely raised in a petition for appeal that was refused, those claims are not precluded. *Smith v. Hedrick*, 181 W.Va. 394, 382 S.E.2d 588 (1989).

12

A court having jurisdiction over habeas corpus proceedings may deny the petition without having a hearing and without appointing counsel for the petitioner, if the petition, exhibits, affidavits or other documentary evidence filed therewith show to such court's satisfaction that the petitioner is not entitled to relief. *White v. Haines*, 215 W.Va. 698, 601 S.E.2d 18 (2004); Syl. Pt. 1, *Perdue v. Coiner*, 156 W.Va. 467, 194 S.E.2d 657 (1973). Moreover, the petitioner is not entitled to a full evidentiary hearing in every proceeding instituted under the provisions of the post-conviction habeas corpus act when allegations in the petition are completely without substance or merit; the statute requires no hearing at all and empowers the Court to deny relief summarily. Syl. Pt. 8, *Gibson v. Dale*, 173 W.Va. 681, 319 S.E.2d 806 (1984).

In general, the statute governing post-conviction habeas corpus proceedings contemplates that every person convicted of a crime shall have a fair trial in circuit court, an opportunity to apply for appeal to the Supreme Court of Appeals, and one omnibus post-conviction habeas corpus hearing to which the petitioner may raise any collateral issues which have not previously been fully and fairly litigated. *Losh v. McKenzie*, 166 W.Va. 762, 277 S.E.2d 606 (1981). Courts are typically afforded broad discretion when considering whether said petition has stated grounds warranting the issuance of the writ. *State ex rel. Valentine v. Watkins*, 208 W.Va. 26, 537 S.E.2d 647 (2000).

When granted an omnibus habeas corpus hearing, the petitioner is required to raise all grounds known or that reasonably could be known by him. *Markley v. Coleman*, 215 W.Va. 729, 601 S.E.2d 49 (2004). Moreover, the petitioner is entitled to careful consideration of his claims for relief; this meticulous consideration is mandated in order to assure that no violation of the

13

petitioner's due process rights could have escaped the attention of either the trial court or the Supreme Court of Appeals. *Id.*

The Court finds that the Petitioner's claims discussed below are not precluded because the issues raised have not been appealed in a direct appeal to the Supreme Court nor heard by this Court in a prior habeas proceeding. The issues have not heretofore been previously and finally adjudicated. As such, the Amended Petition is now ripe for review.

## III. PRELIMINARY MATTERS

Before delving into the legal issues presented in this *habeas*, the Court will first address two preliminary matters: (1) the Petitioner's voluntary decision to pursue *habeas corpus* relief *pro se* and the court's efforts to ensure balanced and fair proceedings; and (2) Petitioner's challenges to out-standing subpoenas and discovery.

### A. Pro Se Litigant

Throughout the history of this case Petitioner was represented by a number of different attorneys, and, at various times Petitioner attempted to proceed as a *pro se* litigant. Originally, Daye filed his Petition for Writ of Habeas Corpus in 2004. The Circuit Court of Raleigh County summarily denied the Petition, and Daye appealed. The West Virginia Supreme Court of Appeals ("our Court") accepted the appeal and appointed Lonnie Simmons, Esquire, to represent Daye thereon.

On appeal, however, our Court limited its review to the issue of whether the circuit court acted properly under Rule 35 (a) in correcting an illegal sentence. *See,* W.Va. R. Crim. Pro. 35(a)(1996).[4] Our Court affirmed the circuit court's ruling, which imposed a life sentence

---

[4] W.Va. R. Crim. Pro. Rule 35(a). *Correction of Sentence* – The court may correct an illegal sentence at any time and may correct a sentence imposed in an illegal manner within the time period provided herein for the reduction of sentence.

pursuant to W.Va. Code § §61-11-18 (2000), and remanded the case with instructions to appoint counsel amend Daye's Petition for Writ of Habeas Corpus to raise all other constitutional or jurisdictional issues Daye may have had.

On remand and in accordance with our Court's direction, the Circuit Court of Raleigh County appointed Matthew Victor, Esquire, to represent Daye in his pursuit of habeas corpus relief. Mr. Victor did, in fact, file an amended petition; however, his role as counsel was short lived. Mr. Victor moved to withdraw as counsel based on disagreement with Daye about the grounds to include in the amended petition and the manner in which to proceed. The Circuit Court of Raleigh County granted Mr. Victor's motion to withdraw and appointed Lonnie Simmons, Esquire. Mr. Simmons represented Daye until he, too, reached an impasse with Daye about the prosecution of the habeas petition. Mr. Simmons filed a motion to withdraw as counsel.[5] Daye himself filed a motion in support of Mr. Simmons request to be relieved as counsel. The circuit court granted the motion

---

[5]     In this case, the circuit court appointed counsel to represent Daye because he could not afford to hire his own attorney. In fact, the court twice appointed attorneys with extensive experience in these matters. In both instances Daye was unable or unwilling to consult with, work with, or accept the advice of either lawyer, which resulted in the following motions to withdraw:

On December 12, 2011 Mr. Lonnie Simmons filed his Motion to Withdraw as Counsel in this case. While stating in paragraph 4 of his motion that Mr. Simmons believed that the amended petition for habeas corpus relief contained several meritorious issues. Mr. Simmons reluctantly concluded, however, that the continuation of the attorney-client relationship became "more of the distraction than a benefit to the petitioner." Mr. Simmons' motion further detailed that Petitioner (1) filed pro se motions to removal of Mr. Simmons as counsel; (2) filed ethics complaints against Mr. Simmons with the State Bar Ethics Commission; and (3) filed numerous *pro se* pleadings in different courts and agencies, attaching thereto correspondence from Mr. Simmons.

On December 15, 2011 Daye filed "Petitioner's Motion in Support of Attorney Lonnie C. Simmons Motion to Withdraw, and Motion of Petitioner to Represent Himself in Writ of Habeas Corpus". Daye's asserted "that from the beginning of his case [Case No. 00-F-36-K], Daye has disagreed with the strategies of the attorneys who represented him, namely, Attorneys DeWitt Daniels, Douglas Buffington, John Parkulo, Matthew A. Victor, and now Lonnie C. Simmons, Esq." In addition to affirmatively stating his general disagreement with strategy, Daye accused Mr. Simmons of unethical conduct. The court granted the motion to withdraw as well as Petitioner's request to proceed *pro se.*

15

It was in Daye's motion in support of Mr. Simmons' withdrawal that Daye requested permission to proceed *pro se*. Article III, § 17 of the West Virginia Constitution establishes that "the right of self-representation in civil proceedings is a fundamental right which cannot be arbitrarily or unreasonably denied." Syl. Pt. 2, *Cottrill v. Cottrill*, 219 W.Va. 51, 631 S.E.2d 609 (2006) *citing* Syl. Pt. 1, *Blair v. Maynard*, 174 W.Va. 247, 324 S.E.2d 391 (1984). Indeed, the fundamental right of self-representation may not be denied without a clear showing in the record that the *pro se* litigant is engaging in a course of conduct which demonstrates a clear intention to obstruct the administration of justice. *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006) *citing Blair*, 174 W.Va. at 253, 324 S.E.2d at 396. In the present case, Daye was not engaged in a course of conduct intended to obstruct the administration of justice. To the contrary, he believed himself better able to pursue justice than his lawyers. Hence, the Court had no grounds upon which to deny him the fundamental right of self-representation. *Mathena*, 219 W.Va. 417, 633 S.E.2d 771 (2006); *Blair*, 174 W.Va. at 253, 324 S.E.2d at 396.

When faced with a *pro se* litigant a trial court bears the responsibility to ensure the litigant receives fair and balanced proceedings. Our Court has consistently recognized that cases should be decided on the merits, which may require "reasonable accommodation" of litigants, whether represented by counsel or not. *WV Dept. of Health & Human Resources Employees Federal Credit Union v. Tennant*, 215 W.Va. 387, 599 S.E.2d 810 (2004) *citing Blair v. Maynard*, 174 W.Va. at 253, 324 S.E.2d at 396. (internal citations omitted). "Reasonable accommodation" does not, however, require a court to cross the fine line between accommodating a litigant and advocating for the litigant. Nor does it require the Court to give legal counsel. Ultimately, the *pro se* litigant bears the responsibility and the consequences of his

16

mistakes and errors. *WV Dept. of Health & Human Resources Employees Federal Credit Union*, 215 W.Va. 387, 599 S.E.2d 810.

Guided by these tenets, this Court has reviewed the actions by the Circuit Court of Raleigh County to determine whether it produced balanced and fair proceedings. The Court finds that it did, as demonstrated by the transcript of the habeas hearing on May 9, 2012. During the habeas hearing, Judge Hutchison guided Daye through verbalizing his habeas petition, the Losh grounds on which Daye sought relief, and Daye's allegations and evidence (if any) in support of each ground. Daye was provided a full opportunity to articulate and explain each and every reason he believe he was entitled to habeas relief, and the Court asked Daye relevant questions if more information or clarification was needed. The care and detail of the Court portrays a picture of absolute fairness to Daye.

From this Court's perspective upon review, the only possible issue touching on fairness of the proceedings arises from Daye's failure to set a hearing on his *pro se* discovery motion and his failure to serve his seven subpoenas *duces tecum*. On or about May 9, 2011, Daye filed a motion for discovery and seven subpoenas *duces tecum* with the Circuit Clerk of Raleigh County.[6] At no time, however, did Daye take any action to set a hearing on his request for discovery or to issue the subpoenas. It was not until the Omnibus evidentiary hearing in May of 2102 that the petitioner first complained that his summonses not been served and that he had not received the additional discovery he requested. When questioned regarding his failure to bring these matters before the court by way of hearing, Daye indicated it was the obligation of counsel for the respondent, i.e., the prosecuting attorney, to make sure that Daye's subpoenas were

---

[6] At the time the Circuit Clerk received the filings, Lonnie Simmons still represented Daye even though Daye acted *pro se* in the filings. Mr. Simmons did not sign or indicate his knowledge or approval of any of Daye's *pro se* initiatives.

17

served and that his discovery was supplied. The Raleigh County Circuit Court found no merit to Daye's argument and proceeded with the omnibus hearing.

Upon review, this Court finds that "reasonable accommodation" of a *pro se* litigant does not require a court to (1) take it upon itself to give legal advice to the litigant, to serve the summonses, or to *sua sponte* set hearings on the *pro se* litigant's filings; or (2) require the prosecuting attorney to 'help out' the party whom he is prosecuting.[7] While no *pro se* litigant shall be denied the right to have a full and fair hearing solely by reason of the *pro se* litigant's lack of familiarity with procedural or evidentiary rules, this right does not require a court to cross the line from impartial judge to legal counsel for the *pro se* party. *See, Cottrill,* 219 W.Va. 51, 631 S.E.2d 609; *Blair,* 174 W.Va. at 253, 324 S.E.2d at 396. Nor does the right to a full and fair hearing require opposing counsel to help its opposition. Indeed, such action by either the court or the prosecuting attorney would be nothing short of an ethical violation.

Furthermore, the purpose for "reasonable accommodation" is to prevent the *pro se* litigant from suffering an unfair disadvantage because of his lack of familiarity with procedure or evidentiary rules. No such disadvantage existed in this case. The court repeatedly appointed counsel to represent Daye. Daye repeatedly took his own advice instead of that of his lawyer, which resulted in multiple lawyers withdrawing from representation. Daye was confident enough with his own ability and knowledge of the law that he filed his own motions, his own pleadings, his own subpoenas, and he filed at least one statement supporting his lawyer's motion to withdraw. Daye knew precisely what he was doing and how to go about it.

For these reasons, the Court concludes that the court did indeed ensure that the petitioner received balanced and fair proceedings, and Daye alone "must bear the responsibility and accept

---

[7] Later in this Order the court will address in detail it's reasoning why the court would not have permitted the service of the subpoenas or granted Petitioner's request for additional discovery.

18

the consequences of any mistakes and errors." *Sanchez v. Benson*, 2012 WL 2865988 (W.Va. 2012); *citing WV Department of Health and Human Resources Employees Federal Credit Union v. Tennant*, 215 W.Va. at 393, 599 S.E.2d at 816 (2004) *(per curiam)*. What is more, even had a hearing on the discovery issues and subpoenas been conducted, for the reasons explained in the next section of this Opinion, the outcome would have been the same.

## B. Out-Standing Subpoenas and Discovery

As mentioned above, the Petitioner raised an issue at the omnibus hearing regarding service of subpoenas to obtain further information on the West Virginia State Police crime lab investigations. Upon review, this Court concludes that Petitioner assertions are without merit for multiple reasons, not the least of which is the fact that the Court did, in fact, rule on the motions at the omnibus hearing itself.

At the omnibus hearing, the Petitioner claimed that his prior counsel, Lonnie Simmons, was advised by the West Virginia Supreme Court in *State ex rel. Cornell Daye v. McBride*, Nos. 33100 and 33101, to file subpoenas to obtain the crime lab investigation information, but that counsel never filed the subpoenas. On May 9, 2011, the Petitioner, still represented by Mr. Simmons, attempted to file *pro se* seven (7) subpoenas *duces tecum* by sending them to the Raleigh County Circuit Clerk's Office. The subpoenas sought production of all criminal records, transcripts and other court documents bearing the name of the confidential informant, James Ewell; copies of plea and sentencing transcripts in Case Nos. 97-F-16 and 99-IF-69-K; 911 and/or other police dispatch telephone records and recordings of the purported phone call from James Ewell to Sophia police on August 25, 1999; and the FBI investigation report and findings regarding Officers Timothy White and Janet Hudson from the West Virginia State Police crime

lab. The Petitioner's Motion for Post-Conviction Discovery, filed *pro se* with the Clerk the same day as the subpoenas, sought production of the same documents.

This Court reviewed the subpoenas at the omnibus hearing and ruled on the record that petitioner failed to serve them on the intended recipients. The Court also pointed out that the subpoenas were neither requested nor approved nor pursued by the Petitioner's counsel, Lonnie Simmons, who still representation Daye at the time he filed them with the circuit clerk's office.

Furthermore, the West Virginia Supreme Court in *Gibson v. Dale* explained the role of discovery in habeas corpus proceedings in 1984 as follows:

> We note that the rules of procedure in criminal and civil cases do not apply in post-conviction habeas corpus proceedings. W.Va. Code § 53-4A-1(a) expressly provides that proceedings under that article are civil in nature. (Citations omitted.) As a consequence, the criminal rules of discovery do not apply. *See* W.Va.R.Crim.P. 16. In addition, the discovery provisions of the West Virginia Rules of Civil Procedure are expressly excluded from application in proceedings in habeas corpus by Rule 81(a)(5). (Citations omitted.)

173 W.Va. 681, 319 S.E.2d 806, n. 7 (1984). In 1999, Rule 7(a) of the Rules Governing Post-Conviction Habeas corpus Proceedings in West Virginia was amended to allow a prisoner in post-conviction habeas corpus proceedings to invoke the processes of discovery available under the West Virginia Rules of Civil Procedure *if, and to the extent that, the court in the exercise of its discretion, and for good cause shown, grants leave to do so*. No such leave was granted by the Raleigh County Circuit Court because no good cause was shown. As a result, the Raleigh County Circuit Court concluded that the Petitioner was not entitled to the discovery process afforded by the *West Virginia Rules of Civil Procedure* or any other rules. The undersigned Judge, however, afforded Petitioner leeway on the only discovery that could have potentially impacted this habeas: information on James Ewell, which this Court itself provided to Daye. This Court would not have granted any of the other discovery requests, because the other issues were

20

thoroughly addressed at the underlying trial and no good cause for additional discovery was shown. *See*, Ground 1, *infra*.

The rules of civil procedure, as applied to the case at bar, require the person requesting the subpoenas to be responsible for ensuring they are properly served upon the intended parties. Although at the omnibus hearing Petitioner expressed his understanding that he was required only to mail the subpoenas to the Circuit Clerk's office and that it was the duty of the State to ensure that they were served and properly executed, regardless of his flawed understanding, the law places the duty on the Petitioner or his counsel to serve the subpoenas, or to at the very least file a motion with the Court seeking to have them served. Petitioner's subpoenas were never issued because he did not follow the correct procedure, which was unquestionably by no fault of the State or the Court. What is more, the Petitioner never brought the Motion for Post-Conviction Discovery on for hearing or even asked for any type of hearing on the issue of discovery. Thus, the Petitioner did not comply with any of the procedural obligations for discovery requests and subpoenas. While the Court owes the *pro se* Petitioner some measure of deference, the Court is not required to undertake steps to fulfill the service requirements for him; *the Petitioner must bear the burden of following the prescribed rules and statutes, as all litigants must*, whether they are represented by counsel or not. See, *Sanchez*, 2012 WL 2865988 (W.Va. 2012).[8]

For these reasons, the Court finds that the arguments raised by the Petitioner regarding outstanding subpoenas and other discovery issues, whether raised in the Amended Petition, at the omnibus hearing, or thereafter, are without merit except as otherwise ruled by prior Order of the Court or in this Opinion.

---

[8] Given the astuteness with which Petitioner has represented himself in this matter, it is difficult to comprehend his claim of ignorance in regard to subpoena service.

## IV. ANALYSIS OF ASSIGNMENTS OF ERROR

**Ground 1: Petitioner asserts that his incarceration is illegal in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article III, §§ 1, 5, 10 and 14 of the West Virginia Constitution, because newly discovered exculpatory evidence should have been disclosed by the State under *Brady v. Maryland*. Since it was not, he asserts his convictions in case numbers 00-F-36-K and 01-IF-158-H must be set aside. (Decided under State and Federal law)**

**Relief Denied.**

August 25, 1999, Petitioner first met James Ewell. As a result of his interaction with Ewell that night, Petitioner was arrested and subsequently charged with Possession with Intent to Deliver in Case No. 00-F-36. Prior to trial on that charge Petitioner's lawyer asked the State to disclose any type of agreement between the police and Ewell, believing that Ewell was acting as a confidential informant on August 25, 1999. The petitioner sought the existence of such an agreement because without it he would be unable to impeach Ewell's assertions that he was not an "informer" for the State, nor could petitioner prove Ewell was acting as an agent of the State on August 25, 1999. Without a link between Ewell and the State, Daye could not prove his defense of entrapment. The State responded then, and repeatedly responded since, that no such agreement existed at the time Ewell tipped off the police about Petitioner.

At trial, Ewell testified that although he had previously worked for the police as a confidential informant following his own arrest for driving under the influence, he was not under such an agreement at the time of the Petitioner's arrest. While under oath at trial, Ewell candidly testified about his prior agreement to work with law enforcement, how he fulfilled his commitment, and acted on in his own volition in regard to Daye's arrest. Defense counsel also questioned Ewell, taking full advantage of cross-examination and planted the seeds that Ewell was not credible and had, in fact, been working for the police on August 25, 1999. The jury ultimately convicted the petitioner for possession with intent to deliver.

22

On August 28, 2009, approximately eight years after his conviction, Petitioner obtained certain documents through a FOIA request to the City of Beckley, West Virginia. These documents show that Ewell entered into a "cooperating individual agreement" with the Regional Unified Drug Enforcement Task Force (RUDE) in late August 1999[9] and was arrested in October of 1999 for Driving under the Influence.[10] Petitioner's claims in Ground 1 arise, in part, from these documents.

The petitioner raises several different theories in support of Ground 1. The theories are: (1) the FOIA documents constitute newly discovered evidence; (2) the State failed to disclose exculpatory evidence, i.e., Ewell's agreement with RUDE to work as a confidential informant; (3) improper testing at the crime lab resulted in false evidence; and (4) that false evidence was used to convict him.

Theories one and two are closely related, so the Court will address them first. In so doing the Court finds it best to preface its discussion by setting forth the relevant parts of James Ewell's testimony from Petitioner's August 2001 trial. It is as follows:

Direct Examination of James Ewell[11]

Q.    All right, sir. Now, you were arrested by Sergeant White, not to be confused with the Trooper, but Sergeant White of the Sophia Police Department on June 8, 1999. Do you remember?

A.    Yes.

Q.    And what did he stop you for?

A.    I was ultimately charged with DUI

Q.    All right, sir. And you made an agreement with the State where you wouldn't be prosecuted for that. What was your agreement? Tell the jury.

---

[9] Referred to as the "first operating agreement"
[10] Referred to as the "second operating agreement"
[11] Tr. Transcr. Vol. 1. pp. 151-159

23

A.   The agreement was with Officer Sweeney that if I could help him gain an arrest, or get into a drug — drug sales from two individuals from Detroit.

. . .

Q.   Now, did you complete that agreement and, in summary, you were responsible for two gentlemen out of Detroit being convicted for drug trafficking, in the federal court system. Is that right?

A.   Yes.

Q.   Now had you completed your service under that plea agreement by August 25th of 1999?

A.   Yes.

. . .

A.   When I first came in, I saw that Cornell and his friend Petey had a plate with crack cocaine on it, and they asked me if I wanted to buy some.

Q.   What did you tell them?

A.   I said, "I don't have any money."

Q.   And what did they say?

A.   Said, "Can you get me a girl?"

Q.   Who said that?

A.   Cornell.

Q.   What did you say?

A.   I said, "Yes. I got to go to Sophia though."

Q.   What did you do then?

A.   I proceeded to my house in Sophia with Cornell. Once I got there, I told him to wait here — I didn't have a phone at the time, - and I went over to the Sophia Police Station. There was no one there. I went down to the pay phone and called the Sophia Police Department, told them the situation.

Q.   Sophia Police or 911?

A.   911. You know, emergency operation central.

Q.   Now why did you do this?

24

A.    I felt obligated. I mean, it was fun. It was the right thing to do. I resent anybody that sells that drug.

Q.    Now, you had completed your service?

A.    Yes.

Q.    You bought your way out of the DUI, in fairness to everybody, by convicting these two guys of felony drug cases in federal court. So is it your testimony that you did this just because you like doing it, and you resented people trafficking cocaine?

A.    Yes.

. . .

Q.    So again, in fairness to Mr. Daye, once you find out that he was willing to trade sex for drugs, you were basically just out there to turn him into the police. Is that right?

A.    Yes.

. . .

Q.    Officer White showed up within three, four, five minutes at the most, and I told him the situation: I had this Mr. Daye in the house, he had drugs and, you know, come and get him more or less. But I said I don't want him taken out at the house. And I said I need a cover. I don't want to have to go through this like I'm going through it right now.

. . .

Q.    Where did the idea - - of and I understand you did not want the defendant arrested at your house. So there was a traffic stop arranged. Is that what you're saying?

A.    Yes.

Q.    Okay. And where did you get the beer?

A.    It was - - I think it was - - it was beer that had been confiscated from a prior incident or something.

Q.    So the police gave you the beer.

A.    Yes.

Q.    Then once they handed you the beer, and you arranged to have them stop you as a driver, what did you do then?

25

A.    I went back to my house, told Cornell that I could not get ahold of the girl. And he got tired - - he was tired of waiting anyways. I said, "Well, okay, I'll take you back."

Q.    Then what did you do?

A.    Went up Eisenhower Drive and proceeded to get pulled over by Officer Sweeney and Officer White.

. . .

Q.    What did they find on Mr. Daye?

A.    They were having trouble finding it. And I pointed - - I pointed to Officer White - - I indicated that he had it hidden down in his sock.

. . .

### Cross Examination, in part[12]

Q.    First of all, you indicated previous in time you were definitely a confidential informant for the city - - was it the city? Who were you working for? Were you working for this drug task force or - -

A.    RUDE Drug Task Force.

. . .

Q.    And to your knowledge, do you know how many agencies, law enforcement agencies make up the RUDE Task Force?

A.    No, I don't.

Q.    Do you know that it's involving the various branches of law enforcement, such as state police, deputies and sheriffs?

A.    Yes.

Q.    Actually, in your case, at the time that you dealt with Officer White, what agency, what police agency did he work for?

A.    Sophia, Sophia City Police.

Q.    Stan Sweeney, what agency did he work for?

A.    Beckley City Police. . .

Q.    How many investigations did you do in the course of this being a confidential informant for the RUDE Task Force, Mr. Ewell?

A.    Five.

---

[12] Tr. Transcr. Vol. 1. pp. 159-174

Q.   You did five cases total?

A.   Yes.

Q.   Is that counting this case?

A.   Yes.

Q.   And in terms of working for the RUDE Task Force, you indicated you were initially arrest June 8th, '99 . . .

A.   Best of my recollection.

. . .

Q.   Who arrested you for your DUI, Mr. Ewell?

A.   Officer White.

Q.   And was anybody with Officer White? ·

A.   Officer Sweeney.

Q.   Tim Sweeney?

A.   Yes.

. . .

Q.   And did you get placed in jail and actually arrest for the DUI?

A.   Yes.

Q.   How long - - were you in jail at the time they made the deal?

A.   Yes. No. No.

Q.   I'm sorry?

A.   No. We did not make the arrangement until about a week later.

. . .

Q.   And when Timothy Sweeney offered you such a deal, what was your response to him?

A.   Initially, I said I'll see what I can do.

. . .

Q.   Now let me ask you: According to your testimony, you went down to a house, some Toothless wonder lady I think it was testified to. You went to a house on Heber Street. Is that correct?

27

A.   Yes.

Q.   What's the lady's name?

A.   All I know her as is Tina.

. . .

Q.   And you weren't invited to the residence?

A.   No.

Q.   What was your purpose of going to the residence?

A.   I knew there was drug activity there.

Q.   So you were looking for drug activity, weren't you.

A.   Yes.

Q.   You were specifically looking for drug activity to report these people to law enforcement as part of your deal, weren't you?

A.   It was not part of my deal.

Q.   You were doing it for the fun of it?

A.   Yes.

Q.   So you were out finding people to report to the law, setting them up like you did Mr. Daye, as you testified to, purposely. Is that your testimony Mr. Ewell?

A.   I wouldn't determine it as setting it up. He initiated it by offering to sell me drugs.

. . .

Q.   And when you were in there, what was - -what did you tell them your purpose of being there was for?

A.   Well, under the guise that I wanted to do drugs.

Q.   So you approached them, because you were telling them you wanted to buy drugs. Is that correct?

A.   No. I didn't ask them to buy drugs. I was - - it was already there.

. . .

Q.   Why did you go to Sophia?

A.   Because I had a working relationship with Officer Tim Sweeney.

28

Q. So you purposely got him to go with you so that you could contact Officer Sweeney, then. Is that correct?

A. That's correct.

. . .

Q. Then why did you go to your house?

A. Because he's [Tim Sweeney] a Sophia City Policeman.

. . .

A. . . .I had a working relationship with Officer Tim Sweeney, and it's his jurisdiction as Sophia City Police.

Q. So you specifically made sure that you got Mr. Daye down to this working jurisdiction with the law enforcement agency of your choice. Is that what you're testifying to here, Mr. Ewell?

A. Well, no, it's not really that. It's because he wanted - - he wanted me to get him a girl so that he could have sex with her, and paying her with the crack that he was trying to sell.

. . .

Q. When you called 911, I take it you asked them to get ahold of Sophia Police to get ahold of you?

A. Yes. I needed to see a Sophia City Policeman.

Q. You specifically said "Sophia City policeman," right?

A. Yes.

End of excerpt.

## A. FOIA Documents as they relate to Newly Discovered Evidence Inquiry

Petitioner's Ground 1 is based in part on his assertion that the State failed to disclose evidence prior to trial[13] that James Ewell, a primary State witness, was operating under an agreement with law enforcement at the time of the incident leading to Petitioner's arrest, and as a result, the State breached its obligation to correct known false or misleading testimony and to disclose any agreements the State had with any witnesses. Specifically, this Ground arises from

---

[13] Case No. 00-F-36-K

29

three particular documents produced by William H. File[14] ("File") by the City of Beckley in response to Petitioner's 2009 FOIA request for records regarding James Ewell and law enforcement, and James Ewell's arrests and citations issued by the City of Beckley Police Department.[15] The first two documents File produced consisted of a "Cooperating Individual Agreement" and a "Special Consent Form" between Ewell and the Regional Unified Drug Enforcement Task Force (RUDETF). Ewell signed both in August of 1999. A third document showed that Ewell was arrested for DUI, and other offenses on October 13, 1999. It is undisputed that the State did not include Ewell's October arrest in its disclosures prior to trial on August 20, 2001.[16] Nor is it disputed that Ewell omitted mention of these issues when asked about his criminal history during trial.[17]

As a result of this purported non-disclosure of the three documents, Petitioner asserts that the State's failure to correct known false or misleading testimony and its failure to disclose a witness's agreement the State violated Petitioner's Constitutional rights by preventing him from using the information to attack Ewell's credibility at trial and from proving his defense of entrapment. Thus, the Petitioner contends that his convictions in that Case No. 00-F-36-K[18] and Case No. 01-IF-158-H[19] are invalid.

---

[14] William File was the City Attorney for Beckley, West Virginia.
[15] At the omnibus hearing, Mr. Daye presented these documents as Petitioner's Exhibit 14.
[16] The State's agreement that the documents were not disclosed prior to trial does not in any manner equate to the State intentionally withholding evidence. To the contrary, the prosecuting attorney has continually maintained that he knew nothing about such documents until he received them from the Petitioner. The Court has no basis or suspicion upon which to find the prosecutor at fault.
[17] At the omnibus habeas corpus hearing on May 9, 2012, counsel for the State argued that the State was not in possession of these documents until they were provided by the Petitioner's attorney following the FOIA request.
[18] Trial in 00-F-36 began August 20, 2001.
[19] 01-IF-158-H is for recidivism

The Court consolidates[20] and summarizes Daye's contentions about the three documents as follows: the documents constitute newly discovered evidence warranting a new trial because the documents (1) would have discredited a James Ewell by showing Ewell did, in fact, have a "Cooperating Individual Agreement" with law enforcement at the time of the Petitioner's arrest; (2) would have supported Petitioner's defense of entrapment; and (3) would prove the State convicted Petitioner by using false evidence at trial.

Before the Court can determine whether a new trial is warranted based on the aforesaid documents, it must first determine whether the documents qualify as "newly discovered evidence." To be "newly discovered evidence," the evidence must (1) have been discovered after the trial, and, from the affidavit of the new witness, state what the evidence will be or its absence satisfactorily explained; (2) appear from facts stated in plaintiff's affidavit that plaintiff was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict; (3) be new and material, and not merely cumulative; (4) the evidence must be such as ought to produce an opposite result at a second trial on the merits; and (5) the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side." *State v. Frazier*, 162 W. Va. 935, 936, 253 S.E.2d 534, 535 (1979).

Viewing the factors in a light most favorable to Petitioner and applying *Frazier* to the facts of this case demonstrates: (1) that the agreement form signed by Ewell in August 1999 was not disclosed before Petitioner's trial and was obtained pursuant to a FOIA request nine years after the Petitioner was convicted; (2) counsel for the Petitioner was diligent in his efforts to

---

[20] Many of Mr. Daye's assignments of error overlap and intertwine. The Court's consolidation of the claims is in effort for clarity and avoidance of repetitive discourse while still addressing the merits of each contention. The Court is not in any way ignoring, glossing over, minimizing, or avoiding any argument Petitioner has made.

determine whether an agreement existed and due diligence would not have secured the documents prior to trial; and (3) the evidence was new and it was not cumulative, in that it was evidence of the same kind, but not on the same point (documentation of an agreement between Ewell and law enforcement during a different time frame than that previously disclosed).[21] Thus, the Court finds that the three documents meet the first three prongs of the *Frazier* test.

The Court's inquiry does not stop there, however. In addition to the three factors above, to warrant a new trial the evidence must be such as ought to produce an opposite result at a second trial on the merits, and the sole object of the new evidence cannot be to discredit or impeach a witness on the opposite side. *Ibid.* Neither of these factors are satisfied.

To begin, upon reviewing Petitioner's Exhibit 14[22] from the Omnibus hearing, the Court was initially concerned because the date Ewell signed the "Cooperating Individual Agreement" with RUDE and the "Special Consent Form" could be interpreted as one of three dates: August 24, 1999, August 27, 1999, or August 29, 1999. If it *was* August 24th, then it could be problematic. Upon closer examination, however, the Court's initial concern became unfounded. Under oath at trial James Ewell consistently and repeatedly testified that he did not have an agreement with the police or RUDE on August 25, 1999, but instead had reported Daye to the authorities because "it was fun. It was the right thing to do. I resent anybody that sells that drug[]".[23] Officer Timothy Sweeney of the Sophia Police Department testified that by August 25th of 1999 "He [Ewell] was no longer under any obligations to work for us" and had acted voluntarily in his dealings with Daye.[24] Likewise, Detective Stanley Sweeney of the Beckley

---

[21] Cumulative evidence is additional evidence of the same kind on the same point. *State v. O'Donnell,* 189 W.Va. 628, 433 S.E.2d 566 (1993).

[22] Exhibit 14 included the Special Consent Form and the Cooperating Individual Agreement
[23] Tr. Transcr. Vol. 1, 154:20-22
[24] Tr. Transcr. Vol. 1, 196:4-10

City Police Department, who was also one of the police officers involved in the August 25, 1999, dealings with Cornell Daye, testified both at trial and at the habeas corpus omnibus hearing,[25] that Ewell did not have any agreement with law enforcement on August 25, 1999.[26]

| | |
|---|---|
| MR. TRUMAN. | Ewell wasn't operating in the traditional sense as a CI in Daye's case, was he? |
| S. SWEENEY. | That's correct. |
| MR. TRUMAN. | He was essentially a citizen phoning in information to the police? |
| S. SWEENEY. | Letting them know Mr. Daye had crack cocaine on him. |
| MR. TRUMAN. | And the police never tried to control Ewell in the case of State versus Daye, did they? |
| S. SWEENEY. | No, sir. |
| MR. TRUMAN. | But if you're using a confidential informant in the traditional sense, you keep very tight control on them, don't you? |
| S. SWEENEY. | Video, audio and police surveillance. |

Tr. Transcr. Vol. 2, 147:15 – 148:4[27]

In light of the testimony of Ewell, Tim Sweeney, and Stan Sweeney eliminated the Court's concern with the date on the operating agreement, because the jury would have had to conclude that two police officers perjured themselves in order to find that Ewell was acting on behalf of the police as a CI on August 25, 1999. The jury would also have had to conclude that Ewell was lying, and for all the Court knows, perhaps the jury *did* find Ewell's credibility lacking. But

---

[25] In the omnibus hearing, the Petitioner called retired Det. Stanley Sweeney of the Beckley Police Department as a witness. Det. Sweeney them testified regarding some inconsistencies in his testimony at the Petitioner's trial as compared to his testimony in a February 15, 2001, probation revocation hearing in one of the Petitioner's other cases. Specifically, during the omnibus hearing, Det. Sweeney testified that he had been mistaken about some facts during the probation revocation hearing, and that his testimony at trial stated the correct facts. He further testified that Ewell was not working as an informant for the police department on August 25, 1999, and only began working as such following the Petitioner's arrest.

[26] See generally, Tr. Transcr. Vol. 2, pp. 235-247. Sweeney's testimony in both the trial and the probation revocation proceedings supported the date of August 29, 1999, contained on the Cooperating Individual Agreement and Special Consent Form, as being the date on which Ewell began working for the police as an informant.

[27] Transcripts from the August 20-21, 2001 trial will be cited as "Tr. Transcr. Vol. #, Page #:Line #"

regardless, the jury had every opportunity to judge the credibility of these witnesses, and in light of defense counsel's rigorous cross examination (of Stan Sweeney in particular), there is no reasonable probability that these documents would have altered the outcome of the trial.

Nonetheless, assume the jury did see these documents and concluded that the signing date was August 24, making Ewell a confidential informant when Daye was arrested on August 25, 1999. Would it have likely produce an opposite result at a new trial? The Court thinks not. First, in light of all the evidence presented at trial, the FOIA documents would have had a negligible impact on the outcome of the case. The State presented the testimony of numerous witnesses – including Officer Timothy Sweeney and Detective Stanley Sweeney - not just the testimony of James Ewell. To affect the outcome of the trial, the jury would have to find that every single state witness lied in their testimony concerning Ewell. The Court finds that an unlikely occurrence. Second, James Ewell was bombarded with tough questions during his testimony at trial regarding his work with law enforcement. The questions came not just from the prosecution, but also from defense counsel who thoroughly cross-examined Ewell. Likewise, defense counsel subjected Stanley Sweeney to an exacting cross examination, picking apart details of the CI process and use of CI's, and really taking full advantage of the opportunity to use Sweeney's testimony to portray Ewell as a CI on August 25th.[28]  Thus, viewing the matter in its entirety, while the FOIA documents would have provided more fodder for questioning, the petitioner has not demonstrated any reasonable likelihood that those documents would have altered the outcome of the case.

Furthermore, even though presentation of the FOIA documents would have supported the Petitioner's defense of entrapment, the jury did in fact deliberate on the defense of entrapment

---

[28] Tr. Transcr. Vol. 2, pp. 235-247

and found it lacking. During the jury charge, the trial court instructed the jury on the two-prong defense of entrapment:

THE COURT    Members of the jury, the defendant is relying upon the defense of entrapment. A person is entrapped when the person has no previous intention to violate the law and is persuaded to commit a crime by State agents. On the other hand, where a person is predisposed to commit the offense when first contacted by State agents, the fact that the State afforded him the opportunity to do so does not constitute entrapment. Once the defense of entrapment is raised, the burden is on the State to prove beyond a reasonable doubt that the defendant was not entrapped.

There are two elements to the defense of entrapment. First, an inducement by the State to commit the crime and, second, the absence of predisposition on the part of the defendant. The second part of the defense of entrapment concerns the predisposition of the defendant at the time when he is first approached by State agents. Predisposition is a state of mind which readily – which readily responded to the opportunity furnished by the officer or his agent to commit the offense charged.

If the evidence leaves you with a reasonable doubt whether the defendant had any intent to commit the crime except for the inducement or persuasion on the part of some State officer or agent, then it is your duty to find the defendant not guilty.

Trial Transcr. Vol. 2, 310:1 – 311:2. In addition to the entrapment instruction, the Court instructed the jury to reach a verdict based on the evidence - evidence that exposed Ewell for what he was: a man who not only aided the police through an agreement from which he benefited personally, but a man who also aided the police in the absence of such an agreement for the "fun" of it. Given Ewell's testimony and his apparent enjoyment of exposing criminal conduct, it would hardly be a surprise to the jury that Ewell either lied about being an informant on August 25, 1999, or that he entered into a subsequent arrangement to work as a confidential informant for RUDE. And ultimately it becomes clear that regardless of the date on the FOIA documents, the jury would in all probability still have found Daye guilty, thereby defeating Daye's claim for a new trial based on newly discovered evidence.

35

Again, for the sake of argument, presuming that the FOIA documents absolutely fulfill the first prong of the entrapment defense, the verdict still would not change because those documents have no impact whatsoever on the second prong of the entrapment defense - defendant's predisposition to commit the offense charged. The evidence presented at trial showed that Daye had the drugs on his person, offered to sell them to Ewell, voluntarily followed Ewell across town so Ewell could arrange for payment for the drugs by getting a girl, and waited a fairly significant amount of time while Ewell was out contacting the cops (unbeknownst to Defendant, of course). Thus, even if Ewell had been setting Daye up, or "entrapping" him, it is highly probably that the jury would still conclude that defendant Daye was predisposed to committing the offense, and it ultimately matters not whether Ewell was acting on his own or at the behest of the State on August 25, 1999.

Lastly, the Court considers the *Frazier* factor requiring that the purpose of introducing newly discovered evidence at a new trial be more than impeaching an opposing witness. In the case at hand, Petitioner's stated motivation or purpose for introducing the newly discovered documents is to further discredit Ewell's testimony by proving he *was* working for law enforcement on August 25, 1999, despite Ewell's protestations to the contrary. Our Court has expressly deemed such a purpose insufficient for a new trial. Moreover, for the documents to further discredit Ewell's testimony, the jury would first have to determine that the date written the second agreement was the 24th, as Daye contends, rather than the 27th or the 29th.[29] The jury would also have to find that the Officer Tim Sweeney and Officer Stan Sweeney committed perjury, because they both testified that they Ewell was not a confidential informant on August 25, 1999. If, however, the jury determined the date to be either August 27, 1999, or August 29,

---

[29] Although Petitioner insists the date on the cooperating individual agreement was either August 24, 1999, or if not, then it was falsified, not even a scintilla of evidence supports this conjecture.

1999, the newly discovered evidence would actually bolstered Ewell's credibility. This dichotomy demonstrates the very essence of why questions of credibility remain exclusively within the realm of the jury.

Petitioner attempts to escape operation of *Frazier's* 5th factor by arguing that the newly discovered evidence is not merely impeachment evidence but rather goes to the heart of the State's case. As demonstrated by the record, and, indeed, by the very nature of criminal proceedings, Ewell's credibility was not the sole issue for the jury in Case No. 00-F-36-K; instead, the pivotal issue was whether the State had proven beyond a reasonable doubt that Daye possessed crack cocaine with the intent to deliver. And while Ewell's credibility was undoubtedly a factor in the jury's deliberations, the Court properly instructed the jury to treat Ewell's testimony the same as they treated that of the other witnesses – that is, to give it whatever weight it felt was appropriate based on the circumstances and the evidence – all of which revealed Ewell's possible link to law enforcement and his self-serving proclivities prior to contacting the Sophia Police. Once the Sophia police became involved with Ewell's plan, the jury had every reason to conclude that Ewell was working in concert with law enforcement. Yet still the jury concluded that Cornell Daye was guilty beyond reasonable doubt.

For these reasons, the Court finds that the FOIA documents, although "newly discovered" evidence, do not fulfill the five factors required for a new trial.

**B.      Failure to Disclose "Exculpatory" Documents Petitioner Obtained Via FOIA[30]**

Petitioner claims he is entitled to a new trial because the State did not disclose "exculpatory evidence": the document showing Ewell worked as a confidential informant for RUDE in late August of 1999. It is well-established in West Virginia that "[t]he prosecution

---

[30] "Exculpatory" is in quotes to denote Petitioner's characterization of the evidence. It is not, however, exculpatory, as further explained in this section of the opinion.

must disclose any and all inducements given to its witnesses in exchange for their testimony at the defendant's trial." Syl. Pt. 1, *State ex. rel. Yeager v. Trent*, 203 W.Va. 716, 510 S.E.2d 790 (1998) *citing* Syl. Pt. 2, *State v. James*, 186 W.Va. 173, 174, 411 S.E.2d 692, 693 (1991). "Such deals are crucial as impeachment evidence; in some cases the jury may decide that the deal has created an incentive for the witness to lie," and "[c]lear evidence of a deal directly linking leniency for ... [a witness] with testimony tending to convict ... [the defendant] that was not disclosed would be grounds for a new trial." *James*,186 W.Va. at 175. Although the Court finds that the trial record demonstrates Ewell did not receive any inducement in exchange for his testimony at Petitioner's trial, and, hence, the FOIA documents were not exculpatory, it will nonetheless analyze the claim.

In the instant matter Petitioner Daye equates his case to *State ex rel. Yeager v. Trent*, 203 W.Va. 716, 510 S.E.2d 790 (1998), but the undisputed testimony in Daye's case materially distinguishes it from Yeager. In *Yeager*, the W.Va. Supreme Court reversed the defendant's conviction of first-degree murder and remanded it for a new trial based on the State's failure to disclose a possible plea agreement with a critical prosecution witness regarding criminal charges pending against him. Prior to trial, Yeager had filed a motion for discovery of any plea agreements between the State and its witnesses, including Steven Workman, who had been charged as an accessory after the fact of the murder for which Yeager stood trial. The State denied the existence of any agreements with Workman. Likewise, Workman testified that no promises had been made to him with regard to the pending criminal charges in exchange for his testimony. However, approximately eighteen months after testifying against Yeager, the prosecutor dismissed the criminal charges against Workman.

38

After Yeager filed his petition for writ of habeas corpus, it came to light that Workman may have indeed had some sort of unwritten agreement with the State that if his testimony against Yeager bore out, the prosecutor would drop the charges against Workman. Although no agreement was actually in writing, both the prosecuting attorney as well as defense counsel gave self-conflicting testimony about the existence of an agreement with Workman. Because the evidence of an agreement was circumstantial, the circuit court denied Yeager habeas relief, and Yeager appealed.

On appeal, the W.Va. Supreme Court was troubled by the unresolved question of whether a plea agreement with Workman had existed. There was no doubt that the criminal charges against Workman had been continued until after he testified against Yeager, which our Court found suggestive of a plea agreement. Also indicative of an agreement was the prosecuting attorney's testimony that an agreement had been made with Workman – testimony the prosecutor later recanted. Additionally, Workman's attorney had testified that if Workman's testimony supported the State's case against Yeager "they would drop his [Workman's] case at some point." The fact that the charges against Workman were, in fact, dropped after he testified against Yeager further supported the existence of an agreement. Based on this suggestive testimony, the Court concluded that substantial evidence, though circumstantial, indicated that an agreement had existed. As a result, our Court gave Yeager the benefit of the doubt that an agreement had existed between Workman and the State.

Our Court then addressed the whether the State's failure to disclose that agreement was material under the facts of the appellant's case. The Court concluded that it was material, particularly to the impeachment of Workman, who was a critical witness. Our Court considered Workman critical because he was the only witness who claimed to have heard Yeager arguing

39

with the victim for not charging for the drugs, referring to the victim as a rat, and pointing to a grave, saying that that was where the victim should be. Further, the Court found, the State needed to bolster Workman's credibility because he admitted lying to the police in a statement he had given them. Consequently, the Court concluded that had Yeager known about the plea, counsel could have subjected Workman to extensive cross-examination that could have impacted the Workman's credibility. Thus, our Court concluded that the lack of discloser denied Yeager a significant opportunity to challenge Workman's credibility, and Yeager was awarded a new trial.

Turning to the present case, first and foremost, the prosecutor in this case did not know about or possess the documents at issue until after Petitioner himself obtained them in 2009. This is not a *Yeager* scenario. Moreover, the undisputed testimony demonstrates the instant matter is further distinguishable from *Yeager*. Specifically, Ewell's undisputed testimony was that he had "worked off" his criminal charges prior to August 25, 1999, and was not arrested again until October of 1999. Additionally, the police officers testified that Ewell had worked off his prior obligation to act as a CI and that he was not acting as a CI on the night in question. Further, Ewell had no criminal charges pending against him at that time that he could have 'worked off' by turning in Daye. There was never any time of CI agreement in the works, and Ewell, unlike Workman, had no State-inspired interest in testifying against Daye in exchange for his own charges being diminished or dismissed.

Moreover, the FOIA documents are not so material to the issue of Daye's guilt as to qualify as exculpatory. The West Virginia Supreme Court recognized in *State v. Fortner*, 182 W.Va. 345, 354, 387 S.E.2d 812, 821 (1989) that "evidence reflecting on the credibility of a key prosecution witness may be so material to the issue of guilt as to qualify as exculpatory matter which the prosecution is constitutionally required to disclose." *State v. Fortner*, 182 W.Va. 345,

354, 387 S.E.2d 812, 821 (1989). As previously stated, Ewell's prior agreement with law enforcement to "work off" a DUI charge was made clear to the jury and subjected his testimony to the same discrediting as would have occurred if another agreement had existed on August 25, 1999. Further, even if Ewell entered an agreement with law enforcement in August 1999, and even assuming the State knew about it at Daye's trial, the non-disclosure was harmless because the jury knew of Ewell's previous involvement with law enforcement.

What is more, errors, even those of a constitutional level, are harmless and do not require a new trial where there is "no reasonable possibility that the violation contributed to the conviction." *Kelley*, 451 S.E.2d 425. As discussed, *supra*, there is no reasonable possibility that the FOIA documents, had they been disclosed, would have resulted in an acquittal the Petitioner. The evidence against him came from multiple witnesses, and the jury had ample evidence upon which to assess Ewell's credibility and the merits of the crime. Accordingly, the failure to disclose was not material to the Petitioner's case, and the Petitioner's argument again fails.

## C. Use of False Evidence & Improper Testing at Crime Lab

### Daye's Argument regarding the use of false evidence

Daye claims that the failure to disclose Ewell's criminal history and his work as a CI also constitutes conviction by false evidences. Petitioner relies on *Napue* to demonstrate that the prosecution has a constitutional obligation under due process principles to disclose to the defendant any plea agreements with any of its witnesses. The West Virginia Supreme Court of Appeals ("W.Va. Supreme Court") addressed this very issue in *State v. James*, holding:

> 1. "A prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution." Syl. Pt. 4, State v. Hatfield, 169 W.Va. 191, 286 S.E.2d 402 (1982).

41

2. The prosecution must disclose any and all inducements given to its witnesses in exchange for their testimony at the defendant's trial.

Syl. Pts. 1 and 2, 186 W.Va. 173, 411 S.E.2d 692 (1991).

The Petitioner also notes that the Supreme Court has considered whether the admission of perjured testimony justifies a new trial. Specifically, in *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division*, the W.Va. Supreme Court held that "[a]lthough it is a violation of due process for the State to convict a defendant based on false evidence, such conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict." Syl. Pt. 2, 190 W.Va. 321, 438 S.E.2d 501 (1992). Daye contends that the sole issue for the jury's consideration in Case Number 00-F-36-K was whether Ewell was acting on his own or whether Ewell was acting pursuant to an agreement with the State. Therefore, Daye contends, the testimony (which must have been perjured) that Ewell was not an agent of the State had a material effect on the jury's verdict. Lastly, the Petitioner argues that the State's failure to disclose Ewell's status as a paid informant prejudiced Daye at trial by denying him the opportunity to present a cautionary jury instruction about Ewell receiving compensation for his work for the police.

Daye also claims that the evidence from the West Virginia Crime Lab was improperly tested and false, and therefore should not have been used against him. To support his claim, he relies on *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (U.S. 1972), where the United States Supreme Court ("Supreme Court") held that the use of tainted or false testimony to obtain a conviction is a fundamental violation of the accused's due process rights under the Fourteenth Amendment. In addition, the Petitioner cites *Napue v. Illinois*, 320 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (U.S 1959). In *Napue*, the Supreme Court articulated that

The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

360 U.S. at 269.

### State's Argument

The State fully agrees that had it known of Ewell's agreement with law enforcement to act as a confidential informant it would have been required to disclose the same. However, the State has continually maintained that it did not know of any such agreement or any other criminal charges against Ewell prior to receiving the FOIA documents from Daye. The State argues that it did not present any false evidence to the jury, that the crime lab properly tested the cocaine, and that the jury correctly convicted Petitioner based on the facts and evidence.

### Analysis

Upon review of the record and careful consideration of pertinent legal authorities, this Court finds that Petitioner's arguments regarding the State's failure to disclose evidence and the use of false evidence are without merit. As previously discussed, the Court agrees with the parties that had the FOIA documents been provided to both the State and the defense prior to trial in Case No. 00-F-36-K, the question of whether Ewell was an informant for law enforcement on August 25, 1999, could have been presented to the jury for consideration. At the same time, however, Mr. Ewell did in fact testify at length about his initial agreement with law enforcement and his motivation on August 25th. More significantly, Ewell was extensively cross-examined by defense counsel, who exposed Ewell's self-serving actions and the problems with his believability, thereby presenting the jury with a thorough picture of Ewell upon which to

judge Ewell's credibility...or lack thereof. Petitioner has presented no evidence whatsoever that testimony regarding Ewell was perjured; Speculation and conspiracy theories, without more, present basis to overturn or vacate a guilty verdict.

Furthermore, the record before the Court convinces it that the State did not possess or know about the documents Ewell obtained through FOIA until after the FOIA request in 2009. It would be different if the State knew Ewell was acting under an agreement with law enforcement on August 25, 1999, and the State knowingly withheld that information. See, Syl. Pt. 1, 2, *James*, 186 W.Va. 173 (prosecution's withholding of potentially exculpatory violates defendant's due process, and prosecution must disclose inducements given to witnesses in exchange for their testimony). However, that is not the case, and the State cannot supply evidence that does not exist or of which it has no knowledge. Furthermore, from its extensive review of all the materials, the Court cannot help but conclude that the prosecuting attorney has been forthright, diligent, and honest, in all dealing with Daye, including the disclosure of evidence and including rectifying an Order that had incorrectly calculated Daye's time served.[31] There is not even a hint that the prosecution knowingly withheld information or presented false information to the jury.

Even if the Court assumes *arguendo* that the State convicted Daye with false evidence about Ewell's status as a confidential information, thereby violating Daye's due process, such a conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict. Syl. Pt. 2, *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division*, 438 S.E.2d 501. The Court finds it did not. First, as set forth above, the jury had ample evidence upon which to consider Ewell's credibility and testimony. Thus, even if the lack of evidence about Ewell's subsequent agreement with the State

---

[31] This Order is addressed in Ground 4.

44

violated Daye's due process rights, a trial error involving the deprivation of a constitutional right is harmless if there is no reasonable possibility that the violation contributed to the conviction. Syl. Pt. 4, *State v. Kelley*, 192 W.Va. 124, 451 S.E.2d 425 (1994), citing Syl. Pt. 20, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974). Thus, the question is whether there was any reasonable possibility that the missing evidence (which Daye obtained through FOIA) contributed to Daye's conviction. In other words, would Daye have been convicted even if this evidence had been presented at trial?

As discussed in the section on "newly discovered evidence," the Court likewise finds that Daye would still have been convicted if this evidence had been presented at trial and that there is no reasonable possibility that the missing evidence contributed to the jury's verdict. Even supposing Ewell was acting as a confidential informant at the time of the Petitioner's arrest, that that information was potentially exculpatory, and that the State was aware of the agreement prior to trial, the effect of its omission was harmless and does not require a new trial. First, the jury was aware that Ewell worked as a confidential informant for the police prior to Daye's arrest. This information was disclosed by Ewell's own testimony. Second, through Ewell's testimony the jury was also well aware that he got a kick out of turning drug dealers and would act just as his did in Daye's case, whether sanctioned by the police or not. Third, at the conclusion of the evidence, the court instructed the jury to consider all the evidence and circumstances when determining how much weight to give each witness's testimony. Tr. Transcr. vol. 2, 301:16-303:7. For that reason, Ewell's testimony was in fact subject to the credibility attack Petitioner claims he was denied, because the jury heard from Ewell himself about his arrangement to assist law enforcement in an effort to rid himself of a DUI charge. Stated another way, the jury was fully able to evaluate the credibility and reliability of Ewell's testimony.

45

Furthermore, the Petitioner has not presented clear evidence to show that the jury would have reached a different conclusion regarding the Petitioner's guilt had they been provided with evidence of an additional agreement between Ewell and law enforcement. Based upon the evidence actually presented to the jury, including the circumstances surrounding Daye's arrest and Ewell's prior agreement with police, there is no reasonable possibility that the State's failure to disclose a second agreement between Ewell and the police, which they entered into *after* Daye's August 25th, 1999, arrest, contributed to Daye's conviction. Therefore, pursuant to *Kelley*, this Court finds the error was harmless, and the Petitioner is not entitled to a new trial. *Kelley*, 451 S.E.2d 425.

### Allegations of Improper Testing at Crime Lab

In addition to the alleged errors regarding the documents produced through the 2009 FOIA request, Petitioner presented another series of allegations to support his claim in Ground 1. Specifically, at the omnibus evidentiary hearing on May 9, 2012, Daye argued for the first time that newly discovered evidence in the form of a newspaper article existed regarding the evidence analysts at the West Virginia State Police Crime Lab. Petitioner claimed that the article reported that Timothy White and Janet Hudson - the two Crime Law employees who tested the substance seized from Daye, determined it to be crack cocaine, and testified against him at trial - were involuntarily removed from the crime lab following allegations of improper testing.[32] According to Petitioner, this information should have been disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), because the analysts may have improperly tested the evidence used to convict him.

---

[32] The Petitioner noted that at trial, Hudson testified that she had voluntarily transferred to another section of the lab, and both witnesses testified that their testing was done properly.

46

In response, the State argues that the specimen at issue was submitted both before and after the initial investigation of the crime lab, and both witnesses testified under oath about their methods and procedures in conducting the analysis. The State contends that the Petitioner's information was speculative, and the State was not aware of any improprieties in Daye's case.

The Court views Petitioner's argument as two-fold: (1) a claim of newly discovered evidence; and (2) a claim of false evidence. Upon consideration, the Court finds no merit to either claim, because Daye failed to meet any of the requisite criteria.

Applying the 5-part inquiry pursuant to *Frazier*, *supra*, the Court finds that the newspaper article does not qualify as "newly discovered evidence." Other than having been discovered after the trial, there are no facts demonstrating (1) that petitioner was diligent in ascertaining and securing his evidence; (2) that the new evidence is such that due diligence would not have secured it before the verdict; (3) that it is material; (4) that it would produce an opposite result at a second trial on the merits; or (5) that the evidence would have any purpose other than to discredit or impeach a witness on the opposite side. *Frazier*, 162 W. Va. 935, 936, 253 S.E.2d 534, 535 (1979).

For deeper analysis the court looks to *Slater v. U.S.*, 2005 WL 4147921 (S.D.W.Va. 2005) *aff'd*, 70 Fed.Appx. 107, 2003 WL 21660356 (C.A.4 (W.Va.)), a case in which the District Court for the Southern District of West Virginia addressed similar claims regarding testing done at the West Virginia crime lab. In *Slater*, the defendant argued, *inter alia*, that newly discovered evidence revealed that the government engaged in misconduct when it used the crime lab, specifically Sgt. Timothy White and another employee, for testing evidence.

The District Court in *Slater* rejected Slater's arguments, which are very similar to those Daye now makes. *Slater v. U.S.*, 2006 WL 1831400 (2005)(adopting magistrate judge's findings

47.

of fact and conclusions of law set forth in *Slater v. U.S.*, 2005 WL 4147921 (S.D.W.Va. 2005)). Admittedly the unpublished *Slater* opinions are merely persuasive authority, but this Court nonetheless finds its analysis and conclusions apropos to the instant matter. In *Slater*, the defendant argued that newly discovered evidence revealed that the government engaged in misconduct when it used the crime lab, specifically Sgt. Timothy White and another employee, for testing evidence. He claimed that the agents' pattern of misconduct undermined any forensic work performed in his case, and that the government withheld from him the information regarding the agents' practices. *Brady*, 373 US 83 (1963); *Napue v. Illinois*, 360 US 264 (1959). The defendant essentially argued that he was denied his right to a fair trial by non-disclosure of evidence, pursuant to *Brady*, and by his alleged conviction on the basis of false evidence, pursuant to *Napue*, 320 U.S. 264.

The magistrate judge in *Slater* found Slater's claims meritless, as did the United States District Court for the Southern District of West Virginia in adopting the lower court's findings and recommendations. *See, Slater*, 2005 WL 4147921 (S.D.W.Va. 2005). First, with regard to the *Brady* non-disclosure of evidence argument, the *Slater* court noted the two-prong inquiry: (1) the prosecutor must fail to disclose evidence favorable to the accused; and (2) the evidence must be material to the verdict in order for the *Brady* claim to stand. The *Slater* court pointed out that the defendant was indicted in July 2001, several months after one of the officers at the lab was sentenced for his misconduct at the lab in January 2001. For that reason, the court found, that any evidence of misconduct at the lab was public knowledge available to the defense throughout the defendant's proceedings; thus, there was no *Brady* violation. Second, the *Slater* Court held that the defendant's false evidence claim failed pursuant to *Napue*, 360 U.S. 264, because Slater had not demonstrated that any false evidence was used to obtain his conviction. *Napue*, 360 U.S.

48

at 271(holding a new trial will only be granted if the false testimony could in any reasonable likelihood have affected the judgment of the jury.)

Similarly, in Daye's situation not only was the investigation at the West Virginia Crime Lab public knowledge, but the crime lab employees who testified at Daye's trial were thoroughly examined at trial.[33] Defense counsel cross-examined both White and Hudson about their work at the crime lab and their testing of the evidence in this case. The mere fact that the Petitioner presented a newspaper article purportedly indicating that White was removed from the lab and Hudson was involuntarily transferred to another section simply does not meet the standard of a *Brady* violation. Further, while this Court is aware of circumstances surrounding the discovery of improprieties at the crime lab, both witnesses testified at trial that their analyses of the substance were performed correctly, and that the substance was indeed cocaine base. Both crime lab employees were subjected to extensive questioning under oath at trial, and Petitioner has produced no evidence other than a newspaper article to show that improprieties in the lab could have had any effect on the evidence in his case. "We do not . . . automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . .'" *Giglio*, 401 U.S. at 153, quoting *United States v. Keogh*, 391 F.2d 138, 149 (CA2 1968). The Petitioner's arguments are speculative, at best, and do not meet the standards required for relief.[34]

---

[33] The relevant testimony from Hudson and White is included at the end of the Court's discussion on Ground 1.

[34] The Court notes that at the omnibus hearing, the Petitioner argued that the issue regarding the crime lab was orally argued before the West Virginia Supreme Court by the Petitioner's prior lawyer, Lonnie Simmons, in *State ex rel. Cornell Daye v. McBride*, Nos. 33100 and 33101. The Petitioner claimed that the Supreme Court advised his counsel to file subpoenas to obtain further information regarding the investigations, but that his counsel never filed the subpoenas. The Petitioner also claimed that he attempted to file them himself, *pro se*, while still represented by counsel of record, and that he sent them to the Raleigh County Circuit Clerk's office. Upon review, this Court has determined that the subpoenas

49

For all of the reasons discussed above, the court concludes that the purported newly discovered evidence, even if proven true, does not rise to the level required to warrant a new trial. This Court finds that the newly discovered evidence does not require reversal of the Petitioner's convictions in Case Nos. 00-F-36-K and 01-IF-158-H pursuant to *Brady*. The request for relief in Ground 1 of the Amended Petition is therefore **DENIED.**

## Excerpts of Testimony Regarding Crime Lab Testing and Improprieties

### TROOPER JANET HUDSON

Trooper Hudson, Transcr. Vol. 1 pp. 115-122 (full testimony: pp. 110-124)

DIRECT EXAMINATION BY MR TRUMAN:

Q. Trooper Hudson, you've released the contents of what's been marked for identification as State's Exhibit 6, and there is another brown envelop inside with a number of markings. Can you identify whether you handled that package in the past?

A. Yes, sir. It has my initials here on the bottom. And then the Laboratory Case No. is here. It's been printed on the package also. But these are my personal initials here.

Q. Why would those initials be on that document?

A. This is the envelope that I returned the evidence in.

. . .

Q. Trooper Hudson, removing the contents of the second envelope, did you mark on that document anywhere?

A. Yes, sir. . .

. . .

Q. Trooper Hudson, you can see through the back of what's been marked State's Exhibit 9, and there's a film - -plastic film container - -film roll container.

A. Yes.

Q. Is it considered standard procedure in your business to place specimens, such as crack cocaine, inside of a film container so it can be crushed?

A. Yes, sir. As a matter of fact, I teach that at the Academy.

Q. And this is the same specimen delivered to you by Officer Gray from the Beckley P.D.?

A. Yes, sir. Once again, I can identify it by my initials there on the packaging.

---

prepared by the Petitioner were never served, and were not requested by his counsel of record at the time. The Court will address the issue regarding the subpoenas in a separate section below.

Q. So as a matter of procedure, when you went to analyze this, when you opened the film container and tested the contents, how did you do the test of the contents? What physical test did you perform on this specimen?.

A. The first thing I did was a weight determination to see how much of the substance was actually present. The next two tests that I performed were preliminary tests. They're only general tests that will give me an indication of what substance might be there.

The final test is the one that is specific, and to do it we use an instrument called an infared [sic] spectrometer. This instrument analyzes the substance, and the chart that it produces is as good as a fingerprint. A spectrum of cocaine base will only be cocaine base.

. . .

CROSS EXAMINATION  BY MR. PARKULO

. . .

Q. Previous in time, the lab was shut down, which there's been some testimony, due to improprieties, to the best of our knowledge, as to what occurred, and an investigation was done by the Federal Bureau of Investigation. Are you familiar with that situation?

A. Yes, sir.

Q. this evidence initially was in the time frame when the lab was suffering such improprieties, Is that a fair statement?

A. This was before the investigation

Q. This was prior to the investigation?

A. Yes, sir.

Q. Was this during the period when improprieties were taking place at the lab, if you know?

A. We had a problem with one of our chemists, and that chemist was there at this time; however, he did not have access to this evidence.

Q. Are you still at the lab?

A. No, sir.

Q. Where are you now?

A. I'm in the uniform and crime reporting section.

Q. Why did you leave the lab?

A. Because whenever the investigation was finished and I was given the option to go to a different section, I felt I had enough time in the lab and I chose to leave.

Q. And you're not familiar with the results of the investigation into the closure of the lab, because it hasn't been released to anybody, are you?

A. no, sir.

Q. You haven't seen the federal bureau of investigation report on their findings in terms of the improprieties at the lab during that period of time, are you?

A. No, sir, I've not seen that report.

Q. And everything you've testified to here is all you know about this particular evidence entered into tin this case. Is that correct?

A. Yes, sir.

## TROOPER T.G. WHITE

DIRECT EXAMINATION BY MR. TRUMAN of TROOPER T.G. WHITE
Transcr. Vol. 1, pp. 140-149.

Q. You're in a unique position, Trooper, because you were with the forensic lab before the shutdown of the lab, and you are still assigned to the lab, aren't you, sir?

A. Yes, sir.

Q. Are you the only chemist still assigned?

A. At the present time, yes, sir.

. . .

Q. Specifically, what did you do when you received the specimen to analyze what it was?

A. First thing I did was await determination to find out how much was present. I did a sample color test where I took a little bit of the sample and added some reagents to it, and observed a color change. I did a microcrystalline test, where I looked at the sample underneath a microscope; and I did one instrument test, which identified the cocaine base.

Q. and did you draft a report indicating your findings?

A. Yes, sir.

. . .

Q. What were your findings?

A. I found that it weighed approximately 1.06 grams and contains cocaine base, schedule II controlled substance.

Q. Trooper, I hand you what's been marked as State's Exhibit No. 8, and what is that, sir?

A. It looks like a copy of one of Trooper Hudson's reports.

Q. Now, I want you to compare the weight Trooper Hudson said the specimen weighed with the weight that you had.

A. Yes, sir.

Q. And are they the same/

A. Generally, sir. Not exactly.

Q. and how unexactly are they?

A. approximately three one-hundredths of a gram.

Q. Can you account for why the specimen would weight three-hundredths of a gram less when you weighted it than when Trooper Hudson weighted it?

A. Yes, sir. The first thing we do in the laboratory when we receive it, is weigh that. And then whatever amount of the sample which we used in the test would be consumed in the analysis. So I would expect if she did an analysis, that it would weigh less.

Q. Finally, can you tell if the same –if you tested the same specimen as Trooper Hudson tested?

A. I can't specifically say, no, sir.

Q. Just except on the basis of the report numbers?

A. Basis for the report number and that her initials and Case No. were on the evidence also when I received it.

Q. So it's all going to b e a matter of tracking, but in terms of you weren't there when she analyzed it; she wasn't there when you analyzed it?

A. Correct

Q. But it would appear to you that the numbers and the tracking system, that it's one and the same specimen. Is that a fair statement?

A. Yes, sir.


CROSS EXAMINATION MR. PARKULO

. . .

Q. Your sole job is strictly to test at that lab. Isn't that correct?

A. Yes.

Q. And is it or is it not true, since you have been there, you are aware that there were improprieties in the testing of specifically drugs at the state lab, which closed it down and resulted in a federal investigation. Isn't that correct?

A. Yes, sir.

Q. And furthermore, you'll testify for the record, nobody else has, and I don't think you have, but I'm going to ask you the question – have you seen the results of that investigation?

A. No sir.

Q. . . .No further questions.


REDIRECT EXAMINATION BY MR. TRUMAN

Q. Trooper White, after all was said and done, you were reassigned to the lab. Primarily, there was nothing wrong with what you did?

A. Yes, sir.

Q. Were you given an option of going someplace else, or did you just say, "I want to stay in the lab"?

A. Not really. I guess had I wanted to go someplace else, and made those wishes known, that probably could have happened.

Q. You didn't do anything wrong in this case, did you?

A. No sir.

Q. Are you aware of anyone else that did?

A. In this case, no, sir.


53

RECROSS EXAMINATION BY MR. PARKULO

Q. You're not aware of a trooper that was actually prosecuted—my understanding either prosecuted or pled, or somehow got time out of some improprieties. You're not aware of that?

A. That was not a trooper. That was a civilian chemist, and that was not in this case.

Q. . . .So that wasn't a trooper in the lab at all. Is that correct?

A. That was a civilian personnel in the lab.

Q. Is it not correct that – I mean, if you know, is it not correct that certain state officers were placed on administrative leave during the course of this investigation?

A. Yes, sir.

Q. And, again, you don't know if the investigation has been completed, do you, since you don't know the results of it?

A. Well, I was one of those persons that was placed on administrative leave, and when they brought me back, I would have to assume that then the investigation was over.

Q. But, again, that would be an assumption, wouldn't it?

A. Well, I wouldn't be back to work, I don't think, if there was a problem.

Q. Have you or anybody, to your knowledge, seen the final results of any investigation, Officer?

A. The only thing that I've seen is I've got a letter from the Superintendent of state police that says that the part of the investigation that applies to me is over, and they found no improprieties; that I've been returned to work fully.

Trooper T.G. White's full testimony: pp. 139-150.

## SERGEANT D.W. SKEEN

### CROSS EXAMINATION BY MR. PARKULO OF SERGEANT D.W. SKEEN
Transcr. Vol. 1, pp. 131-132.

Q. Trooper, you do know that the lab was, in fact shut down, and there was an investigation by the FBI pursuant to request. Is that correct?

A. Yes, sir.

Q. And to your knowledge, you haven't seen the results of any such investigation, have you?

A. No. Have I personally viewed the results? No.

. . .

REDIRECT EXAMINATION BY MR. TRUMAN

Q. Sergeant, one of the former chemists there was removed and actually was involved in a federal prosecution pleading guilty, correct?

A. Yes, sir.

Q. From your review of Mr. Daye's case, was anything improperly done?

MR. PARKULO: Objection, your Honor. This officer did not do an investigation into any improprieties. Therefore, he wouldn't have the knowledge to answer such a question.

THE COURT: Sustained.

**FIRST SERGEANT G. E. MCCABE**

CROSS EXAMINATION BY MR. PARKULO
... (Transcr. Vol. 1, pp. 138) ·

Q. Sergeant, I'm going to ask you one other question. You, of course, are aware that there was an FBI – Federal Bureau of Investigation – into our own state lab for what we know as improprieties. Is that correct?

A. There was an investigation, yes, sir.

Q. You have not been privileged, and you have not had an opportunity – or anybody else that I know as of now – an opportunity to see the results of the FBI investigation, have you?

A. No, sir, I did not.

---

**Ground 2: Petitioner asserts that his incarceration is illegal in violation of the Fifth, Sixth, Eighth and Fourteenth to the United States Constitution and Article III, Sections 1, 5, 10 and 14 of the West Virginia Constitution, because Petitioner's life sentence under the habitual offender statute was constitutionally disproportionate, as all three underlying convictions were for nonviolent offenses to wit: possession of a controlled substance with intent to deliver. (Decided under State and Federal law)**

**Relief Denied.**

. Our Court has long held that "when a question has been definitely determined by this Court its decision is conclusive on parties, privies and courts, including this Court, upon a second appeal or writ of error and it is regarded as the law of the case." Syl. pt. 1, *Mullins v. Green,* 145 W.Va. 469, 115 S.E.2d 320 (1960). Our Court has further explained that the 'law of the case' doctrine

> "generally prohibits reconsideration of issues which have been decided in a prior appeal in the same case, provided that there has been no material changes in the facts since the prior appeal, such issues may not be re-litigated in the trial court or re-examined in a second appeal." 5 Am.Jur.2d *Appellate Review* § 605 at 300 (1995) (footnotes omitted)." *State ex rel. Frazier & Oxley, L.C. v. Cummings,* 214 W.Va. 802, 808, 591 S.E.2d 728,734(2003).

*Hatfield v. Painter*, 222 W.Va. 622, 671 S.E.2d 453 (2008).

This "law of the case" doctrine bars consideration of the issues Petitioner raises in Ground 2 because the West Virginia Supreme Court of Appeals addressed these very same contentions in Daye's 2007 challenge to the enhancement of his sentence. *State ex rel. Daye v. McBride*, 222 W.Va. 17, 658 S.E.2d 547 (2007). In Petitioner's 2007 appeal, Daye challenged the enhancement of his sentence from 2-30 years in the penitentiary to life imprisonment, which the trial court imposed pursuant to W.Va. Code §§61-11-18 and 19. The West Virginia Supreme Court thoroughly examined the matter and declared the life sentence mandatory for the defendant.

Via the instant habeas corpus Petition, Daye again seeks to litigate those issues regarding his enhanced sentence despite the West Virginia Supreme Court previously ruling upon and rejecting the same arguments. Because our Court previously established the law of the case and no material changes in the facts exist, Daye's sentence enhancement to life imprisonment is Constitutional. **RELIEF DENIED.**

For the benefit of the parties (and the subsequent benefit of the Supreme Court), the full opinion in *State ex rel. Daye v. McBride*, 222 W.Va. 17, 658 S.E.2d 547 (2007) is set forth below.

---

*State ex rel. Daye v. McBride*, 222 W.Va. 17, 658 S.E.2d 547 (2007)

Supreme Court of Appeals of
West Virginia.

STATE of West Virginia ex rel. Cornell F. DAYE, Petitioner Below, Appellant
v.
Thomas McBRIDE, Warden, Mount Olive Correctional Center, Respondent Below, Appellee (Two Cases).

Nos. 33100, 33101.
Submitted May 9, 2007.

Decided June 27, 2007.

**Background:** Defendant convicted of possession of crack cocaine with intent to deliver, second or subsequent offense filed petition for writ of habeas corpus, challenging enhancement of sentence to life. The Circuit Court, Raleigh County, John A. Hutchison, J., denied relief, and defendant appealed.

**Holding:** The Supreme Court of Appeals, Starcher, J., held that life sentence was mandatory for defendant convicted of felony drug offense, second or subsequent offense, who admitted two prior felony drug convictions.

Affirmed in part; remanded in part.

**\*\*548 \*18 Syllabus by the Court**

1. "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus Point 1, *Mathena v. Haines,* 219 W.Va. 417, 633 S.E.2d 771 (2006).

2. "Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation." Syllabus Point 2, *Crockett v. Andrews,* 153 W.Va. 714, 172 S.E.2d 384, (1970).

3. "Where an accused is convicted of an offense punishable by confinement in the penitentiary and, after conviction but before sentencing, an information is filed against him setting forth one or more previous felony convictions, if the jury find or, after being duly cautioned, the accused acknowledges in open court that he is the same person named in the conviction or convictions set forth in the information, the court is without authority to impose any sentence other than as prescribed in Code, 61–11–18, as amended." Syllabus Point 3, *State ex rel. Cobb v. Boles,* 149 W.Va. 365, 141 S.E.2d 59 (1965).

4. "The general rule of statutory construction requires that a specific statute be given precedence over a general statute relating to the same subject matter where the two cannot be reconciled." Syllabus Point 1, *UMWA by Trumka v. Kingdon,* 174 W.Va. 330, 325 S.E.2d 120 (1984).

5. When any person is convicted of an offense under the Uniform Controlled Substances Act (*W.Va. Code,* Chapter 60A) and is subject to confinement in the state correctional facility therefor and it is further determined, as provided in *W.Va.Code,* 61–11–19 (1943), that such person has been before convicted in the United States of a crime or crimes, including crimes under the Uniform Controlled Substances Act (*W.Va.Code,* Chapter 60A), punishable by confinement in a penitentiary, the court shall sentence the person to confinement in the state correctional facility pursuant to the provisions of *W.Va.Code,* 61–11–18 (2000), notwithstanding the second or subsequent offense provisions of *W.Va.Code,* 60A–4–408 (1971).

**STARCHER, J.:**

The appellant, in this habeas corpus action, seeks relief from his sentence as enhanced under *W.Va.Code,* 61–11–18 (2000). The trial court initially sentenced the appellant under *W.Va.Code,* 60A–4–408 (1971), which provides that the sentencing judge may sentence a convicted defendant up to twice the term for the offense as otherwise authorized. The State subsequently filed a motion pursuant to *W.Va. Rules of Criminal Procedure,* Rule 35a, to correct the initial sentence to conform with the requirements of *W.Va.Code,* 61–11–18 (2000). The trial court

granted the State's motion and sentenced the appellant to confinement in the penitentiary for life. The appellant claims that his original sentence under *W.Va.Code*, 60A–4–408 (1971) was valid and should be reinstated.

For the reasons discussed in this opinion, we affirm the decision of the trial court and remand this case for further proceedings.

## I.
### *Facts & Background*

On August 25, 1999, the appellant, Cornell F. Daye, aka "Jumpshot," while on probation on a prior felony drug charge, was arrested in Raleigh County, West Virginia, for possession of crack cocaine. A few months after the August 1999 arrest in Raleigh County, but before his indictment, the appellant was *19 **549 arrested in Orange County, Florida, where he pled *nolo contendere* to possession of a controlled substance, and was sentenced to six months in jail. On January 10, 2000, while the appellant was serving his sentence in Florida, the appellant was indicted by a Raleigh County grand jury for the West Virginia incident leading to his August 1999 arrest for possession of crack cocaine with intent to deliver, second offense.[FN1]

> FN1. Following is the complete text of the January 10, 2000 indictment:
>
> **Alleged Offense:** POSSESSION OF "CRACK" COCAINE WITH INTENT TO DELIVER–SECOND OFFENSE
>
> **Citation:** W.VA. CODE 60A–4–406
>
> **STATE OF WEST VIRGINIA, COUNTY OF RALEIGH, TO WIT:**
>
> **The Grand Jurors of the State of West Virginia, in and for the body of the County of Raleigh, upon their oaths present that CORNELL DAYE aka "JUMPSHOT" in or about the 25th day of August, 1999 in the said County of Raleigh, did unlawfully, knowingly, intentionally and feloniously possess a quantity of "crack" cocaine, a Schedule II controlled substance, with the intent to deliver, this being his Second Offense, having been previously convicted on or about the 22nd day of March, 1999, in the Circuit Court of Raleigh County, West Virginia, said conviction having become final, against the peace and dignity of the State, and found upon the testimony of Detective M.R. Robinson, RUDE duly sworn to testify the truth before the Grand Jury this the 10th day of January, 2000.**
>
> [Signed by] Larry Frail **Prosecuting Attorney**
>
> The indictment was subsequently amended to correct the *Code* citation to *W.Va.Code*, 60A–4–408.

The appellant waived extradition while serving his sentence in Florida, and upon completion of his sentence, on May 19, 2000, the appellant was transported back to West Virginia. The appellant was held in a regional jail until his trial. On November 6, 2000, the appellant was arraigned on the indictment. On January 2, 2001, a hearing was held to revoke the appellant's probation from his March 22, 1999 Raleigh County felony drug charge conviction.[FN2]

> FN2. On March 22, 1999, in the Raleigh County Circuit Court, in Case 99–IF–69–K the appellant was

58

sentenced to a term of not less than one (1) nor more than fifteen (15) years for a conviction of Possession of a Controlled Substance with Intent to deliver. The sentence was suspended and the appellant was placed on probation.

The appellant's trial began on August 20, 2001, and concluded on August 21, 2001, with a conviction for possession of crack cocaine with intent to deliver, second or subsequent offense.[FN3]

> FN3. Following is the relevant text of the court order accepting the jury verdict:
>
> We, the jury, find the defendant, **Guilty of Possession with the Intent to Deliver a Schedule II Substance, to-wit, "Crack" Cocaine, second or subsequent offense** as contained in the State's Indictment.

On August 22, 2001, the State filed an information pursuant to _W.Va.Code, 61–11–19 (1943)_, stating the appellant had been convicted on: (1) August 23, 2001, of possession of crack cocaine with intent to deliver, (2) March 22, 1999, of possession of a controlled substance with intent to deliver, and (3) April 28, 1998, of possession of crack cocaine with intent to deliver. [FN4] All convictions were for felony offenses.

> FN4. Following is the text of the State's information:
>
> THE PROSECUTING ATTORNEY CHARGES:
>
> That on or about August 21, 2001 in Raleigh County, West Virginia, the defendant was found convicted by a jury of his peers of an offense punishable by confinement in the penitentiary in the Circuit Court of Raleigh County, West Virginia. The defendant has not been sentenced for his conviction of August 21, 2001.
>
> The prosecuting attorney has knowledge of a former sentence to the penitentiary of defendant by the Circuit Court of Raleigh County, West Virginia, March 22, 1999 for a term of not less than one (1) nor more than fifteen (15) years in Case 99–IF–69–K wherein the defendant was convicted of Possession of a Controlled Substance with Intent to deliver.
>
> The prosecuting attorney has knowledge of a former sentence to the penitentiary of defendant by the Circuit Court of Raleigh County, West Virginia, April 28, 1998 for a [period] of not less than one (1) year nor more than fifteen (15) years in Case 97–F–16 wherein the defendant was convicted of Possession of Crack Cocaine with Intent to Deliver.

On September 6, 2001, a hearing was held to consider the State's August 22, 2001 information. This hearing was presided over by a different judge than the judge who had presided over all of the prior proceedings. The judge explained to the appellant that if he admitted he was the person convicted of the *20 **550 crimes identified in the State's information, "you _could be_ sentenced to a period of life in the penitentiary, with possibility of parole." (Emphasis added.) The appellant admitted that he was the person convicted in the previous cases. The judge accepted the appellant's admission and entered a finding that the appellant "knowingly, voluntarily and understandingly appreciates the ramifications of an admission."

On September 26, 2001, the original judge in the case reviewed the pre-sentence report and the record relating to the appellant's admission to the prior convictions. On September 26, 2001, the judge ordered the appellant sentenced to not less than two nor more than thirty years in a state correctional facility pursuant to the enhancement provisions of *W.Va.Code, 60A–4–408 (1971).*[FN5] The judge specifically declined to sentence the appellant under the provisions of *W.Va.Code, 61–11–18 (2000).*

FN5. Following is the complete text of the sentencing order:

ORDER SENTENCING DEFENDANT

On this the 26th day of September 2001, came the defendant, in person and by counsel, John Parkulo, Esq. The Adult Probation Department appeared by Walter Flarper Adult Probation Officer. The state appeared by its assistant prosecuting attorney pursuant to Order.

The Court reviewed the pre-sentence report of September 3, 2001. The Court heard argument from defense counsel and granted the defendant an opportunity to address the Court. The state noted that the defendant had previously admitted to the state's information 01–F–158–H wherein it was alleged that the defendant had previously been convicted of felony crimes.

Based upon the entire record it is ORDERED that the defendant is committed to the West Virginia Division of Corrections to be confined in the penitentiary of this state for a term of not less than 2 nor more than 30 years for his conviction of Possession with Intent to Deliver a Controlled Substance, to-wit, Cocaine, Second or Subsequent offense under Indictment 00–F–36K. The sentence shall rune [sic] CONSECUTIVELY with the sentence imposed by the Court in 99–1F–69–K.

The Court acknowledges that pursuant to West Virginia Code 61–11–18 & 61–11–19 the state has met its burden. The Court, however declines to enhance the sentence of the defendant as a habitual offender.

The defendant is remanded to the Southern Regional Jail pending transfer to the penitentiary.

The defendant is granted credit for time served on this charge awaiting sentencing.

The defendant OBJECTS to the Court's denial of his motion for probation and to the Court's sentence.

The state OBJECTS to the Court's failure to sentence the defendant as an habitual offender.

The defendant shall pay the costs of the prosecution of this matter.

It is ORDERED that the Clerk of this Court remove this case from the Court's active docket of cases.

On October 2, 2001, the State filed a motion, pursuant to Rule 35(a) of the *West Virginia Rules of Criminal Procedure,*[FN6] to correct the sentencing order, contending that a life sentence was mandatory under *W.Va.Code, 61–11–18 (2000).* On October 11, 2001, the judge entered an order which "corrected" the initial sentence and ordered

60

that the appellant be confined in a correctional facility for life pursuant to *W.Va.Code, 61-11-18 (2000)*.[FN7]

FN6. Rule 35 of the *West Virginia Rules of Criminal Procedure* permits the court to correct illegal sentences.

FN7. Following is the relevant text of the court's order granting the State's motion to correct the appellant's sentence:

ORDER DENYING DEFENDANT'S MOTION TO SET ASIDE VERDICT; DENYING MOTION FOR NEW TRIAL; GRANTING MOTION OF THE STATE TO CORRECT SENTENCE AND GRANTING MOTION TO WITHDRAW AS COUNSEL.

On this the 11th day of October 2001 the defendant appeared in person and by counsel, John Parkulo, Esq. The state appeared by its assistant prosecuting attorney pursuant to Notice of hearing on all post trial motions.

The defendant, by counsel and with direct input of the defendant through counsel argued the defendant's Assignments of Error and Motion for New Trial. The state was granted the opportunity to respond. The defendant then presented rebuttal argument to the state's argument. The Court then made the following findings:

...

The Court then addressed the state's Motion to Correct Sentence. The state advised that it was prepared to have its motion resolved on the basis of the documents filed. The defendant filed a *pro se* response to the state's motion that had not been provided to the Court. In addition, counsel and the defendant directing counsel cited specific cases to the Court. The Court recessed to review the cases cited by the defendant.

It is ORDERED that the state's motion is GRANTED. The sentence imposed by this Court September 26, 2001 is CORRECTED to state that the defendant is committed to the West Virginia Division of Corrections where he shall be confined in a correctional facility for life.

...

The appellant filed a direct appeal to this Court challenging the life sentence. On March 11, 2003, the West Virginia Supreme Court denied the appellant's appeal.

On May 25, 2004, the appellant filed a *pro se* habeas corpus petition. On June 9, 2005, the trial judge summarily denied all habeas corpus relief pursuant to *W.Va.Code, 53-4A-3 (1971)*.[FN8] Following the denial of his *pro se* habeas corpus petition, the appellant requested that the court appoint him counsel to appeal his case. The judge denied the appellant's request for appointment of counsel on June 28, 2005.

FN8. Following is the relevant text of the court order denying the appellant's writ of habeas corpus:

ORDER DENYING PETITIONER'S WRIT OF HABEAS CORPUS

61

This matter is before this Court on a Petition filed by the Petitioner, Cornell F. Daye (hereinafter "Daye"), on May 25, 2004. Daye is proceeding *pro-se* and the State has not filed a response to this matter. In the Petition, Daye raises Ten (10) grounds for relief as to why his underlying conviction was unconstitutional. This Court has reviewed the entire record including, the underlying criminal matters and all pleadings filed in Civil Action Number 04–C–531. After fully considering the matter before it, this Court finds and concludes that Daye has failed to raise any constitutional issues and therefore this Petition is SUMMARILY DISMISSED.

It is from the circuit court's denial of appellant's *pro se* petition for habeas corpus that the appellant appeals. On May 26, 2006, this Court accepted appellant's petition and appointed counsel to assist him with his appeal.

## II.
### Standard of Review

In Syllabus Point 1 of *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006) this Court held:

In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

With these standards in mind, we will now consider the appellant's arguments.

## III.
### Discussion

*W.Va.Code*, 61–11–18(c) (2000) provides that:

(c) When it is determined, as provided in section nineteen [§ 61–11–19] of this article, that such person shall have been twice before convicted in the United States of a crime punishable by confinement in a penitentiary, the person *shall* be sentenced to be confined in the state correction facility for life.

(Emphasis added.)

*W.Va.Code*, 61–11–19 (1943) provides that:

**61–11–19. Procedure in trial of persons for second or third offense.**

It shall be the duty of the prosecuting attorney when he has knowledge of former sentence or sentences to the penitentiary of any person convicted of an offense punishable by confinement in the penitentiary to give information thereof to the court immediately upon conviction and before sentence. Said court shall, before expiration of the term at which such person was convicted, cause such person or prisoner to be brought before it, and upon an information filed by the prosecuting attorney, setting forth the records of conviction and sentence, or convictions and sentences, as the case may be, and alleging the identity of the prisoner with the person named in each, shall require the prisoner to say whether he is the same person or not. If he says he is not, or remains silent, his plea, or the fact of his silence, shall be entered of record, and a jury shall be impaneled to inquire whether the prisoner is the same person mentioned in the several records. If the jury finds that he is not *22 **552 the same

person, he *shall* be sentenced upon the charge of which he was convicted as provided by law; but if they find that he is the same, or after being duly cautioned if he acknowledged in open court that he is the same person, the court shall sentence him to such further confinement as is prescribed by section eighteen [§ 61–11–18] of this article on a second or third conviction as the case may be.

The clerk of such court shall transmit a copy of said information to the warden of the penitentiary, together with the other papers required by the provisions of section ten [§ 62–7–10], article eight [seven], chapter sixty-two of the Code of West Virginia, one thousand nine hundred thirty-one.

Nothing contained herein shall be construed as repealing the provisions of section four [§ 62–8–4], article eight, chapter sixty-two of the Code of West Virginia, one thousand nine hundred thirty-one, but no proceeding shall be instituted by the warden, as provided therein, if the trial court has determined the fact of former conviction or convictions as provided herein.

(Emphasis added.)

We held in Syllabus Point 2, *Crockett v. Andrews,* 153 W.Va. 714, 172 S.E.2d 384, (1970):

Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation.

Also, this Court has previously held that the life sentence language of *W.Va.Code,* 61–11–18 (2000) is mandatory. In Syllabus Point 3 of *State ex rel. Cobb v. Boles,* 149 W.Va. 365, 141 S.E.2d 59 (1965), we held:

Where an accused is convicted of an offense punishable by confinement in the penitentiary and, after conviction but before sentencing, an information is filed against him setting forth one or more previous felony convictions, if the jury find or, after being duly cautioned, the accused acknowledges in open court that he is the same person named in the conviction or convictions set forth in the information, *the court is without authority to impose any sentence other than as prescribed in* Code, 61–11–18, as amended.

(Emphasis added.) *See also* Syllabus Point 5 of *State ex rel. Combs v. Boles,* 151 W.Va. 194, 151 S.E.2d 115 (1966). Thus in accord with *Cobb, supra,* and *Combs, supra,* any sentence imposed, after the successful completion of the procedures prescribed in *W.Va.Code,* 61–11–19 (1943), which does not comport with *W.Va.Code,* 61–11–18 (2000) is an *illegal* sentence.

The appellant claims, in effect, that once the trial court refused to impose the mandatory life sentence, despite his conviction as an habitual offender, the court lost the power to correct its mistake because the result would be an increase in the sentence. A close examination of our decisions, however, does not support the appellant in this regard but rather points to a different conclusion. In both *State ex rel. Williams v. Riffe,* 127 W.Va. 573, 34 S.E.2d 21 (1945) and *Sellers v. Broadwater,* 176 W.Va. 232, 342 S.E.2d 198 (1986), cited by the appellant, the trial court attempted to set aside plea and sentencing after protests by victims' families. In *State ex rel. Roberts v. Tucker,* 143 W.Va. 114, 100 S.E.2d 550 (1957), also cited by the appellant, the trial court attempted to increase the original sentence after the defendant escaped from jail. In the cases cited by the appellant, unlike the instant case, the original sentences were *legal.* Therefore, the Constitutional prohibition against double jeopardy, *W.Va. Const.,* art. III, § 5, barred imposition of an increased sentence.

63

In the instant case because of our holdings in *Cobb, supra,* and *Combs, supra,* the initial sentence imposed by the trial court was *illegal.* Therefore, when properly applying the mandatory language of *W.Va.Code, 61–11–18 (2000)* and *W.Va.Code, 61–11–19 (1943),* the trial court had a duty to correct the initial *illegal* sentence and sentence the appellant to a state correctional facility for life.

The appellant also contends that in a case where all of a defendant's convictions are drug related, the requirements of *W.Va.Code, 61–11–18 (2000)* and *W.Va.Code, 61–11–19 (1943)* must give way to the enhancement provisions of the Uniform Controlled Substances Act, *W.Va.Code, 60A–4–408 (1971).* *23 **553 The appellant argues that failure to treat the law in this manner would render the sentence enhancement provisions of the Uniform Controlled Substances Act a nullity.

We believe that the appellant's argument in this regard is without merit because historically the prosecuting attorney has exercised discretion as to whether or not to file an information to seek recidivist enhancements under *W.Va.Code, 61–11–18 (2000)* and *W.Va.Code, 61–11–19 (1943). See Griffin v. Warden, West Virginia State Penitentiary, 517 F.2d 756 (4th Cir.1975).* Further, we believe that the filing of such informations pursuant to *W.Va.Code, 61–11–19 (1943)* is relatively rare and only occurs in more extreme cases where a defendant's criminal history suggests that a more severe sentence than may be imposed by the penalty for the underlying offense. Furthermore, since many of the offenses under the Uniform Controlled Substances Act are relatively minor and involve little or no danger to others, they may be inappropriate for the more severe treatment under *W.Va.Code, 61–11–18 (2000)* and *W.Va.Code, 61–11–19 (1943).* For these reasons we see no danger in the sentencing provisions of the Uniform Controlled Substances Act being nullified as suggested by the appellant.

The appellant also contends that the sentence enhancement provisions of the Uniform Controlled Substances Act, *W.Va.Code, 60A–4–408 (1971),* should take precedence over the sentence enhancement provision of recidivist enhancements under *W.Va.Code, 61–11–18 (2000)* and *W.Va.Code, 61–11–19 (1943)* because the Uniform Controlled Substances Act is specific to drug related offenses.

This Court has previously held that we apply such a statutory construction only "where the two [statutes] cannot be reconciled." In Syllabus Point 1 of *UMWA by Trumka v. Kingdon, 174 W.Va. 330, 325 S.E.2d 120 (1984)* this Court held:

The general rule of statutory construction requires that a specific statute be given precedence over a general statute relating to the same subject matter *where the two cannot be reconciled.*

(Emphasis added.) In the instant case we believe that the State persuasively argues that the two statutes can be reconciled.

The Uniform Controlled Substances Act, *W.Va.Code, 60A–4–408 (1971),* provides a lesser, and discretionary, enhancement in any case involving a repeat drug offender. Furthermore, the judge, not the prosecuting attorney, makes the enhanced sentencing decision under this drug offense statute. The statute applies to both misdemeanor and felony offenses. It does not require the filing of an information by the prosecuting attorney.

In contrast, the general habitual offender statute is utilized only in cases where the totality of a criminal defendant's criminal history makes a mandatory sentence of life imprisonment an appropriate punishment The

64

procedural provisions of the general habitual criminal offender statute, *W.Va.Code, 61–11–19 (1943)*, require the filing of an information by the prosecuting attorney within certain time limits, and the defendant has a right to a jury trial with attendant procedural safeguards.

The appellant cites to numerous cases from other jurisdictions in support of his position that the sentencing provisions of the Uniform Controlled Substances Act, *W.Va.Code, 60A–4–408 (1971)*, should take precedence over the sentencing provisions of the general habitual offender statute, *W.Va.Code, 61–11–18 (2000)*. The State agrees that some of the cases cited do support the appellant's position,[FN9] but that at least one of appellant's cases supports the State's position.[FN10] The State further contends that other cases are distinguishable[FN11] from the instant case. *24 **554 Nonetheless, both appellant and appellee agree that the issue presented in this case has never been decided in West Virginia.

> FN9. *Buff v. State, 538 P.2d 1117, 1975 OK CR 129 (Okla.Crim.App.1975)*; *State v. Loudermilk, 221 Kan. 157, 557 P.2d 1229 (1976)*; *Blunt v. State, 743 P.2d 145, 1987 OK CR 201 (Okla.Crim.App.1987)*.

> FN10. *See State v. Ray, 166 Wis.2d 855, 481 N.W.2d 288 (1992)*.

> FN11. *Chambers v. State, 522 So.2d 311 (Ala.Crim.App., 1986)*; *Lloyd v. State, 139 Ga.App. 625, 229 S.E.2d 106 (1976)*; *People v. Fetterley, 229 Mich.App. 511, 583 N.W.2d 199 (1998)*; *State v. Chapman, 205 Neb. 368, 287 N.W.2d 697 (1980)*; *State v. Heyward, 90 N.M. 780, 568 P.2d 616 (1977)*.

Finally, the appellant argues that the trial court improperly applied *West Virginia Rules of Criminal Procedure, Rule 35(a)*,[FN12] to enhance his sentence. We do not agree.

> FN12. **Rule 35.** **Correction or reduction of sentence.**

> (a) *Correction of Sentence.* The court may correct an illegal sentence at any time and may correct a sentence imposed in an illegal manner within the time period provided herein for the reduction of sentence.

The appellant contends that the initial sentence for "possession of crack cocaine with intent to deliver, second or subsequent offense" was a legal sentence because it was proper under *W.Va.Code, 60A–4–408 (1971)*. Appellant argues that the trial court cannot use a Rule 35(a) motion to change a *legal* sentence because Rule 35(a) provides for correcting an *illegal* sentence. We believe this argument ignores the unambiguous application of the general habitual offender statute, *W.Va.Code, 61–11–18* (2000) or *W.Va.Code, 61–11–19 (1943)*. Here, after the appellant's conviction, the State timely filed a recidivist information based on the appellant's two prior felony convictions. The appellant admitted to the allegations in the information. Once this procedure was completed, the trial court was "without authority to impose any sentence other than as prescribed in [*W.Va.*] Code [sic], 61–11–18 [2000]." *See Cobb, supra,* and *Combs, supra.*

We believe that the trial court erred in imposing the initial sentence, and therefore properly corrected the sentence pursuant to the authority under *West Virginia Rules of Criminal Procedure, Rule 35(a), supra.*

Based on the foregoing we hold that when any person is convicted of an offense under the Uniform Controlled Substances Act (*W.Va Code*, Chapter 60A) and is subject to confinement in the state correctional facility therefor,

and it is further determined, as provided in *W.Va.Code, 61–11–19 (1943)* that such person has been before convicted in the United States of a crime or crimes, including crimes under the Uniform Controlled Substances Act (*W.Va.Code*, Chapter 60A), punishable by confinement in a penitentiary, the court shall sentence the person to confinement in the state correctional facility pursuant to the provisions of *W.Va.Code, 61–11–18 (2000)*, notwithstanding the second or subsequent offense provisions of *W.Va.Code, 60A–4–408 (1971)*.

We decline to address the appellant's other assignments of error as we consider them to be without merit.

Finally, we observe from the appellant's brief that his counsel has indicated that he received a limited copy of the record. For this reason, appellant's counsel requested that the Court limit its consideration in the instant case to the issues presented in this appeal and that all other issues identified in appellant's original *pro se* petition be deferred for possible consideration at a later date. Counsel for the State conceded in her brief that the appellant may have further issues not presented in the present appeal and suggested that the appellant's case be remanded to the trial court for appointment of counsel and further proceedings on the remaining issues. We agree with these suggestions. Accordingly, we remand this case for appointment of counsel and further proceedings on all issues not decided in this opinion.[FN13]

> FN13. Because the appellant in this case was sentenced to a term of confinement in a state penitentiary for life, the appellant should have been appointed counsel to assist him with his habeas corpus petition in the trial court.

IV.

*Conclusion*

Based on the foregoing, we affirm, in part, and remand, in part, pursuant to the previous discussion.

---

**Ground 3: Petitioner asserts that his incarceration is illegal and in violation of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article III, Sections 1, 5, 10 and 14 of the West Virginia Constitution, because the trial court incorrectly explained the law to him in the recidivist proceeding. Alternatively, Petitioner asserts that his incarceration is illegal and in violation of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article III, Sections 1, 5, 10 and 14 of the West Virginia Constitution, because he was denied effective assistance of counsel, who failed to correctly advise him regarding the law in the recidivist proceeding. (Decided under State and Federal law)**

**Relief Denied.**

The complaints raised by the Petitioner under Ground Three of his Amended Petition arise from Case No. 01-IF-158-H. This Information was filed by the State of West Virginia immediately after the petitioner was convicted by jury in 00-F-36-K for "possession of a

66

controlled substance with intent to deliver." In the normal rotation of assignment of cases, case 01-IF-158-H was assigned to the docket of the Honorable John A. Hutchison. On September, 6, 2001, a status hearing was held before Judge Hutchison. Cornell Daye appeared in person and was represented by counsel, John F. Parkulo. The State appeared by Chief Deputy Prosecuting Attorney Thomas Truman.

In assessing the merits of this Ground, the Court carefully reviewed the transcript of the status hearing. The transcript demonstrates that the Court fully informed the Petitioner about the purpose of the Information, and although the hearing was merely a status, the record reflects that the Petitioner, who was represented by counsel, was the one who desired to proceed to a final resolution of the matter by admitting to the allegations contained in Information No. 01-IF-158-H.

### The Information

The first question before the Court is whether the requirements of W.Va. Code § 61-11-19 were met prior to the Petitioner's conviction for recidivism in Information No. 01-IF-158. Specifically, W.Va. Code §61-11-19 provides that:

> A person convicted of a felony may not be sentenced pursuant to W.Va. Code, 61-11-18, -19 [1943], unless a recidivist information and any or all material amendments thereto as to the person's prior conviction or convictions are filed by the prosecuting attorney with the court before expiration of the term at which such person was convicted, so that such person is confronted with the facts charged in the entire information, including any or all material amendments thereto. W.Va. Code, 61-11-19 [1943].

*State v. Cain*, 178 W.Va. 353, 357, 359 S.E.2d 581, 585 (1987). As recognized by our Court in *State v. Deal*, 178 W.Va. 142, 358 S.E.2d 226 (1987), "the provisions of this statute are mandatory and must be complied with fully before an enhanced sentence for recidivism may be imposed under W.Va. Code § 61-11-18." *Deal*, 358 S.E.2d 226, at 229. After reviewing the

67

transcripts, the Court concludes that all provisions of W.Va. Code §61-11-19 were met prior to sentence enhancement.

The transcripts demonstrate that the purpose of the hearing on September 6, 2001, was to determine the course of the proceedings pursuant to the requirements of code and caselaw. During the hearing, the prosecutor emphasized his concern that because the conviction in Case No. 00-F-36-K was returned so late in the term, it could be problematic to try the allegations in the Information in that same term. Nonetheless, the prosecutor announced he was ready to begin trial of the allegations in the Information on the following day, absent a motion for continuance by the Petitioner.

The record also reveals that an extensive discussion was held with the Petitioner and his counsel regarding the purpose of the Information and the ultimate outcome that a finding by the jury in favor of the State would have on the subsequent hearing for sentencing of the Petitioner in Case No. 00-F-36-K. The Petitioner's counsel indicated that he had spent a significant amount of time reviewing Chapter 61, Article 11, Section 19 with the Petitioner. Counsel also indicated that he had informed the Petitioner that he had three options, "[o]ne of which is to say he is the person, one of which is to say he isn't the person, and one of which is to not say anything." Hrg. Transcr. 7:19-21 (Sept. 6, 2001). Petitioner's counsel went on to further state, "[a]nd with that said, then I firmly believe that Daye does understand his options, and I will defer to him in terms of how he would like to address the Court, in terms of those three options, Judge." Hrg. Transcr. 8:10-13 (Sept. 6, 2001).

Thereafter, the Court on the record had a conversation with the Petitioner and inquired if he understood the nature of the proceedings, and further if he had made a decision regarding his options as explained by his counsel. On the record, the Petitioner indicated clearly that he

68

understood his options and the nature of these proceedings, and informed the Court that he would admit that he was the individual previously convicted as alleged in Information No. 01-IF-158-H.

The record further indicates that the Court, the prosecutor, and the Petitioner's counsel explained to the Petitioner the possible maximum sentence he could receive upon his admission to the counts contained in the Information. There was detailed discussion on the record regarding amendments to W.Va. Code § 61-11-18 and their effect upon the Petitioner. The parties agreed that the maximum possible sentence that could be imposed in Case No. 00-F-36-K would be a life sentence with the possibility of parole after 15 years. At the same time, however, the record also reflects that there was some confusion regarding whether the maximum time required prior to being eligible for parole consideration was 10 years or 15 years. In an abundance of caution, the Court made it absolutely clear that the worst possible sentence could be life with mercy, meaning parole consideration after the Petitioner had served 15 years. The totality of the proceedings as evidenced by the transcript shows the Petitioner had full knowledge about the purpose for the Information and the possible outcomes if a jury unanimously, and beyond a reasonable doubt, determined that he had been previously convicted of felony crimes in Case Nos. 97-F-16-H, 99-IF-69-K and 00-F-36-K.

Be that as it may, the Petitioner also contends that the Court improperly used the permissive word "could" rather than the mandatory word "should" when explaining a life sentence. However, the transcript once again puts to rest any merit to the Petitioner's contentions in Ground Two of the Amended Petition. First, the language use by the Court was appropriate, particularly considering that the sentencing judge initially refused to impose a life sentence and after correcting the sentence pursuant to Rule 35(a) of the *West Virginia Rules of*

69

*Criminal Procedure*, the West Virginia Supreme Court affirmed the life sentence. The court's use of permissive language rather than mandatory language was harmless, and the Court finds that the Petitioner fully understood the sentencing possibilities.

<u>Ineffective Assistance of Counsel</u>

The Petitioner alternatively argues that if this Court finds that he was indeed informed of the sentencing possibilities as required by the rules, then his attorney was ineffective. The crux of Petitioner's allegation of ineffective assistance of counsel is that a competent attorney would not recommend or counsel his client to plead guilty to the allegations contained in the Information when such a plea would result in his client being subjected to a potential life sentence with mercy. The West Virginia Supreme Court of Appeals set forth the standard of review for ineffective assistance of counsel in Syl. Pts. 5 and 6, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995):

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

As recently as October of 2010 in *State v. VanHoose*, –S.E.2d– , 2010 WL 4025096, the West Virginia Supreme Court articulated that "[i]n deciding ineffective ... assistance claims, a court need not address both prongs of the conjunctive standard of *Strickland v. Washington*, 466 U.S.

70

668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995),[10] but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test." Syl. pt. 5, *State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 465 S.E.2d 416 (1995); *See also*, Syl. pt. 3, *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Thus, failure to meet one prong defeats a claim of ineffective assistance.

Bearing in mind that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," the record of this case makes it clear that John Parkulo representation of the petitioner was by no means deficient under the above standards, and that even if it were, the petitioner suffered insufficient prejudice to warrant setting aside the plea. *See*, Syl. *pt. 2*, *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. First, on the record in open court, the petitioner confirmed that his counsel had explained to him the ramifications of the Information that had been filed and the possibilities of sentence enhancement under W.Va. Code § 61-11-18. Second, the Petitioner also acknowledged he fully understood that if he either admitted his identity, or a jury made a finding beyond a reasonable doubt that he was in fact the individual previously convicted in the identified cases, then that finding would be considered and would have a significant impact on sentencing in Case No. 00-F-36-K. Third, the September 6, 2001, transcript not only demonstrates that Mr. Parkulo had explained all possible ramifications of the recidivist statute, but it also reflects that Mr. Parkulo made it clear to the petitioner that the petitioner needed to make the decision about entering a plea to the Information. Specifically, the Court, attorney John Parkulo and the Petitioner engaged in the following discourse:

> MR. PARKULO: And with that said, then I firmly believe that Daye does understand his options, and I will defer to him in terms of

---

[10] The two-prong test is hereinafter referred to as the *Strickland-Miller* test.

how he would like to address the Court, in terms of those three options, Judge.

THE COURT: All right. Daye, has your lawyer explained the process, what we're doing here today?

THE DEFENDANT: Yes, sir.

THE COURT: And have you elected a course of action; have you decided on a course of action in what you're going to do here today?

THE DEFENDANT: Yes, sir.

THE COURT: And what are you going to do?

THE DEFENDANT: I'll admit that I'm the person that was convicted.

THE COURT: Okay. So, as to— for purposes of this proceeding— now, let me go through a few things with you. Do you understand that this could affect the sentence that you receive in 99-F-36 (sic)? That's the case you just finished trying.

Hrg. Transcr. 8:10-9:4 (Sept. 6, 2001).

Later in the same conversation, the Petitioner pointed out that the court was referencing the wrong case number. The actual case was 00-F-36-K, and the court corrected itself on the record. This Court finds it telling that the petitioner was following the proceedings closely enough to pick up on the court's error in case number and to correct the court. Had the petitioner failed to understand something of importance, such as he alleges now, the Court is confident that he would have spoken up.

For these reasons, the Court concludes that Petitioner clearly understood his options in regard to the Information, that he was fully informed of his rights and knowingly and voluntarily admitted to the allegations contained in the Information. Petitioner knew prior to making his

72

admission that he could be sentenced in Case No. 00-F-36-K to incarceration for life with the possibility of parole consideration after having served 15 years.

Thus, the Court finds that counsel was objectively reasonable, and Petitioner's claim for ineffective assistance fails.

**RELIEF DENIED.**

**Ground 4: Petitioner asserts that his incarceration is illegal and in violation of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article III, Sections 1, 5, 10 and 14 of the West Virginia Constitution, because:**

> 1. **The West Virginia Supreme Court has repeatedly held that once a defendant begins serving a sentence, trial courts have no authority or jurisdiction to increase the sentence, under double jeopardy principles;**
>
> 2. **Only the specific sentence enhancement under W.Va. Code § 60A-4-408 can be applied where the defendant has multiple convictions under the Uniform Controlled Substances Act; and**
>
> 3. **Rule 35(a) only permits a trial court to correct an illegal sentence.**

**Relief Denied.** (Decided under State and Federal law)

In this assignment of error, the Petitioner seeks again to revisit the very decision rendered by the West Virginia Supreme Court in *State ex rel. Daye v. McBride*, 222 W.Va. 17, 658 S.E.2d 547 (2007), and to re-characterize the issues previously presented to and decided by the Supreme Court by again arguing that the original sentences imposed by Judge Kirkpatrick in Case Nos. 00-F-36-K and 01-IF-158-H were not an "illegal sentence" and were therefore not subject to correction under Rule 35(a) of the *West Virginia Rules of Criminal Procedure*. The West Virginia Supreme Court ruled that the Petitioner's original sentence was, in fact, illegal and subject to Rule 35(a) correction. As set forth in Ground 2, *supra*, the "law of the case" doctrine controls the issues previously decided by our Court, such as those presented in Ground 4.

Background

73

The Petitioner was convicted of felony offenses in Case Nos. 97-F-16-H and 99-IF-69-K. During the September 2001 hearing on Information No. 01-IF-158-H, the Petitioner admitted to the same after having been fully and adequately advised by both his attorney and the Court of the consequences of his admission. Petitioner was originally sentenced to a 2-30 year term of imprisonment. However, upon the prosecution's Motion to Correct Sentence,[35] the Court corrected the sentence to life imprisonment, as required by W.Va. Code §61-11-18. Needless to say, petitioner did not like the corrected sentence, and appealed. The West Virginia Supreme Court accepted the appeal and issued its Opinion on June 27, 2007. The Order addressed every issues raised by the Petitioner in Ground 4 of his Amended Petition, and that Opinion conclusively governs those issues.

Accordingly, because the Petitioner's arguments in Ground 4 have been previously and finally decided by the Supreme Court, this Court finds that the request for relief contained therein should be and is hereby **DENIED**.

**Ground 5: Petitioner asserts that his incarceration is illegal in violation of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article III, Sections 1, 5, 10 and 14 of the West Virginia Constitution, because, his convictions in case numbers 97-F-16-H and 99-IF-69-K, should be invalidated for multiple reasons.[36] (Decided under State and Federal law)**

**Relief Denied.**

In support of this alleged assignment of error, the Petitioner asserts the following three arguments:

---

[35] Motion dated Oct. 2, 2001, approximately 7 days after sentencing.

[36] The Petitioner filed a Motion to Strike Impertinent or Otherwise Scandalous Matter from the Record of the Proceedings on April 24, 2012. In the Motion, the Petitioner requested that Ground Five of the Amended Petition filed May 20, 2010, be stricken and replaced with Ground Five of a Supplemental Petition accompanying the Motion. At the omnibus hearing on May 9, 2012, this Court granted Petitioner's motion to strike and request that Ground Five of the Amended Petition be replaced *in toto* with Ground Five of the Supplemental Petition.

1. The plea of guilty for possession with intent to deliver a controlled substance in Case No. 99-IF-69-K lacked any factual basis whatsoever, and for that reason must be reversed.
2. The Court erred in sentencing the Petitioner to a life sentence because the sentencing in Case No. 99-IF-69-K was for a misdemeanor.
3. Probation should have been concurrent in 97-F-16-H and 99-IF-69-K precluding recidivist action.

The Court reviews each assignment of error in turn.

1. **The plea of guilty for possession with intent to deliver a controlled substance in Case No. 99-IF-69-K lacked any factual basis whatsoever, and for that reason must be reversed.**

The Petitioner claims he was denied due process of law when the Court accepted his *Kennedy* plea[37] in Case No. 99-IF-69-K. Specifically, the Petitioner argues that no factual basis was established for the plea in light of his claim of innocence and that the Court failed to adequately explain the element of intent to deliver in relation to the facts of his case. For these reasons, Petitioner argues that his plea was involuntary and not knowingly or intelligently entered and that it must therefore be set aside and the conviction based thereon dismissed.

*a. Plea made knowingly and voluntarily*

On March 22, 1999, the petitioner appeared before Judge Kirkpatrick for purposes of a plea and sentencing pursuant to a plea agreement previously entered into by the Petitioner and the State. The Petitioner was represented by counsel, Robert Goldberg, and the State was represented by Raleigh County Chief Assistant Prosecuting Attorney Kristen Keller. At the hearing, to ensure that Petitioner's desire to plead guilty was voluntary and that Petitioner understood that he would be waiving his constitutional rights by entering the plea of guilty to the felony charge in the Information, the trial court asked,

THE COURT:

---

[37] Pleas proffered pursuant to the principals of *Kennedy v. Frazier*, 178 W.Va. 10, 357 S.E.2d 43 (1987), are commonly referred to as "Kennedy" pleas.

Q. All right. To the best of your knowledge, do you understand all of the matters set forth on this document.[38]

A. Yes, sir.

Q. Very well. Is anybody twisting your arm, or forcing you against your will to go through with this plea?

A. No.

Q. How about your attorney, Mr. Goldberg, is he putting undue pressure on you to enter this plea?

A. No.

Q. Are you satisfied with Mr. Goldberg's representation of you in this matter?

A. Yes, sir.

Q. Any complaints to voice against him?

A. No.

Q. Do you understand, Mr. Daye, that you have an absolute right to a trial by jury in this case, and if you wanted that trial, we would impanel a jury of 12 persons to hearing the trial. They would hear the entirety of the case, the evidence that the State would present against you, and any defense that you would offer.

You would have the absolute right to confront your accusers and to cross-examine witnesses that would testify against you. Mr. Goldberg would take care of the cross-examination of witnesses. You would work with your attorney, and I assume that you would provide him with a list of witnesses to call in your defense, and they could be called and testify presumably in your defense.

You would have the right to testify yourself . . . .I want you to understand that you have the right also to stand mute during the trial proceedings, and to elect not to testify at all. If you went that route, I would not permit the prosecutor to jump up and say, "Well, Daye has to be guilty, ladies and gentlemen of the jury, or else he would stand before you and prove his innocence."

The reason for that is that under our system of justice, it is the State's obligation and burden of proof to prove the defendant guilty at the trial

---

[38] Referring to the defendant's statement in support of plea of guilty. Hrg. Transcr. p. 5.

beyond a reasonable doubt. That is the standard that we look to, and the defendant does not have to prove his or her own innocence.

You would further have the right to appeal a jury conviction for any errors of law. You could move the trial court to suppress any illegally obtained evidence or any illegally obtained confessions, and you could challenge before me and on appeal any errors that may have occurred not only during the trial, but also during pretrial proceedings. These are, in summary form, your constitutional rights that are afforded to you.

Do you understand those rights generally, Mr. Daye?

A: Yes sir.

Hrg. Transcr. 6:18 – 8:15. As demonstrated, the Judge explained and the petitioner understood that the pleading guilty would waive Petitioner's constitutional rights, and petitioner did so willingly.

### b. Claim of Involuntary Plea Because No Factual Basis: meritless

Petitioner claims he is entitled to relief pursuant to *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160 (U.S. 1970). In *Alford*, the defendant sought to enter a plea of guilty to murder while maintaining that he did not commit the murder, in order to avoid a trial and possible imposition of the death penalty. The *Alfred* Court held that a defendant "may knowingly, voluntarily, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." 400 U.S. at 37. The Supreme Court rationalized that "an express admission of guilt . . . is not a constitutional requisite to the imposition of criminal penalty." *Id.* By entering in such a plea, a "defendant intelligently concludes" that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt. *Id.* The Supreme Court has, however, cautioned the courts that, "pleas coupled with claims of innocence should not be accepted unless there is a factual basis for the plea; and until the judge taking the plea has inquired into and sought to

77

resolve the conflict between the waiver of trial and the claim of innocence." *Id.* at 38 n. 10 (citations omitted)

The West Virginia Supreme Court relied heavily upon the *Alford* case in *Kennedy v. Frazier*, 178 W.Va. 10, 357 S.E.2d 43 (1987). In *Kennedy*, the defendant sought to plead guilty to one of two felony offenses because there was a significant probability that he would be convicted of both felonies and suffer sentence enhancement if taken to trial. Upon learning of statements indicating the defendant had a defense of entrapment, the trial court refused to accept Frazier's plea of guilty. Frazier then sought a Writ of Prohibition to require the trial court to accept his plea. The West Virginia Supreme Court awarded the Writ, emphasizing that pursuant to *Alford*, a plea constitutes a voluntary and intelligent choice where a defendant enters the plea to avoid the possibility of a higher penalty if convicted at trial: precisely the situation presented in *Kennedy*. 178 W.Va. at 12, 357 S.E.2d 45. Indeed, our Court declared an accused "may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even though he is unwilling to admit participation in the crime, if he intelligently concludes that his interests require a guilty plea and the record supports the conclusion that a jury could convict him." *Id.* Thus, no court "should []'force any defense on a defendant in a criminal case. . .'" particularly when advancement of the defense could result in disaster. *Id.* at 12-13, citing *North Carolina v. Alford, supra*, quoting *Tremblay v. Overholser*, 199 F.Supp. 569, 570 (D.C.1961). Ultimately, then, it is the defendant who, after proper consultation with competent counsel, determines whether to roll the dice and go to a jury or plead guilty. *Id.*

Accordingly, when determining whether to accept such a plea a trial court should take in to account the entire criminal event, such as the "defendant's prior criminal record [and] whether the plea bargain enables the court to dispose of the case in a manner commensurate with the

78

seriousness of the criminal charges and the character and background of the defendant." *Id.* at 12, quoting *Myers v. Frazier*, 173 W.Va. 658, Syl. Pt. 6 (1984). At the same time, however, in circumstances where the weight of the evidence indicates a complete lack of guilt, a judge would be remiss to accept such a guilty plea. *Id.*

In the instant case, the record of the March 22, 1999, plea and sentencing hearing reflects a quintessential *Kennedy* plea in that Petitioner desired to plead "guilty to possession with intent to deliver" because he believed his past involvement with narcotics would cause a jury to convict him of the charges, thereby subjecting him to a potentially higher sentence. Thus, regardless of the factual basis for the plea, as in *Kennedy*, the petitioner believed it was in his best interest to enter the plea and did indeed plead guilty for that very reason.

THE COURT:     Are you entering this plea because you are, in fact, guilty?

THE DEFENDANT:     I'm entering this plea because I don't feel I can beat it in court.

Hrg. Transcr. 8:18,19 (Mar. 22, 1999).

Upon so hearing, the following dialogue ensued:

THE COURT:     Are you entering this plea because you are, in fact, guilty?

THE DEFENDANT:     I'm entering this plea because I don't feel I can beat it in court.

THE COURT:     All right. Is this a *Kennedy* plea, Mr. Goldberg?

MR. GOLDBERG:     No, your Honor. That was not contemplated by the plea agreement.

THE COURT:     Very well.

BY THE COURT:

Q.     I'm looking at the information and, of course, it charges you with possession of a controlled substance with intent to deliver, to wit: Crack cocaine. And we're talking about a date of October the 6th, 1998.

Tell me in your own words what happened. How was it that you were charged with this crack cocaine business?

A. I was in the hotel room with somebody – a person who had it, and police came to the hotel room, and the person who had just left, went to the front desk, and the police came, and when they came to the room, I was the only one in the room.

Q. Where was this hotel room?

A. Honey in the Rock Hotel.

Q. Okay. And so this was not your crack cocaine?

A. No, sir.

Q. Well, why is it that you'd want to plead guilty to this serious charge if it wasn't your drug?

A. Because I was involved in drugs before, and it's just bad, you know.

Q. All right. And you're still willing to plead guilty to possession of a drug that wasn't even yours?

A. In court I don't feel I could beat this charge.

Q. I have some reluctance in accepting a plea of this nature unless we go under a *Kennedy* plea, because the defendant has indicated in open court that the crack cocaine was not his own.

I'm never one to accept a plea from someone who maintains that they are not guilty, but simply wish to offer a plea, unless we do it along the lines of an *Alford* plea or a *Kennedy* plea.

MS. KELLER: Your Honor, I am at a certain disadvantage because this is Mr. Frail's case, and our office can't find the file. So I can't offer what the State's evidence would be, but it's my understanding, just from what Mr. Frail had indicated, that I did not believe that the State would have an objection to a *Kennedy* plea under the circumstances.

| THE COURT: | All right. Is that agreeable with you, then, Mr. Goldberg? |
| MR. GOLDBERG: | Your Honor, I don't believe the defense would have any objection. |
| THE COURT: | Okay. |
| MR. GOLDBERG: | It was not contemplated in the original agreement. |
| THE COURT: | All right. Let's go with the *Kennedy* or *Alford* guilty plea, and we can, of course, abide by the same agreement if the Court accepts it. |

Hrg. Transcr. 8-9 (Mar. 22, 1999).

In light of this discourse, the Court finds that the circumstances of the case were precisely the situation in which an *Alford/Kennedy* plea would be appropriate, as recognized by Judge Kirkpatrick.

What is more, contrary to Petitioner's assertion that no factual basis for the plea existed, the Petitioner himself recited in the facts in significant detail, facts which sufficiently support the court's basis for accepting the *Kennedy* plea. The petitioner also repeatedly stated that he wanted to plead guilty because "I don't feel like I can beat this charge." Further, given the Petitioner's prior criminal history and his admission of being "involved in drugs before," the circumstances in Case No. 99-IF-69-K were not such that "the weight of the evidence indicate[d] a complete lack of guilt." *Kennedy*, 178 W.Va. at 12. The trial court correctly determined that a factual basis existed for the *Kennedy* plea. Hrg. Transcr. 16:13-14 (Mar. 22, 1999), and Petitioner intelligently concluded, after consultation with competent counsel, that his best interests required entry of a guilty plea. Therefore, this Court finds that the trial court complied in every way with the mandates of *Alford* and *Kennedy* and did not in any manner deny the petitioner his right to due process of law.

Lastly, this Court points out that the Petitioner significantly benefited from the trial court's acceptance of a *Kennedy* plea, especially since a *Kennedy* plea was not even contemplated by the parties' original plea agreement, which included a very favorable Rule 11(e)(1)(c) sentencing recommendation. Judge Kirkpatrick appears to have agreed with this sentiment:

THE COURT: Before I accept the plea, let us develop the record a little bit more. Mr. Goldberg, have you explained to this defendant, the worst possible scenario in terms of sentencing; in other words, the penalty that is available to the Court to use ordinarily in such a case?

MR. GOLDBERG: I have, your Honor. I also explained to him the general outlines of a Rule 11(e)(1)(c).

THE COURT: All right. And Mr. Daye, do you understand that ordinarily if we did not have this Rule 11 agreement that the Court does accept, I would have the availability to sentence you to 1 to 15 years in the penitentiary of this State, or to fine you not more than $25,000 or both. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Now, in reviewing the plea agreement, under the arrangement that has been discussed, the defendant would be sentenced under 62-12-9 to a term of four months in the Southern Regional Jail and, thereafter be placed on probation.

Hrg. Transcr. 13:20 – 14:16. (Mar. 22, 1999).

. . .

THE COURT: Thank you all very much.

Daye, let me tell you that your attorney has done an excellent job for you. This is one of the best plea bargains, from a defendant's viewpoint, that I have seen in quite a while. And, frankly, I probably should be sending you to the penitentiary for a term of 1 to 15 years, but yet you are receiving one more chance to prove yourself. If you come back to court with a dirty drug test; if you come back for any other reason, I'll have no alternative but to send you on to the penitentiary. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT:     All right. I do wish you luck, and I hope that you can straighten out your life.

Hrg. Transcr. 20:15-21:4 (Mar. 22, 1999).

### c. Assertion the court failed to explain "intent": Meritless

In addition to finding that the trial court had ample factual basis for accepting Petitioner's

*Kennedy* plea, this Court also finds the trial court adequately explain the element of intent to

deliver. The record shows that during the March 22, 1999, plea and sentencing hearing the

Petitioner was given time to consult with counsel prior to the hearing and prior to entering into

the plea agreement. The trial court questioned the Petitioner multiple times, as to whether he

understood the terms of the agreement:

BY THE COURT:

Q.     All right. To the best of your knowledge, do you understand all of the matters set forth on this document.

A.     Yes, sir.

Hrg. Transcr. 6:2-5 (March 22, 1999). The trial court again asked the Petitioner about his

understanding of the plea agreement and opportunity to consult with counsel regarding the

agreement:

BY THE COURT:

Q.     Now, let me ask you this, Mr. Daye: Is it a fact that you have set down with you attorney and discussed all of the options that you have available to you; one, of course, being a trial, and another being entering this plea?

A.     Yes, sir.

Hrg. Transcr. 11:4-9 (March 22, 1999). The Court also reiterated that the plea was being made

to an information.

83

THE COURT:

Now, Mr. Daye, I'm going to read to you the information that has been filed on March the 21st, 1999, and I will thereafter take your plea.

And it has been filed in the case of State of West Virginia versus Cornell F. Daye as Information No. 99-IF-69-K. In it, the prosecuting attorney charges that on or about the 6th day of October 1998, in the said county of Raleigh, Cornell F. Daye did unlawfully, knowingly, intentionally, and feloniously possess a quantity of crack cocaine, a Schedule II controlled substance with the intent to deliver, in violation of Chapter 60A-Article 4, Section 401(a). . .

Now, Cornell F. Daye, how do you plead to this charge of possession of a controlled substance with intent to deliver. . .

THE DEFENDANT: Guilty.

Hrg. Transcr. 12-13.

Lastly, before accepting the plea, the trial court again allotted the Petitioner time to consult with his attorney and ask questions to the court:

| THE COURT: | Do you have any questions at all? |
| --- | --- |
| THE DEFENDANT: | Not that I can think of. |
| THE COURT: | Do you wish to pause for a few moments so you can speak with your attorney privately? |
| THE DEFENDANT: | No I think everything is clear. |
| THE COURT: | Do you want my [sic] to accept the plea that you have offered both orally and in writing? |
| THE DEFENDANT: | Yes, sir. |

Hrg. Transcr. 15:21-16:4.

The record unequivocally evidences that the Petitioner was given adequate time and opportunity to voice any concerns about the plea itself and his understanding of the plea. However, he did not. To the contrary, he assured the court that "everything is clear." Thus, the

84

Court finds that Petitioner's argument pertaining to the element of intent not being adequately explained to be without merit.

### d. Assertion the court lacked jurisdiction to accept plea: meritless

At the omnibus hearing on May 9, 2012, the Petitioner claimed that the court lacked jurisdiction in Case No. 99-IF-69-K to even accept his plea because no signed waiver of indictment was contained in the record; therefore, Daye contends, the orders accepting the plea and sentencing the Petitioner were void.[39]   In the Order accepting the plea following the March 22, 1999, hearing, Judge Kirkpatrick made the following finding: "The Court, thereupon, inquired of the defendant as to the defendant's ability to knowingly, understandingly and voluntarily enter this Waiver of Indictment." April 1, 1999, Plea Order, at 1.

Upon review of the record and careful consideration of the Petitioner's arguments, this Court finds that based upon a totality of the circumstances, the Court had jurisdiction to accept the plea in Case No. 99-IF-69-K and did not err in sentencing the Petitioner pursuant to the plea agreement offered to and accepted by the Court under Rule 11(e)(1)(c) of the *West Virginia Rules of Criminal Procedure*. The transcript of the March 22, 1999, hearing illustrates that the Petitioner understood the details of the plea agreement, the implications of the *Kennedy* plea, and the resulting sentence to be imposed. Although no executed waiver of indictment form is contained in the record, Judge Kirkpatrick inquired of the Petitioner extensively and made specific findings on the record and in the Order that acceptance of the plea was in all aspects proper. For these reasons, this Court finds that the Petitioner's jurisdictional argument is without

---

[39] It is important to note at this point that despite a significant procedural history in this case, the Amended Petition is the first instance in which the Petitioner has raised the issue of a lack of a knowing and intelligent waiver of his constitutional right to have the charges in Case No. 99-IF-69-K reviewed by a grand jury.

merit, and the plea was knowingly and intelligently made, properly accepted by the Court and entered upon the record.

**RELIEF DENIED.**

**2. The Court erred in sentencing the Petitioner to a life sentence because the sentencing in Case No. 99-IF-69-K was for a misdemeanor.**

The Petitioner further claims that on April 18, 2012, less than a month before the omnibus habeas corpus hearing before this Court, he for the first time received a copy of the plea and sentencing hearing transcript in Case No. 99-IF-69-K. The Petitioner states that upon review of the transcript, it is clear that the Court intended to convict him of possession of crack cocaine with the intent to deliver, and did in fact impose the corresponding sentence of not less than one (1) nor more than fifteen (15) years in the penitentiary. However, the Petitioner points out that the Orders following the plea and sentencing hearing, entered by Judge Kirkpatrick on April 1, 1999, state that the Court accepted a guilty plea to the charge of possession of a controlled substance, to-wit: "crack" cocaine, a misdemeanor, and sentenced the Petitioner for the same.

For these reasons, the Petitioner argues that although the language in the Orders could simply be a typographical error, it is nonetheless controlling because it has not been corrected or clarified by the Court. He argues that for this reason, his conviction in Case No. 99-IF-36-K could not be counted as a felony conviction in the later recidivist proceeding filed by the State in Case No. 01-IF-158-H.

Rule 36 of the *West Virginia Rules of Criminal Procedure* states that "[c]lerical mistakes in judgments, orders or other parts of the record and errors in the record arising from oversight or omission may be corrected by the court at any time and after such notice, if any, as the court orders." The West Virginia Supreme Court of Appeals noted in *State ex rel. Hall v. Liller* that "'[t]he errors which a judge or court has inherent power to correct . . . are limited to clerical and

such other errors of record, as prevent it from expressing the judgment rendered.'" 207 W.Va. 696, 700, 536 S.E.2d 120, 124 (2000); quoting *Highland v. Strosnider*, 118 W.Va. 647, 648, 191 S.E. 531, 532 (1937).

A review of the transcript of the March 22, 1999, plea and sentencing hearing in Case No. 99-IF-69-K demonstrates that the Petitioner had previously reached an agreement with the State and did in fact enter a guilty plea to the felony crime of possession of a controlled substance, to-wit: "crack" cocaine, *with the intent to deliver*. After accepting the plea, the Court imposed a sentence upon the Petitioner in accordance with the Rule 11(e)(1)(c) plea agreement, which underlying sentence was a term in the penitentiary of not less than one (1) nor more than fifteen (15) years, the correct penalty for possession of crack cocaine with the intent to deliver. This Court finds that the language in the corresponding Orders entered April 1, 1999, finding the Petitioner guilty of "possession of a controlled substance, to-wit: 'crack' cocaine" does not accurately express the judgment rendered and is plainly a clerical error arising from an oversight. The error therefore may be corrected at any time pursuant to Rule 36.

This Court therefore hereby **ORDERS** the State to prepare an appropriate amended order that accurately reflects the findings made by Judge Kirkpatrick on March 22, 1999, with regard to the plea actually entered by the Petitioner and the sentence imposed in Case No. 99-IF-69-K. The State shall submit the order to Judge Kirkpatrick for entry to correct the obvious clerical error in the plea and sentencing orders entered on April 1, 1999.

The record reflects the Court's intention to accept the Petitioner's plea of guilty to possession of crack cocaine with the intent to deliver, to convict Petitioner of that charge, and to sentence him accordingly, all of which were attained *but for* a clerical error in the Orders. Thus, this Court finds that the Petitioner's conviction in Case No. 99-IF-69-K was properly enumerated

as a prior felony in Case No. 01-IF-158-H. Therefore, the life sentence imposed in Case No. 00-F-36-K and further based upon the admission in Case No. 01-IF-158-H was not in error, and the Petitioner's argument that he was in reality convicted of a misdemeanor in Case No. 99-IF-69-K is without merit. **Relief Denied.**

### 3. Probation should have been concurrent in 97-F-16-H and 99-IF-69-K precluding recidivist action.

Finally, the Petitioner contends that on the date he was convicted and sentenced in Case No. 99-IF-69-K, on March 22, 1999, he was already serving a term of probation in case No. 97-F-16-H. The Petitioner claims that as part of the plea agreement in Case No. 99-IF-69-K, the probation sentence imposed would be ordered to run concurrently with the prior probationary term in Case No. 97-F-16-H, but that this was not done. The Petitioner argues that the Court erred in omitting final disposition of Case No. 97-F-16-H when sentencing the Petitioner in Case No. 99-IF-69-K, and as a result, he was denied due process and equal protection of the law. For this reason, the Petitioner argues that his conviction in Case No. 97-F-16-H should not be included in the recidivist action in Case No. 01-IF-158-H, and the resulting life sentence should be dismissed.

In support of his position, the Petitioner cites *State v. Duke*, 200 W.Va. 356, 489 S.E.2d 738 (1997). In Duke, the defendant was convicted of third-degree sexual assault, and the Circuit Court suspended his penitentiary sentence of one (1) to five (5) years and placed the defendant on probation for a period of three (3) years. During the term of his probation, the defendant was arrested and subsequently convicted of brandishing a knife, a misdemeanor. Upon a petition by the defense, the Court ordered that the term of probation imposed in the sexual assault case be extended by one (1) year.

88

Prior to the expiration of his extended probationary period, the defendant in *Duke* tested positive for marijuana in a random drug screen. The probation officer filed a petition to revoke probation in the sexual assault case. The Circuit Court denied a motion to dismiss the petition, and ordered that the defendant's original sentence of one (1) to five (5) years in the sexual assault case be imposed.

On appeal, the West Virginia Supreme Court of Appeals, Davis, J., noted that West Virginia jurisprudence "fail[ed] to address the clarity of a circuit court's order sentencing a repeat offender, who is currently serving probation, to probation after a plea of guilty to a subsequent offense." 489 S.E.2d at 748. The Supreme Court made the following findings, which were contained in the Syllabus:

> 2. Where a circuit court places a criminal defendant on probation for an offense he/she committed while on probation for a previous offense, the court must make clear on the record the precise nature of the subsequently imposed probationary term (i.e., extension of prior probationary period or separate and distinct subsequent probationary term) and ensure that the defendant has a clear and thorough understanding of the circuit court's intent in placing him/her on probation for the subsequent crime.

> 3. In order to ensure the record is clear with regard to the circuit court's intention in placing a criminal defendant on probation for a subsequent offense where the defendant is currently on probation for a prior offense, and the defendant's understanding of the court's intention, the court should make three inquiries on the record as to the defendant's understanding of the circumstances surrounding the imposition of probation: (1) the possible penalties for the offenses committed; (2) the nature and conditions of probation; and (3) the consequences of a probation revocation.

Syl. Pts. 2 and 3, *Duke*, 489 S.E.2d 738.

In applying these principles to the facts of the *Duke* case, the Supreme Court made the following conclusion:

> We find, on the record before us from the Circuit Court of Wetzel County, that the court did not make it clear on the record that the one-year probationary term it

> imposed upon the defendant for his subsequent plea of guilty to brandishing was intended to be an extension of the defendant's previously ordered three-year probationary term for third-degree sexual assault. Neither can we determine, from the record of the proceedings below, that the defendant understood the court's imposition of probation in connection with his brandishing plea to constitute an extension of his previous three-year term of probation. Accordingly, we find that the circuit court's actions in granting the defendant's request for probation incident to his plea of guilty to brandishing resulted in the imposition of a separate and distinct one-year term of probation for brandishing . . . .

*Id.* at 749-750. The Supreme Court further concluded that because the defendant was not charged with violating his probation until after the three-year sexual assault probationary term had ended, the Circuit Court retained jurisdiction to revoke only the defendant's brandishing probation and impose the corresponding sentence.

In this case, a review of the transcript and sentencing order demonstrates that pursuant to the Rule 11(e)(1)(c) plea agreement, the Petitioner was sentenced to a period of not less than one (1) year nor more than fifteen (15) years in the penitentiary, with credit for 168 days served. The penitentiary sentence was suspended, and the Petitioner was granted a term of two (2) years of probation upon completion of serving four (4) months of actual confinement in the Southern Regional Jail pursuant to W.Va. Code § 62-12-9. Further, the Court ordered the jail sentence to run consecutively to any sentence(s) previously imposed upon the Petitioner in Raleigh County Magistrate Court. Neither the State's March 15, 1999, letter to Petitioner's counsel detailing the plea agreement, nor the transcript of the March 22, 1999, hearing or the sentencing Order, mention the Petitioner's probationary term in Case No. 97-F-16-H. What is more, the record contains no hint of an agreement in Case No. 99-IF-69-K relating to the probation imposed in Case No. 97-F-16-H. At the hearing, both counsel confirmed their understanding that the probationary sentence imposed would run concurrent with any prior *Magistrate Court* sentence per the plea agreement. The Petitioner agreed:

THE COURT: All right. Now, is that your understanding, Daye?

THE DEFENDANT: Yes, sir.

THE COURT: Do you have any questions at all?

THE DEFENDANT: Not that I can think of.

THE COURT: Do you wish to pause for a few moments so you can speak with your attorney privately?

THE DEFENDANT: No, I think everything is clear.

Hrg. Transcr. 15:18-16:1 (March 22, 1999).

The record reflects that during the hearing Judge Kirkpatrick inquired of Petitioner's counsel as to whether he had explained the sentencing possibilities under the circumstances to the Petitioner, and inquired of the Petitioner as to whether he understood the possibilities. In the sentencing phase of the hearing, Judge Kirkpatrick made specific findings that the four-month jail term was a condition of the Petitioner's probation; that the probationary period was two (2) years; that the Petitioner would be subject to the normal terms and conditions of probation; and that the Petitioner would be subject to random drug screens. However, similar to the facts of the *Duke* case, the Court did not make clear on the record whether the two-year probationary term was to run concurrently with or consecutive to the probationary term previously imposed in Case No. 97-F-16-H, nor is it clear whether the Petitioner understood that the Court's imposition of the two-year probationary term in Case No. 99-IF-69-K was to be imposed concurrently or consecutively as it relates to Case No. 97-F-16-H. For these reasons, in accordance with the Supreme Court's findings in *Duke*, this Court finds that the Court's actions in granting the Petitioner probation in Case No. 99-IF-69-K resulted in a term of probation separate and distinct from that imposed in Case No. 97-F-16-H. According to the record and all included documentation, the terms of probation were not intended to run concurrent with each other.

91

Further, as the Supreme Court held in *Mangus v. McCarty*, "[i]n order to sustain and extend the jurisdictional authority to revoke probation subsequent to the expiration of the probationary period, the probationer must at least be charged with the probation violation prior to such expiration. Where no such charges are brought prior to the expiration of the probationary term, jurisdiction does not continue beyond the date of such expiration." Syl. Pt. 2, 188 W.Va. 563, 425 S.E.2d 239 (1992). Similarly, West Virginia Code § 62-12-10 requires "a prompt and summary hearing" regarding revocation if there is cause to believe that the conditions of probation have been violated. In *State v. Holcomb*, the Supreme Court held that "[t]he mere fact of a subsequent criminal conviction, after a trial at which the probationer was entitled to the full panoply of rights guaranteed a criminal defendant, is, in and of itself, sufficient evidence of a probation violation to warrant revocation of probation." Syl. Pt. 3, 178 W.Va. 455, 360 S.E.2d 232 (1987).

Applied to the present case, the Petitioner's conviction in Case No. 99-IF-69-K alone was sufficient to revoke his probationary term in Case No. 97-F-16-H. However, despite the evidence that Petitioner violated his probation via his conviction of a subsequent felony, no probation revocation hearing was held, and no order revoking probation was entered. Because no action was taken to revoke the Petitioner's probation in Case No. 97-F-16-H, the three-year term of probation imposed by the Court on May 5, 1998, expired on its own terms on or about May 5, 2001. Therefore, the Petitioner is not "still on probation" in Case No. 97-F-16-H, as he claimed at the omnibus hearing, and the Court did not err in failing to reference the prior case on the record and in the plea and sentencing orders of Case No. 99-IF-69-K. Alternatively, this Court finds that the Petitioner effectively received the benefit of concurrent sentencing in the two

92

cases even though such an agreement was not formally approved and ordered by the Court pursuant to the plea agreement in Case No. 99-IF-69-K.

As explained above, this Court finds that the record contains no evidence of an agreement in the disposition of Case No. 99-IF-69-K as it relates to the probationary term imposed in Case No. 97-F-16-H. This Court also notes that at the time of his conviction in Case No. 99-IF-69-K, the Petitioner had served in excess of 365 days in the penitentiary on his conviction in Case No. 97-F-16-H, having been given credit at sentencing for 316 days served and thereafter serving more than six (6) months at the Anthony Center for youthful offenders. Thus, pursuant to Division of Corrections policy, the Petitioner would have been eligible at that time for parole consideration in Case No. 97-F-16-H, and therefore owed no further obligation of penitentiary service as a result of that conviction.

For these reasons, construing the facts and ambiguity in a light most favorable to the Petitioner, this Court finds that the probationary period imposed in Case No. 99-IF-69-K effectively ran concurrently with the term in Case No. 97-F-16-H. Hence, although concurrent sentencing was not officially granted by the Court at the time, this Court affirms that the Petitioner, in effect, received the benefit of concurrent sentencing as a result of the subsequent conviction and his credit for time served.

The Court therefore finds that the Petitioner was not denied due process of law or equal protection of the law in this regard, and his arguments regarding denial of credit for time served, denial of the right to appeal, and preclusion of sentence enhancement based on concurrency in Case No. 97-F-16-H are without merit.

For the reasons stated above, this Court finds that the Petitioner's *Kennedy* plea of guilty of possession of crack cocaine with the intent to deliver in Case No. 99-IF-69-K was supported

93

by a factual basis; that the sentence imposed upon acceptance of the plea was for a felony charge rather than a misdemeanor; and that the probationary terms imposed in Case Nos. 97-F-16-H and 99-IF-69-K were not intended to run concurrently. Therefore, the conviction in Case No. 99-IF-69-K should not be dismissed, and both convictions were properly enumerated in the recidivist action filed in Case No. 01-IF-158-H. The request for relief in Petitioner's Pro Se Supplemental Application for Writ of Habeas Corpus, which this Court previously ordered to replace Ground 5 of the Amended Petition, is therefore **DENIED**.

**Ground 6: Petitioner asserts that his incarceration is illegal in violation of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article III, Sections 1, 5, 10 and 14 of the West Virginia Constitution, because the State insisted upon presenting other criminal convictions evidence, where Petitioner's prior conviction was a status element of the crime, when Petitioner repeatedly requested to stipulate to the prior convictions. (Decided under State and Federal law)**

**Relief Denied.**

This ground addresses the dichotomy between the right of the State to introduce a defendant's prior convictions to prove a status element of an offense versus the State's right to use a defendant's prior convictions for Rule 404(b) purposes. Our Court stated in *State v. Nichols*, 541 S.E. 2d 310 (1999) (modified on other grounds), that prior convictions evidence may not be introduced by the State when (1) the prior convictions are a "status element" of the crime charged; and (2) the defendant has offered to stipulate to those prior convictions. Specifically, Syllabus Point 3 as follows:

> When a prior conviction constitute(s) a status element of an offense, a defendant may offer to stipulate to such prior conviction(s). If a defendant makes an offer to stipulate to a prior conviction(s) that is a status element of an offense, the trial court must permit such stipulation and preclude the state from presenting any evidence to the jury regarding the stipulated prior conviction(s). When such a stipulation is made, the record must reflect a colloquy between the trial court, the defendant, the defense counsel and the state indicating precisely the

94

> stipulation and illustrating that the stipulation was made voluntarily and knowingly by the defendant.

*Id.* at Syl. Pt. 3. In comparison, Rule 404(b) of the West Virginia Rules of Evidence provides that a defendant's prior bad acts can be admitted into evidence for purposes such as showing motive or intent. Thus, the question before the Court is whether the trial court properly allowed the State to introduce into evidence Petitioner's prior convictions in order to show motive or intent for the crime being tried even though (1) the prior convictions were "status elements" and (2) Petitioner offered to stipulate to those convictions. The Court answers this question in the affirmative.

It is undisputed that the State sought to introduce the prior convictions pursuant to *State v. Hopkins*, 192 W.Va. 483, 453 S.E.2d 317 (1994). However, the record demonstrates that the State later changed its position and instead intended to use the prior convictions pursuant to Rule 404(b) to prove an essential element of the crime charged: intent. See also, *State v. Johnson*, 179 W.Va. 619, 371 S.E.2d 340 (1988) (recognizing prosecution can introduce evidence of other crimes for purpose of showing motive, intent, plan, or other Rule 404(b) factors). When the State seeks to introduce evidence under Rule 404(b), the court is required to hold an evidentiary hearing to balance the probative value of the evidence against its prejudicial effect. *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994). Thereafter, the trial judge decides whether, by a preponderance of the evidence, the prior bad conduct did occur, the evidence offered is relevant to the proceedings, and the probative value of the evidence outweighs its prejudicial effect. The Supreme Court has held that the other crimes rule is an inclusive one in which all relevant evidence involving other crimes or acts is admissible at trial unless the sole purpose for the admission is to show criminal disposition. *Id.* (adopting an inclusionary rather than exclusionary approach regarding admissibility of other crimes); See *State v. Scott*, 206 W.Va.

158, 522 S.E.2d 626 (1999). Lastly, when the State intends to offer evidence at trial of other crimes, it must identify the specific purpose for which the evidence is being offered. The jury must likewise be instructed to limit its consideration of the prior bad acts evidence to only that purpose. See *State v. Newcomb*, 223 W.Va. 843, 679 S.E.2d 675 (2009). In the present case, the State provided notice prior to trial that it intended to introduce evidence of the Petitioner's prior convictions to prove motive and intent.

On July 9, 2001, the Hon. H. L. Kirkpatrick, III, held a *McGinnis* hearing,[40] and ruled that the State could introduce Daye's prior convictions for the purposes of showing motive and intent - elements that are not "status" elements. Such a use of prior bad acts is precisely the use contemplated by Rule 404(b) of the *West Virginia Rules of Evidence*. Therefore, because the trial judge heard the evidence, ruled that it was relevant, and determined that the probative value of the evidence outweighed its prejudicial effect, it was properly admitted into evidence under Rule 404(b).

The remaining issue is whether, per *Nichols*, the Court should have nonetheless prohibited the evidence of prior crimes from being presented at trial, because they were status elements of the offense and petitioner offered to stipulate to the prior crimes. At first blush, the language contained in Syllabus point 3[41] of *Nichols* would seem to be an ironclad and absolute prohibition regarding the introduction of such evidence. A reading of the *Nichols* case, however, shows that the absolute language contained in Syllabus Point 3 is distinguishable from the facts of this case. Specifically, *Nichols* involved a felony criminal trial related to a third offense of driving under the influence of alcohol. The two prior convictions in that case were obviously

---

[40] See Hrg. Transcr. 33-37 (July 9, 2011). Also addressed in July 2, 2001, pretrial motions hearing (Hrg. Transcr. 30:9-15)

[41] If a defendant makes an offer to stipulate to a prior conviction(s) that is a status element of an offense, the trial court must permit such stipulation and preclude the state from presenting any evidence to the jury regarding the stipulated prior conviction(s). Syl. Pt. 3, in part, *Nichols*, supra.

status offenses necessary to prove the third offense. The defendant, in an effort to keep the jury from hearing of his prior convictions, agreed to stipulate to two prior DUI convictions. It is clear from a reading of the case that the only purpose for which the prior convictions could have been used was to prove a necessary status element of the charge of driving under the influence of alcohol, third offense. The Court did not adopt nor did it discuss any rule related to use of prior convictions, even though stipulated, for other purposes such as motive and intent under Rule 404(b).

The Court finds that the petitioner's prior offenses did indeed constitute "status" elements of the crime charged in Case Number 00-F-36. The one-count Indictment in 00-F-36-K charges as follows:

> The Grand Jurors of the State of West Virginia, in and for the body of the County of Raleigh, upon their oaths present that Cornell Daye a.k.a. "Jumpshot" on or about the 25th day of August 1999 in the said County of Raleigh, did unlawfully, knowingly, intentionally and feloniously possess a quantity of "crack" cocaine, a Schedule II controlled substance, with the intent to deliver, this being his Second Offense, Having Been Previously Convicted on or about the 22nd Day of March, 1999 in the Circuit Court of Raleigh County, West Virginia, said conviction having become final, against the peace and dignity of the state, and found upon the testimony of detective M. R. Robinson, RUDE.

The indictment language of "this being his Second Offense" leaves no doubt that a prior conviction of "possession of a schedule II controlled substance with the intent to deliver" is a status offense and an essential element that the State must to meet to achieve a conviction under the indictment. It is likewise clear from the record that the Petitioner, through counsel, attempted to stipulate to the status offense of a prior conviction of possession with intent to deliver. If the State's only purpose for using the prior conviction was to prove the prior an element of the offense in the indictment, then the Petitioner would be correct that the court was obligated to

97

approve the stipulation offered by the Petitioner for the purpose of precluding the introduction of evidence of a prior status offense.

However, that is not the case.

In this case, the record reflects that the State introduced Daye's prior convictions for the purposes of showing motive and intent - elements that are not "status" elements.[42] Such a use of prior bad acts is precisely the use contemplated by Rule 404(b) of the *West Virginia Rules of Evidence* and in no way conflicts with *Nichols*. Further, during the trial just prior to the evidence at issue being introduced, the Court expressly instructed the jury that it was to consider the prior convictions solely to determine the element of motive or intent. It stated:

> The Court instructs the jury that evidence of other crimes, wrongs or acts by the accused is not to be considered to prove his character in order to show that he acted in conformity therewith. However, the jury may consider such evidence for other purposes, such as proof of motive, opportunity, intent, preparation, plan, identity, and absence of mistake or accident as to the crime charged.

Tr. Transcr. Vol. 1, 68:4-11. The trial court gave this exact same limiting instruction to the jury during the final charge. Tr. Transcr. Vol. 2, 307:13-19.

Therefore, because the trial judge complied with the *McGinnis* requirements, ruled that the evidence was relevant, and determined the probative value of the evidence outweighed its prejudicial effect, it was properly admitted into evidence under Rule 404(b) even though Petitioner offered to stipulate to the prior convictions. Thus, the Court concludes that Petitioner's argument that the evidence is forever barred from presentation once a stipulation has been offered must fail, as a stipulation to prior conduct for one purpose does not forever preclude its use for other permissible purposes. **Relief Denied.**

---

[42] The parties and the trial court discussed the 404(b) issue at length on multiple occasions: (1) July 2, 2001, pretrial motions hearing; (2) July 9, 2001, pretrial hearing; and (3) August 20, 2001, pretrial hearing.

**Ground 7: Petitioner asserts that his incarceration is illegal in violation of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article III, Sections 1, 5, 10 and 14 of the West Virginia Constitution, because he was denied effective assistance of counsel when his lawyer presented a jury instruction advising the jury that the element of intent could be assumed. (Decided under State and Federal law)**

**Relief Denied.**

Ground 7 challenges two aspects of Case No. 00-F-36: (1) the jury instruction given by the Court on the element of intent,[43] and; (2) Petitioner's own counsel proffering that particular instruction. The Petitioner argues that the instruction proposed by his trial counsel and later given by the trial court in Case No. 00-F-36-K was illegal and an incorrect statement of law, which unconstitutionally shifted the burden of proof onto him. The instruction at issue, in pertinent part, states "In determining the defendant's intention, the law assumes that every person intends the natural consequences of his voluntary and willing acts." Tr. Transcr. Vol. 2, 309:5-8. According to the petitioner, the instruction jury would have to accept that he intended and was willing to possess crack cocaine with the intent to deliver if he failed to disprove the assumption of intent.

### The State's Argument in Opposition to Ground 7

The State agrees that using the word "presume" in the instruction would be error. However, as the Prosecutor points out, the instruction at issue did not use the word "presume"; it used "assume," which is not synonymous with "presume." Thus, the instruction was properly given.

### The Jury Instructions on Intent

---

[43] Although such an allegation of error qualifies as ordinary trial court error subject to challenge on appeal – not in a petition for habeas corpus. Nonetheless, to afford the petitioner every benefit, the Court will address it as well as petitioner's claim of ineffective assistance of trial counsel.

On August 21, 2001, the trial Court instructed the jury on the element of intent as follows:

> The crimes charged in this case require proof of his criminal intent before the defendant can be convicted. Criminal intent, as the term implies, means more than the general intent to commit the act or acts. To establish criminal intent, the prosecutor must prove that the defendant knowingly and willingly did the acts forbidden by law, purposely intending to violate the law. Such intents may be determined from all of the facts and circumstances surrounding this case. *In determining the defendant's intention, the law assumes that every person intends the natural consequences of his voluntary and willing acts.* Therefore, criminal intent is required to be proved by the prosecutor beyond a reasonable doubt.

Tr. Transcr. Vol. 2, 308:21-309:10 (emphasis added). Although the petitioner focuses his challenge on the emphasized section above, that, however, is not the only instruction on "intent." The trial court also instructed the jury:

> . . . that possession of cocaine is a lesser included offense as is charged in the indictment and, if you, the jury, believes that the State. . .has not established beyond a reasonable doubt the intent to deliver it, you may find him guilty of the crime of possession of a controlled substance, not the crime of delivery of a controlled substance.
>
> You must be satisfied beyond a reasonable doubt of this additional intent to deliver the cocaine before you may convict him of a crime of delivery of a controlled substance.

Tr. Transcr. Vol 2, 309:11-24. Lastly, in the final instructions of the jury charge, the Court again reiterated that

> . . .there is a permissible inference of fact that a person intends that which he or she does, or which is the immediate and necessary consequence of his or her act. The burden, ladies and gentlemen, is always on the State to prove guilt beyond a reasonable doubt. This burden never shifts to the defendant, for the law never imposes upon a defendant in a criminal case the duty of calling any witnesses or producing any evidence.

Tr. Transcr. vol. 2, 311:3-11.

*Standard of Review*

100

Guiding this Court's consideration of these instructions is the well-established jurisprudence regarding a trial court's initial formulation of jury instructions. Our Court has established that "[t]he formulation of jury instructions is within the broad discretion of a circuit court, and a circuit court's giving of an instruction is reviewed under an abuse of discretion standard. A verdict should not be disturbed based on the formulation of the language of the jury instructions so long as the instructions given as a whole are accurate and fair to both parties. *CSX Transp., Inc. v. Smith,* 229 W. Va. 316, 330-31, 729 S.E.2d 151, 165-66 (2012) *citing* Syl. pt. 6, *Tennant v. Marion Health Care Found., Inc.,* 194 W.Va. 97, 459 S.E.2d 374 (1995). Furthermore, "a jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law." *CSX,* 229 W. Va. 316, *citing* Syl. pt. 4, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995). Thus, " '[i]t will be presumed that a trial court acted correctly in giving ... instructions to the jury, unless it appears from the record in the case that the instructions were prejudicially erroneous[.]' Syllabus Point 1, [in part,] *State v. Turner,* 137 W.Va. 122, 70 S.E.2d 249 (1952)." Syl. pt. 1, in part, *Moran v. Atha Trucking, Inc.,* 208 W.Va. 379, 540 S.E.2d 903 (1997).

<u>Analysis of Jury Instructions</u>

### A. Jury Instructions on "Intent"

Petitioner claims that the emphasized language in the instruction above violates *Sandstrom v. Montana,* 442 U.S. 510, 99 S. Ct. 2450 (1979), and, concomitantly, *State v. O'Connell,* 163 W.Va. 366, 367, 256 S.E.2d 430, 431 (1979). In *Sandstrom,* the United States Supreme Court addressed whether, in a case in which intent is an element of the crime charged, the jury instruction that "the law presumes that a person intends the ordinary consequences of his

voluntary acts," violates the Fourteenth Amendment's requirement that the State prove every element of a criminal offense beyond a reasonable doubt. Ultimately, the *Sandstrom* Court held that "because the jury, which was instructed that the law *presumes* a person intends the ordinary consequences of his voluntary acts," the jury "may have interpreted the presumption as conclusive or as shifting the burden of persuasion." *Ibid.* (Emphasis added). The Supreme Court thus concluded that the instruction was unconstitutional because either interpretation by the jury would violate the Fourteenth Amendment's requirement that the State prove every element of a criminal offense beyond a reasonable doubt. *Ibid.*

After the *Sandstrom* decision was handed down, the *O'Connell* Court addressed a nearly identical jury instruction to that in *Sandstrom*. The jury instruction in *O'Connell* stated "that a man is *presumed* to intend that which he does, or which is the immediate and necessary consequences of his act." 163 W.Va. at 366-367. (Emphasis added). O'Connell was convicted and appealed the use of the word "presume" in the jury instruction. Our Court then delved into the problems created by the word "presume" in a jury instruction, and recognizing that a juror could interpret this instruction as shifting to the accused the burden of persuasion as to a material element of the crime, our Court struck down the instruction as constitutionally defective.

According to Petitioner, the aforesaid authorities establish that the trial court committed reversible error in giving the aforementioned instruction because it allowed the jury to presume the material element of "intent."

The Petitioner, however, is mistaken.

While it is unquestionably constitutional error for a court to give an instruction which supplies by presumption any material element of the crime charged *State v. O'Connell*, 163 W. Va. 366, 256 S.E.2d 429 (1979), no such instruction was given in Daye's trial. The instruction,

as set forth, *supra*, uses the word "*assume*." Our Court has routinely upheld jury instructions using permissive language, such as "may infer" in jury instructions on the element of intent. In *State v. Wright*, 162 W.Va. 332, 249 S.E.2d 519 (1978) our Court upheld the instruction that

> [i]nsofar as the jury was permitted but not required to find from the evidence that the defendant had the intent to kill, and insofar as the jury was properly and adequately advised of the State's duty to prove intent to kill beyond a reasonable doubt, the giving of the instruction that "the jury may infer that a person intends to do that which he does, or which is the natural or necessary consequence of his act."

*Id.* at Syl. Pt. 2; See also, *State v. Ferguson*, 165 W.Va. 529, 270 S.E.2d 166 (1980) (upholding jury instruction "that you may infer that a person intends to do that which he does, or which is the natural or necessary consequence of his own act.") . The word "assume" is permissive language akin to "may infer," and, therefore, appropriate.

Furthermore, as a general rule, when reviewing a challenge to jury instructions, the instructions are to be considered as a whole and not in isolation to determine whether the instructions adequately state the law and provide the jury with an ample understanding of the issues and the controlling principles of law. *State v. LaRock*, 196 W. Va. 294, 307-08, 470 S.E.2d 613, 626-27 (1996) *citing State v. Bradshaw*, 193 W.Va. 519, 457 S.E.2d 456 (1995). Viewing the jury instructions as a whole, this Court finds that the trial court in 00-F-36 accurately and clearly instructed the jury on the element of "intent." It also instructed that "[t]he burden is on the State to prove the guilt of the defendant beyond a reasonable doubt. The defendant is not required to prove his innocence. Our law *presumes* a defendant to be innocent of a crime..." Tr. Transcr. Vol. 2, 298:10-13 (emphasis added). And last, the trial court repeatedly instructed the jury that the State had the burden of proving beyond a reasonable doubt every essential element of the charge, including the Petitioner's intent to commit the crime.[44]

---

[44] Tr.Transcr. Vol. 2, p. 298-313

Therefore, even though the trial court in one instance used the word "assume" as opposed to "may infer," there is no practical difference between the two, and based on the full instructions given to the jury on "intent," no reasonable juror could believe that the burden of proof on the element of "intent" shifted from the prosecution to the defendant/petitioner. Accordingly, the instructions on intent as given by the trial court were constitutional and in no fashion shifted the burden of proof to the Petitioner. **RELIEF DENIED.**

B.        *Analysis of Ineffective Counsel Claim*

Because Mr. Parkulo proffered aforesaid the "intent" instruction to the trial court, Petitioner accuses Mr. Parkulo of ineffective assistance since effective counsel would not proffer and unconstitutional instruction on his client's behalf. The State, on the other hand, emphasizes that Mr. Parkulo raised every conceivable issue, put on the best defense available, and was in no way ineffective, especially in regard to a jury instruction that was accurate and properly given.

In reviewing an attorney's conduct under an ineffective assistance of counsel claim, the Court applies the two-pronged *Strickland–Miller* test discussed in Ground 3, *supra.* "In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive standard of *Strickland* (citations omitted) and *Miller* (citations omitted), but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test." Syl. Pt. 5, *Daniel.*

In the present case, Petitioner fails to meet either prong of the test. First, Counsel's performance was not deficient under an objective standard of reasonableness because, as discussed above, the jury instruction in question was an accurate statement of the law. Disliking the law does not amount to reversible error or ineffective assistance of counsel. Second, the Petitioner cannot show by a reasonable probability that the result of his proceedings would have been different had counsel proffered an instructing using the words "may infer" or some other

permissive word instead of the word "assume." What is more, the charge to the Jury was accurate and fair to the defendant/petitioner. Third, a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue, e.g. proffering an accurate jury instruction to the court. Last, a claim of an incorrect jury instruction constitutes an allegation of trial error, which should have been made on appeal, not via habeas corpus.

For these reasons, the Court finds that Mr. Parkulo's proposal of the specified jury instruction was within the range of professionally competent assistance, and a reasonable defense lawyer would have acted the same under the circumstances even given the apparent breakdown of the attorney-client relationship at that point.

**RELIEF DENIED.**

**Ground 8: Petitioner asserts that his incarceration is illegal and in violation of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article III, Sections 1, 5, 10 and 14 of the West Virginia Constitution, because the Interstate Agreement on Detainers was violated in this case. (Decided under State and Federal law)**

**Relief Denied.**

The Petitioner has argued that the commitment order of October 4, 2001, in Case No. 00-F-36 incorrectly ordered his credit for time served to begin on May 19, 2000 - the date the Petitioner was booked at Southern Regional Jail rather than the date he waived extradition from Florida where he was previously incarcerated. In addition, Petitioner states in his Amended Petition that issues concerning violations of the "anti-shuttling" provisions of the Interstate Agreement on Detainers Act (IADA), W.Va. Code § 62-14-1 et seq., are no longer cognizable in habeas corpus actions under West Virginia's habeas corpus statute and the court, therefore, is

105

precluded from providing relief on any IADA issues raised in this habeas. *Pethel v. McBride*, 638 S.E.2d 727, 731 n.1 (2006).[45]

First and foremost, while it is undisputed that violations of the IADA cannot be properly raised in a habeas corpus proceeding, the issue before the Court actually involves an error in calculating credit for time served as opposed to an issue implicating the IADA. Second, when this issue was raised at the May 9, Omnibus hearing, the record reflects that the State's intention regarding time served had been to give the Petitioner credit for all time served in Florida starting the date he signed the waiver of extradition:

> MR. TRUMAN: -- and he may be right about. In fact, as I recall, the State's intention was to give him time served for when he waived extradition from Florida, which would have been --

Omnibus Hrg Transcr. 111:5-8 (May 9, 2012). For whatever reason, however, that time in Florida was not included in the original order. The State agreed on the record that there had been an incorrect award of credit for time served in Florida, and by Order entered May 14, 2012, the order in Case No. 00-F-36-K was corrected to reflect an effective sentence date of December 28, 1999 - the date the Petitioner waived extradition from Florida.

Thereafter, on November 15, 2012, the Petitioner filed a motion pursuant to Rule 35 of the *West Virginia Rules of Criminal Procedure* asking the Court to again correct or amend the same Orders. In this motion the Petitioner asserted that the court failed to credit his sentence in

---

[45] The *Pethel* case, as noted by the Petitioner, involved Pethel's motion for a certificate of appealability in the Northern District of West Virginia, which the Northern District Court granted. The Fourth Circuit Court of Appeals granted full review of the matter following the Northern District Court's order denying Pethel's petition for federal habeas relief. Subsequent to the filing of the Amended Petition in this case, the Fourth Circuit issued an opinion in *Pethtel v. Ballard*, 617 F.3d 299 (4th Cir. (W.Va.) August 18, 2010)[45]. The Court affirmed the decision of the Northern District Court, holding: (a) that a violation of the IADA's trial-before-return provision was not cognizable on federal habeas review; (b) that Pethel waived his claim that the state court violated his right to due process by refusing to enforce the IADA; and (c) that West Virginia appellate review procedures did not violate defendants' right to due process. *Id.* A writ of certiorari to the Supreme Court of the United States was denied the following year in *Pethel v. Ballard*, 131 S.Ct. 2873, 179 L.Ed.2d 1191 (U.S. May 02, 2011).

106

with 168 days of time served in Case No. 99-IF-69-K. Specifically, the Petitioner's motion alleges that his sentences in Case No. 99-IF-69-K and Case No. 00-F-36-K were to run consecutively –not concurrently- and his effective sentencing date in 00-F-36 should therefore be July 12, 1999, instead of December 28, 1999.

This Court carefully assessed the matter, and finding no merit to it, denied Petitioner's Motion by Order dated June 4, 2013. The reason for the denial was because the May 2012 Order amending the sentence to reflect an effective sentence date beginning December 28, 1999, was correct; As noted by the Petitioner himself in his Motion, the sentences in 99-IF- were to run consecutively and *not* concurrently. As such, Daye was not entitled to receive credit on his sentence in 00-F-36 for time he served in 99-IF-36.

For these reasons, the issue asserted in this ground has been remedied and is now moot, the request for relief in Ground 8 of the Amended Petition is therefore **DENIED**.

## V. ADDITIONAL ARGUMENTS RAISED IN LOSH LIST

The Court has addressed the primary arguments raised by the Petitioner in his Amended Petition. Pursuant to this Court's Order entered March 18, 2009, the Petitioner filed an executed "*Losh* list," in accordance with *Losh v. McKenzie*, 166 W.Va. 762, 277 S.E.2d 606 (1981). The Court reviewed the list and at the omnibus hearing discussed with Petitioner each and every additional argument he identified on the *Losh* list. The Court has carefully considered each of the Losh list arguments under both State and Federal law and makes the following rulings:

a. **Trial Court lacked jurisdiction.** The Petitioner argues that his prior convictions were invalid. Specifically, he argues that there was a failure of the plea agreement involving Case No. 97-F-16-H, and that in Case No. 99-IF-69-K, sentencing should have been concurrent with the prior case; no factual basis existed for the plea; and no waiver of indictment was executed. This Court addressed each of these issues in

107

detail in Ground 5, *supra*, and here likewise finds that the arguments are without merit.

b.  **Statute under which conviction obtained is unconstitutional.** The Petitioner claims that West Virginia Code § 60A-4-408 was an improper statutory reference for his sentence in Case Nos. 00-F-36-K and 00-IF-158-H. This Court has included in Ground 4, *supra*, the complete text of *State ex rel. Daye v. McBride*, 222 W.Va. 17, 658 S.E.2d 547. In that case, the West Virginia Supreme Court specifically addressed the sentencing court's use of § 60A-4-408 in the original sentence of 2-30 years in Case Nos. 00-F-36-K and 01-IF-158-H, and the sentencing court's subsequent revision of the sentence pursuant to Rule 35(a) to impose a life sentence. Pursuant to the Supreme Court's rulings in *Daye*, the Petitioner's arguments are meritless.

c.  **Denial of right to a speedy trial.** The Petitioner argues that the Court incorrectly ruled against him regarding the Interstate Agreement on Detainers Act, and indicated at the omnibus hearing that he wished to preserve his argument on the record for future cases. This Court specifically addressed the Petitioner's arguments on this issue in Ground 8, *supra*, and likewise here finds they are without merit. Further, the Court finds that the Petitioner presented no evidence that he was denied his right to a speedy trial, and his argument in this regard must therefore fail.

d.  **Involuntary guilty plea in Case No. 99-IF-69-K.** The Petitioner again contends that the plea agreement in Case No. 99-IF-69-K was breached when the Court failed to make a final disposition as to Case No. 97-F-16-H when imposing the sentence of probation in the subsequent case. The Court addressed this argument in detail in Ground 5, *supra*, and likewise here finds it to be without merit. Further, the

108

Petitioner has presented no evidence that his guilty plea was involuntary, and his argument in this regard must therefore fail.

e. **Failure of counsel to take an appeal in Case No. 97-F-16-H.** The Petitioner argues that he encountered disagreements with his attorney, Douglas Buffington, regarding whether Mr. Buffington was obligated to correct the sentencing order in Case No. 99-IF-69-K to reflect disposition of the probationary term imposed in Case No. 97-F-16-H. This Court finds that the Petitioner first raised this argument at the omnibus hearing and has presented no evidence as it relates to this issue at any point in this case; therefore, his argument is without merit and must be denied.

f. **Consecutive sentence for same transaction.** The Petitioner contends that the sentence enhancements imposed in Case Nos. 00-F-36-K and 01-IF-158-H were improper and violated double jeopardy principles. This Court addressed the issue of sentence enhancement in detail in Ground 4, *supra*, and likewise here finds the Petitioner's argument is without merit. In addition, this issue was implicitly decided by the West Virginia Supreme Court in of *State ex rel. Daye*, 222 W.Va. 17, 658 S.E.2d 547.

g. **Suppression of helpful evidence by the prosecutor.** The Petitioner argues that the State improperly withheld evidence regarding the status of the confidential informant, James Ewell, as well as records of the State Police Crime Lab investigation and the purported 911 phone call in Case No. 00-F-36-K. This Court addressed the issue of the State's failure to provide the records in detail in Ground 1 and in Outstanding Subpoenas and Discovery Issues, *supra*. The Court likewise finds the Petitioner's arguments meritless on the instant issue.

109

h. **State's knowing use of perjured testimony.** The Petitioner claims that the State presented false evidence with Detective Stanley Sweeney's testimony regarding whether James Ewell was working as a confidential informant at the time of the Petitioner's arrest in Case No. 00-F-36-K. This Court addressed the issue of factual inconsistencies in Det. Sweeney's testimony in Ground 1, *supra*, and likewise here finds the Petitioner's arguments are without merit.

i. **Unfulfilled plea bargains.** The Petitioner again argues that the plea agreement in Case No. 99-IF-69-K was violated when the sentence imposed contained no reference to the probationary term imposed in Case No. 97-F-16-H. This Court addressed the Petitioner's arguments on this issue in detail in Ground 5, *supra*, and likewise here finds the arguments are without merit.

j. **Information in pre-sentence report erroneous.** The Petitioner claims that charges for which he had never been arrested appeared in his pre-sentence report in Case No. 00-F-36-K. At the omnibus hearing, the Petitioner stated that after the trial at the sentencing hearing, the discrepancies were addressed and the judge amended the report. Upon review, this Court finds that the amendments were indeed discussed on the record at sentencing, and that appropriate amendments were made. Thus, the Petitioner's request for relief on this issue is without merit. RELIEF DENIED.

**Ineffective assistance of counsel.** The Petitioner argues that a significant conflict existed between he and his trial counsel, John Parkulo, and that Mr. Parkulo's first motion to withdraw as counsel should have been granted. This Court addressed in detail the Petitioner's claims that Mr. Parkulo provided ineffective assistance of

110

counsel in Grounds 3 and 7, *supra,* and likewise here finds the Petitioner's arguments is without merit. RELIEF DENIED.

k. **Double jeopardy.** The Petitioner claims that his enhanced sentence in Case Nos. 00-F-36-K and 00-IF-158-H was improper pursuant to double jeopardy principles. This Court specifically addressed the Petitioner's double jeopardy argument in Ground 4, *supra,* and likewise here finds the argument is without merit. RELIEF DENIED

l. **Irregularities in arrest.** The Petitioner cites the entrapment defense presented in Case No. 00-F-36-K, and argues that the State failed to present evidence regarding James Ewell's status as a confidential informant, thereby violating the Petitioner's due process rights. This Court discussed in detail the State's failure to provide the information and the effect on the Petitioner's rights in Ground 1, *supra,* and likewise here finds the Petitioner's arguments are without merit. RELIEF DENIED.

m. **No preliminary hearing.** At the omnibus hearing, the Petitioner stated on the record that he wished to waive his argument regarding no preliminary hearing. For that reason, the Court finds the Petitioner is entitled to no relief on this issue. RELIEF DENIED.

n. **Illegal detention prior to arraignment.** The Petitioner again argues that the Court incorrectly ruled against him regarding the Interstate Agreement on Detainers Act, and indicated at the omnibus hearing that he wished to preserve his argument on the record for future cases. This Court specifically addressed the Petitioner's arguments on this issue in Ground 8, *supra,* and likewise here finds they are without merit. RELIEF DENIED.

111

o. **Defects in indictment.** The Petitioner again argues that the charging statute in Case No. 00-F-36-K was improper and that no waiver of indictment form was signed in Case No. 99-IF-69-K. This Court addressed the Petitioner's arguments on these issues in detail in Grounds 4 and 5, *supra*, respectively. The Court likewise here finds the arguments are without merit. RELIEF DENIED.

p. **Pre-trial delay.** The Petitioner again raises the argument that the Court incorrectly ruled against him regarding the Interstate Agreement on Detainers Act, and indicated at the omnibus hearing that he wished to preserve his argument on the record for future cases. This Court specifically addressed the Petitioner's arguments on this issue in Ground 8, *supra*, and likewise here finds they are without merit. RELIEF DENIED.

q. **Claims concerning use of informers to convict.** The Petitioner again argues that information regarding James Ewell's status as a confidential informant was not provided by the State at trial. This Court discussed in detail the State's failure to provide the information and the effect on the Petitioner's rights in Ground 1, *supra*, and likewise here finds the Petitioner's arguments are without merit. RELIEF DENIED.

r. **Constitutional errors in evidentiary rulings.** The Petitioner claims that the use of prior convictions as evidence of his offense in Case No. 00-F-36-K violated his due process rights. This Court addressed the Petitioner's argument and the State's use of the prior convictions pursuant to Rule 404(b) of the *West Virginia Rules of Evidence* in Ground 6, *supra*. The Court likewise here finds the argument is without merit. RELIEF DENIED.

112

s. **Instructions to the jury.** The Petitioner argues that his trial counsel, John Parkulo, improperly proposed a jury instruction regarding assumption of intent in Case No. 00-F-36-K. This Court addressed the Petitioner's argument in detail in Ground 7, *supra*, and likewise here finds the argument is without merit. RELIEF DENIED.

t. **Sufficiency of evidence.** At the omnibus hearing, the Petitioner stated that his argument on this issue should have been raised differently, in that the evidence was not insufficient *per se*, but rather was improper when the State was permitted to use evidence of his prior convictions as elements of the offense in Case No. 00-F-36-K. This Court addressed the Petitioner's argument and the State's use of the prior convictions pursuant to Rule 404(b) of the *West Virginia Rules of Evidence* in Ground 6, *supra*. The Court likewise here finds the argument is without merit. RELIEF DENIED.

u. **Question of actual guilt upon an acceptable guilty plea.** The Petitioner argues that his conviction in Case No. 99-IF-69-K was invalid because no waiver of indictment form was executed. The Court addressed the Petitioner's arguments on this issue in Ground 5, *supra*, and likewise here finds the arguments are without merit. RELIEF DENIED.

v. **Severer sentence than expected.** The Petitioner claims that the judge incorrectly explained the sentencing possibilities in the recidivist proceeding, which led the Petitioner to believe that he "could" receive a life sentence, but that the sentence was not mandatory. The Court addressed the Petitioner's arguments on this issue in detail in Ground 3, *supra*, and likewise here finds the arguments are without merit. RELIEF DENIED.

w. **Excessive sentence.** The Petitioner argues that the life sentence imposed in Case Nos. 00-F-36-K and 01-IF-158-H, upon revision by the Court pursuant to Rule 35(a) of the *West Virginia Rules of Criminal Procedure*, was constitutionally disproportionate because all three convictions were for non-violent offenses. This Court addressed the Petitioner's arguments on disproportionality in detail in Ground 2, *supra*, and likewise here finds the arguments are without merit. See also, *State ex rel. Daye v. McBride*, 222 W.Va. 17, 658 S.E.2d 547. RELIEF DENIED.

x. **Amount of time served on sentence, credit for time served.** Finally, the Petitioner argues that he is "still on probation" in Case No. 97-F-16-H, which would affect his parole eligibility date, and that he did not receive proper credit for time served in Case No. 00-F-36-K due to violations of the Interstate Agreement on Detainers Act. This Court addressed the issue of concurrent sentencing and parole eligibility in Ground 5, *supra*, and likewise addressed the issue of credit for time served in Ground 8, *supra*. The Court therefore finds the Petitioner's arguments regarding these issues are without merit. RELIEF DENIED.

For all of these reasons, the Court finds that the arguments raised by the Petitioner in the "*Losh* list" are without merit.

The Court also finds and concludes that any and all motions not specifically addressed either by prior order or by this Opinion Order are **DENIED.**

The Court further finds that any ground not raised by the Petitioner is expressly, voluntarily, and knowingly waived.

## VI. ADDITIONAL CONCLUSIONS

114

1. Based on all pleadings and the record in this proceeding and as well as the oral argument of Petitioner during the omnibus habeas corpus hearing that the Petitioner has been notified of his obligation to raise all grounds for habeas relief in this one proceeding.

2. Pursuant to Rule 9, *Rules Governing Post-Conviction Habeas corpus Proceedings in West Virginia*, this Court concludes that the Petitioner has raised all available grounds for habeas corpus relief and has knowingly and intelligently waived any and all other grounds for habeas relief.

3. This Court concludes that the Petitioner, appearing *pro se*, did knowingly and intelligently waive his right to counsel, as evidenced by his communications with this Court and by his *pro se* Motion in Support of Attorney Lonnie C. Simmons' Motion to Withdraw, and Motion of Petitioner to Represent Himself in Writ of Habeas Corpus, filed December 15, 2011.

4. This Court concludes, pursuant to Rule 9 of the *Rules Governing Post-Conviction Habeas corpus Proceedings* that no additional evidentiary hearing was required in this matter, as the determination of the claims raised in the Petition is entirely dependent upon the trial record, the habeas pleadings and arguments of counsel during the omnibus habeas corpus hearing.

5. The Petitioner has presented no factual or legal basis to support a conclusion that any of his State or federal constitutional rights have been violated.

6. The Court has reviewed the proposed findings of fact and conclusions of law provided by both the Petitioner, *pro se*, and counsel for the Respondent, Thomas McBride. To the extent that any proposed finding or conclusion is not contained in this order, it was either not adopted or is denied, or it was cover by other discussion in this Order.

115

## RULING

Accordingly, based upon the findings of fact and conclusions of law set forth above, it is hereby **ORDERED** that the Amended Petition for Writ of Habeas Corpus is **DENIED** and **DISMISSED WITH PREJUDICE**, and that any subsequent petitions for habeas corpus relief shall be summarily dismissed pursuant to Rule 4(c), *Rules Governing Post-Conviction Habeas corpus Proceedings in West Virginia.*

The Circuit Clerk shall remove this case from the docket of the Court and provide certified copies of this Order to:

Tom Truman, Esq.
Chief Deputy Prosecuting Attorney
P.O. Box 907
Beckley, WV 25802

Cornell F. Daye, DOC # 30197-2
c/o Huttonsville Correctional Center
P.O. Box 1
Huttonsville, WV 26273

Entered the ___16___ day of ___August___, 2013.

_____
William J. Sadler, Judge 9th Circuit

116